FILED

OCT 2 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINCOLN HOCKEY LIMITED LIABILITY COMPANY, doing business as the WASHINGTON CAPITALS, 401 9th St., N.W. Suite 750 Washington, D.C. 20004 <br><br> Plaintiff, <br><br> -against- <br><br> ALEXANDER SEMIN Voronova 18d #155 Krasnoyarsk Russian Federation 660131, <br><br> INTERNATIONAL SPORTS ADVISORS COMPANY, INC. 878 Ridgeview Way Franklin Lakes, NJ 07417, <br><br> and <br><br> MARK GANDLER 878 Ridgeview Way Franklin Lakes, NJ 07417 <br><br> Defendants. | COMPLAINT <br><br><br> CASE NUMBER 1:05CV02094 <br><br> JUDGE: Henry H. Kennedy <br><br> DECK TYPE: TRO/Preliminary Injunction <br><br> DATE STAMP: 10/26/2005 |

Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals (the "Washington Capitals"), by its attorneys, Proskauer Rose LLP, alleges against defendants Alexander Semin ("Semin"), International Sports Advisors Company, Inc. ("ISA"), and Mark Gandler ("Gandler"), as follows:

1

## NATURE OF THIS ACTION

1. This is an action for breach of contract by defendant Semin. In July 2003, Semin signed a contract with the Washington Capitals of the National Hockey League ("NHL") to play hockey for the Washington Capitals for three seasons, including the current 2005-2006 NHL season. In breach of his contract, Semin has instead begun playing professional hockey in the city of Togliatti in the Russian Federation for a team in the Russian Super League called Lada Togliatti. In accordance with the terms of Semin's NHL Standard Player's Contract, the Washington Capitals seek an injunction prohibiting Semin from playing any hockey games for any team or organization other than the Washington Capitals for the duration of the current 2005-2006 NHL season.

2. In addition, the Washington Capitals seek injunctive relief and an award of damages against Semin's agent, defendant Mark Gandler of ISA, for Gandler's and ISA's tortious interference with the contract between Semin and the Washington Capitals and for aiding and abetting Semin's breach of fiduciary duty to the Washington Capitals. Upon information and belief, Gandler and ISA have advised Semin to stay in Russia, have assisted his efforts to remain in Russia and to play for Lada Togliatti, and are assisting Semin in further breaching his contract with the Washington Capitals by arranging to play for another Russian team. Gandler and ISA have repeatedly told the Washington Capitals that Semin has a "military obligation" in the Russian Federation that prevents Semin from leaving the country.

3. Upon information and belief, that alleged "military obligation" is a sham and Semin is not now, and never has been, validly in the Russian military. Semin's "conscription" is a fabrication, arranged as a ruse to keep Semin in Russia and playing hockey for a private

commercial hockey team. Gandler and ISA have been acting in furtherance of that unlawful conduct.

## PARTIES

4. Plaintiff Lincoln Hockey Limited Liability Company is a limited liability company formed under the laws of the State of Delaware. Lincoln Hockey Limited Liability Company holds a franchise from the NHL to operate a professional hockey team in Washington, D.C., the Washington Capitals. The Washington Capitals are a member club of the NHL.

5. The sole member of Lincoln Hockey Limited Liability Company is Lincoln Holdings Limited Liability Company ("Lincoln Holdings"). The members of Lincoln Holdings are citizens of the states of Virginia and Maryland and of the District of Columbia.

6. Upon information and belief, defendant Alexander Semin is a citizen of the Russian Federation and a resident of Krasnoyarsk, Russia. Semin is a professional hockey player.

7. Upon information and belief, defendant Mark Gandler is a naturalized citizen of the United States who was born in the former Soviet Union, and a resident of the State of New Jersey. Gandler is certified by the National Hockey League Players' Association ("NHLPA") as an agent in the business of representing professional hockey players.

8. Defendant International Sports Advisors Company, Inc. is a corporation formed under the laws of the State of New Jersey, with its principal place of business in Franklin Lakes, New Jersey. Upon information and belief, ISA is co-owned by Gandler. Gandler's services to Semin have been provided through ISA.

3

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), in that this action is between citizens of different States and between citizens of a State and a citizen of a foreign state. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. Venue is proper in this district under 28 U.S.C. §1391(a)(1) and (3) in that a substantial part of the events or omissions giving rise to the claim occurred in this district and, upon information and belief, there is no other district in which Semin is subject to personal jurisdiction.

## SEMIN'S CONTRACT WITH THE WASHINGTON CAPITALS

11. In 2002, Semin opted into the NHL Entry Draft, and was selected in the first round by the Washington Capitals. On July 15, 2003, Semin signed a National Hockey League Standard Player's Contract with the Washington Capitals (the "Semin Contract"). A copy of the Semin Contract is annexed as Exhibit A. After the signing of the Semin Contract, the International Ice Hockey Federation (the "IIHF") paid to the Ice Hockey Federation of Russia all transfer fees with respect to Semin required under the terms of the agreement then existing between the IIHF and the NHL upon the signing of a European hockey player to an NHL contract.

12. Pursuant to the terms of the Semin Contract, Semin agreed to play hockey for the Washington Capitals for a term of three NHL seasons, the 2003-04 season, the 2004-05 season and the 2005-06 season. Under the Semin Contract, Semin was to be paid a salary of $592,500 in each of the 2003-04 and 2004-05 seasons. Semin was to be paid a salary of $1,185,000 for the

4

current 2005-06 season, subject to adjustment as provided in the current Collective Bargaining Agreement between the NHL and the NHLPA. In addition, Semin was to be paid a signing bonus of $1,185,000 in the aggregate, payable in four installments of $296,250 each upon signing of the Semin Contract, on December 31, 2003, September 1, 2004 and January 15, 2005. In addition, Semin was eligible to earn bonus compensation for meeting certain performance standards and other criteria specified in the Semin Contract.

13. The Semin Contract provides that Semin will report to the Washington Capitals training camp at the time and place fixed by the Washington Capitals and that he will "play hockey only for the [Washington Capitals] unless his contract is released, assigned, exchanged or loaned by the [Washington Capitals]." Semin Contract ¶ 2(a), (c).

14. The Semin Contract provides that Semin "represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. [Semin] therefore agrees that [the Washington Capitals] shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunctive proceedings without first exhausting any other remedy which may be available to [the Washington Capitals], from playing hockey for any other team and/or for any breach of any of the other provisions of this contract." Semin Contract ¶6.

15. Pursuant to the terms of the Semin Contract, Semin played for the Washington Capitals in the 2003-04 NHL season, playing in fifty two games for the Washington Capitals and in four regular season and seven playoff games for the Washington Capitals' minor league affiliate, the Portland Pirates of Portland, Maine in the American Hockey League. While playing

5

for the Washington Capitals in the 2003-2004 NHL season, Semin was paid (i) a pro-rated portion of his first year salary of $592,500, or approximately $500,000, (ii) approximately $3,400 for playing for the Portland Pirates, (iii) two installments of his signing bonus totaling an additional $592,500, and (iv) $338,740 for achieving certain performance bonuses.

### SEMIN FAILS TO REPORT IN 2004

16.  In September 2004, the NHL announced a delay in the start of the 2004-2005 NHL season due to the expiration of the Collective Bargaining Agreement with the NHLPA. On September 14, 2004, the Washington Capitals assigned Semin to the Portland Pirates. In February 2005, the NHL cancelled the 2004-2005 NHL season.

17.  Under the terms of the Semin Contract, the Washington Capitals had the right to loan Semin's services "to any other professional hockey club, and [Semin] agrees to accept and to be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by [Semin] and such other Club." Semin Contract ¶11.

18.  Semin was required to report to the Portland Pirates for training camp on September 26, 2004. Instead of reporting to Portland as required by his contract, however, Semin began playing for the team Lada Togliatti in the Russian Super League.

19.  The Washington Capitals suspended Semin without pay as of September 20, 2004 and imposed a fine on Semin of $1,000 per day for each day that Semin failed to report to the Portland Pirates. (The Washington Capitals' right to impose, enforce and collect those fines against Semin is addressed in the Collective Bargaining Agreement between the NHL and the

6

NHLPA, is enforceable in a grievance proceeding under that Agreement and is not a part of this action.)

20. On September 30, 2004, more than two weeks after Semin was assigned to the Portland Pirates, Semin's agent advised the Washington Capitals that Semin was prevented from leaving Russia because he had been conscripted into the Russian military and that Semin was due to report for "military service" on October 15, 2004. Strangely enough, however, the management of Lada Togliatti had allegedly reached an agreement with the "local military authorities" to "allow Alexander to serve his military term while playing for their team."

21. The alleged conscription of Semin into the Russian military follows a long history of past improper efforts by Russian hockey clubs to circumvent the contractual rights of NHL teams by arranging to have their hockey players "conscripted" into the Russian military, and then have them perform "military service" by playing for private, commercial hockey teams. Indeed, there has been a finding by an arbitrator in one recent case that the invalid conscription of an NHL player into the Russian military was based on "fabricated" documents. These "arrangements" are contrary to Russian law.

22. The scenario historically has occurred as follows: an NHL member team drafts a Russian player in the NHL Entry Draft, only to discover afterwards that the player has been conscripted into the Russian military, typically only a few months before (and sometimes after) the NHL draft. This alleged obligation is sometimes mysteriously satisfied, however, after only one year of service, coincident with a payment by the player for which he seeks a reimbursement from his NHL member team. This occurs notwithstanding that there is no procedure in Russian law to reduce the two year compulsory military service obligation to one year.

7

23. For example, Semin's agent told the Washington Capitals in October 2004 that "LADA would be the only team for which Alexander could play during his military service (due to the existence of that certain four year contract he signed with LADA in 2002)." In fact, upon Semin's alleged "conscription," any employment contract he had with Lada Togliatti would be automatically terminated under the Labour Code of the Russian Federation.

24. In addition, Russian law makes no provision for a Russian citizen to perform "military service" by making arrangements to play for a private, commercial hockey team. And, if Semin were actually conscripted, he is barred by Russian law from receiving pay from parties other than the Russian government.

25. On November 2, 2004, the General Secretary of the Ice Hockey Federation of Russia informed the International Ice Hockey Federation that "[a]fter a long negotiation we achieved permission of military management for Alexander Semin to play with our team. . . . Alexander Semin can play with Washington after completion of [the NHL] lock out, with considerably improved hockey skills."

26. The efforts of the Washington Capitals to secure Semin's compliance with the Semin Contract in the 2004-2005 season were unsuccessful. Semin's suspension has never been rescinded, and the fine that the Washington Capitals have imposed on Semin continues to accrue, at the rate of $1,000 per day.

### THE NHL LOCKOUT ENDS AND SEMIN FAILS ONCE AGAIN TO REPORT TO THE WASHINGTON CAPITALS

27. In July 2005, the NHL and the NHLPA signed a new Collective Bargaining Agreement. In August 2005, the Washington Capitals contacted Semin's agent, and advised him

8

that Semin was expected to report to the Washington Capitals training camp on September 11, 2005.

28. Semin's agent responded that "I was able to work out a deal with the Russian military," and that Semin would report to the Washington Capitals as requested.

29. The Russian Super League season began on September 7, 2005. Upon information and belief, Semin did not play for Lada Togliatti in its first four scheduled regular season games on September 7, 9, 12 or 14.

30. Upon information and belief, Semin informed his agent on or about September 10, 2005, that he might stay in Russia and play for Lada Togliatti.

31. Upon information and belief, Semin fired his agent on September 14, 2005.

### SEMIN HIRES GANDLER AND BEGINS TO PLAY FOR LADA

32. By September 14, 2005, Semin hired Gandler as his new agent.

33. Upon information and belief, Gandler and the coach of Lada Togliatti, Peter Vorobiev, have a long and close relationship. Gandler has represented numerous Russian hockey players who played for teams coached by Vorobiev.

34. Shortly after hiring Gandler as his agent, Semin began playing for Lada Togliatti. Upon information and belief, Semin has played in every game that Lada Togliatti has played since September 19, 2005.

9

35. Semin's alleged military "obligation" did not prevent his former agent from securing an "agreement" with the Russian military to allow Semin to depart Russia to report to the Washington Capitals.

36. Notwithstanding that Semin's former agent stated that he was "able to work out a deal with the Russian military," Semin's new agent Gandler has stated that his client's "military" obligation prevents him from departing from Russia.

37. Upon information and belief, Semin's "military obligation" is a sham concocted with the assistance of local conscription commission officials at the request of Lada Togliatti as a means of preventing Semin from leaving Russia to play hockey for the Washington Capitals. The following facts (among others) all lead to the conclusion that Semin's alleged two-year "military obligation" is a sham: (i) the comments of the Ice Hockey Federation of Russia that Semin could leave Russia as soon as the NHL lockout ended, (ii) the statement of Semin's former agent that he "was able to work out a deal with the Russian military," (iii) the timing of Semin's alleged "conscription," which coincided with the date that Semin was to report to the Portland Pirates, (iv) the provisions of Russian law that make it impossible for a Russian citizen to perform "military service" by playing hockey for a private commercial hockey team, and (v) the history of abuse of the Russian military conscription system by Russian hockey teams that desire to keep their talented players away from the NHL. Semin has been quoted in the Russian press as stating that serving in a military unit "is not one of the possible outcomes" of his alleged "military service."

38. Gandler has repeatedly stated to the Washington Capitals that Semin's alleged "military service" is the reason why he cannot leave Russia to report to the Washington Capitals. Upon information and belief, Gandler is aware that Semin's alleged military service is a sham.

### THE WASHINGTON CAPITALS ARE FORCED TO SIGN A PLAYER TO REPLACE SEMIN

39. The Washington Capitals needed the services of a talented left winger to replace Semin. On September 26, 2005, the Washington Capitals traded for Jeff Friesen to take Semin's place. Friesen is a talented and experienced hockey player.

40. The Washington Capitals are paying Jeff Friesen $2,280,000 in the current NHL season to play the position that Semin was supposed to have played.

### FIRST CAUSE OF ACTION

#### (Against Semin For Injunctive Relief)

41. The Washington Capitals repeat and reallege paragraphs 1-40 above as if set forth herein at length.

42. The Semin Contract is a valid and binding contract between the Washington Capitals and Semin.

43. Semin has breached the Semin Contract by, among other things, failing to report to the Washington Capitals and by playing hockey for Lada Togliatti. This breach is continuing.

44. Paragraph 6 of the Semin Contract provides that Semin "represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by

11

damages. [Semin] therefore agrees that [the Washington Capitals] shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunctive proceedings without first exhausting any other remedy which may be available to [the Washington Capitals], from playing hockey for any other team and/or for any breach of any of the other provisions of this contract."

45. This provision of the Semin Contract is an exception to the arbitration provisions of the NHL/NHLPA Collective Bargaining Agreement and is enforceable in this Court.

46. Semin's breach of the Semin Contract has caused and will continue to cause irreparable injury to the Washington Capitals. The Washington Capitals have no adequate remedy at law.

47. The Washington Capitals are entitled to an injunction requiring Semin to cease playing any hockey games for any professional hockey team or organization other than the Washington Capitals, including but not limited to Lada Togliatti, for the duration of the Semin Contract.

### SECOND CAUSE OF ACTION

**(For Damages Against Gandler And ISA For Tortious Interference With Contract)**

48. The Washington Capitals repeat and reallege paragraphs 1-47 above as if set forth herein at length.

49. Gandler was and is aware of the Semin Contract.

50. Gandler and ISA have interfered with the Semin Contract by advising and assisting Semin to stay in Russia and play hockey for Lada Togliatti.

51. Semin did not play for Lada Togliatti in the current Russian Super League season until after Gandler became his agent.

52. Upon information and belief, Gandler knows that Semin's "military obligation" is a sham.

53. Gandler has repeatedly stated to representatives of the Washington Capitals in numerous telephone conversations since September 14, 2005, that Semin's "military obligation" prevents him from leaving Russia.

54. Gandler's assistance to Semin is in furtherance of his own relationship with the coach of Lada Togliatti.

55. Gandler and ISA have intentionally interfered with the Semin Contract without justification.

56. Gandler's and ISA's interference has caused damage to the Washington Capitals. Such damage includes, but is not limited to, (i) the $1,000 per day fine that the Washington Capitals have imposed on Semin, which Semin has not paid, and (ii) the amount that the Washington Capitals have had to pay to Jeff Friesen to secure the services of a player to fill Semin's spot on its team.

57. Gandler and ISA should be required to forfeit to the Washington Capitals any and all compensation or consideration that they have received from any source for acting as Semin's agent and inducing Semin to breach his contract with the Washington Capitals.

## THIRD CAUSE OF ACTION

### (For Injunctive Relief Against Gandler And ISA To Restrain Their Continued Tortious Interference With Contract)

58.     The Washington Capitals repeat and reallege paragraphs 1-57 above as if set forth herein at length.

59.     Upon information and belief, Lada Togliatti has recently been experiencing financial difficulties.

60.     Upon information and belief, Lada Togliatti has recently advised its hockey players that they are free to make arrangements to play for other professional hockey teams.

61.     According to Russian press reports, several other teams in the Russian Super League have expressed interest in signing Semin to contracts to play for their teams. Semin is quoted in the Russian press as stating that "my agent is working on" the issue of where he will continue his career.

62.     Upon information and belief, Gandler and ISA have been discussing with other professional hockey clubs in Russia potential offers to Semin to play for their teams.

63.     Gandler's and ISA's efforts to facilitate Semin's further breaches of the Semin Contract by agreeing to play hockey for another team in Russia threaten to cause additional irreparable injury to the Washington Capitals. The Washington Capitals have no adequate remedy at law.

64.     The Washington Capitals are entitled to an injunction requiring Gandler and ISA to cease and desist from any and all efforts to make or to facilitate any agreement, contract, trade,

14

loan or other arrangement whereby Semin will play hockey for any professional hockey team other than the Washington Capitals.

## FOURTH CAUSE OF ACTION

### (For Damages Against Gandler And ISA For Aiding And Abetting A Breach Of Fiduciary Duty)

65. The Washington Capitals repeat and reallege paragraphs 1-64 above as if set forth herein at length.

66. As a result of the Semin Contract, Semin owes the Washington Capitals a duty of undivided loyalty.

67. Semin has breached, and is continuing to breach, his duty of loyalty to the Washington Capitals.

68. Semin's breach has caused, and is continuing to cause, injury to the Washington Capitals.

69. Gandler and ISA have provided knowing and substantial assistance to Semin in breaching his duty of loyalty.

70. Gandler's assistance to Semin in breaching his duty of loyalty has been with full knowledge that they are fostering and perpetuating the deception that Semin is performing "military service." Upon information and belief, such sham "conscriptions" are typically the result of bribery of local military officials in Russia, and are widely known to be the result of such bribery.

71. Gandler's and ISA's aiding and abetting has caused damage to the Washington Capitals. Such damage includes, but is not limited to, (i) the $1,000 per day fine that the Washington Capitals have imposed on Semin, which Semin has not paid, and (ii) the amount that the Washington Capitals have had to pay to Jeff Friesen to secure the services of a player to fill Semin's spot on their team.

72. Gandler and ISA should be required to forfeit to the Washington Capitals any and all compensation or consideration that they have received, or hereafter receive, from any source for acting as Semin's agent and inducing Semin to breach his contract with the Washington Capitals.

**DEMAND FOR RELIEF**

WHEREFORE, the Washington Capitals demand judgment:

A. Preliminarily and permanently enjoining Semin from playing hockey for any professional hockey team other than the Washington Capitals, including but not limited to Lada Togliatti, for the duration of the Semin Contract.

B. Preliminarily and permanently enjoining Gandler and ISA to cease and desist from any and all efforts to make or to facilitate any agreement, contract, trade, loan or other arrangement whereby Semin will play any hockey games for any professional hockey team or organization other than the Washington Capitals.

C. Awarding damages against Gandler and ISA for tortious interference with contract and for aiding and abetting Semin's breach of fiduciary duty, in an amount to be determined at trial.

D. Requiring Gandler and ISA to account to the Washington Capitals for all compensation, gains, profits and other advantages derived from their wrongful acts and to forfeit

any and all such compensation, revenue, gains, profits and other advantages to the Washington Capitals.

  E.  Granting such other and further relief as this Court deems just and proper.

Dated: October 26, 2005

              PROSKAUER ROSE LLP
              Bradley I. Ruskin
              Scott A. Eggers

              1585 Broadway
              New York, NY 10036-8299
              (212) 969-3000

              -and-



              Robert M. Bernstein
              (D.C. Bar No. 490166)
              1233 20th Street, N.W., Suite 800
              Washington, DC 20036-2396
              (202) 416-6800

              *Attorneys for Plaintiff Lincoln Hockey*
              *Limited Liability Company, doing*
              *business as the Washington Capitals*

# Exhibit A