IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                    Plaintiff,              Case No:  1:05 CV 02094 (HHK)

    -against-

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

                    Defendants.

---

**MOTION FOR (i) A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, (ii) EXPEDITED DISCOVERY AND (iii) ALTERNATE SERVICE OF PROCESS ON ALEXANDER SEMIN**

Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals, hereby moves for an order, in the form submitted herewith (i) granting a temporary restraining order and preliminary injunction in the form submitted herewith, (ii) authorizing expedited discovery and (iii) authorizing alternate service of process on defendant Alexander Semin.  The grounds for this motion are stated in the Declarations of George McPhee and Anna Beliakova, dated November 1, 2005, submitted herewith, and the Statement Of Points And Authorities, dated November 1, 2005, submitted in support of the motion.

**PLAINTIFF REQUESTS AN ORAL HEARING ON THIS MOTION ON WEDNESDAY, NOVEMBER 2, 2005, OR SOON THEREAFTER AS COUNSEL MAY BE HEARD.**

The grounds for the motion are that Defendant Alexander Semin is in breach of an exclusive contract to play hockey for the Washington Capitals, and his agents, Defendants

International Sports Advisors Company, Inc. and Mark Gandler are tortiously interfering with

that contract and aiding and abetting Semin's breach of fiduciary duty.

Dated:  November 1, 2005

Respectfully submitted,

PROSKAUER ROSE LLP


By:  s/ Scott A. Eggers
Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
Telephone:  (212) 969-3000

-and-

By:  s/
Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC  20036-2396
(202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey
Limited Liability Company, doing
business as the Washington Capitals*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                    Plaintiff,                    Case No:  1:05 CV 02094 (HHK)

     -against-

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

                    Defendants.

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR (i) A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION, (ii) EXPEDITED DISCOVERY AND (iii) ALTERNATE SERVICE OF
PROCESS ON ALEXANDER SEMIN**

Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
Telephone:  (212) 969-3000

          -and-

Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC  20036-2396
(202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey
Limited Liability Company, doing
business as the Washington Capitals*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    The Washington Capitals Select Alexander Semin In The NHL Entry Draft And
    Sign Him To A Three-Year Exclusive Contract In 2003 ..................................... 3

    Semin Breaches His Contract with the Washington Capitals in 2004 ............................. 3

    Semin Is Allegedly Conscripted Into The Russian Military ............................. 4

    Semin Fails To Report For The Current NHL Season ..................................... 6

    The Relevant Terms Of The Semin Contract .......................................... 7

ARGUMENT ................................................................................................. 8

I.    This Case Meets The Standard For Issuance Of A  Temporary Restraining Order
    And A Preliminary Injunction ............................................................. 8

    A.    Plaintiff Has Demonstrated a Substantial Likelihood of Success on the
        Merits.......................................................................................... 8

    B.    The Washington Capitals Will Suffer Irreparable Injury If an Injunction Is
        Not Granted.................................................................................10

    C.    Defendants Will Not Be Substantially Injured If an Injunction Is Granted ..........11

    D.    Relief That Aids the Washington Capitals in Enforcing Their Contractual
        Rights Furthers the Public Interest.......................................................12

II.    Injunctive Relief Is Warranted Against Gandler And ISA.............................12

III.    The Washington Capitals Are Entitled To Expedited Discovery ....................15

IV.    The Washington Capitals Are Entitled to An Order Providing that Service of
    Process May Be Effected On Semin Through His Agent Gandler .................16

    CONCLUSION................................................................................20

i

# TABLE OF AUTHORITIES

## CASES                                                                    Page(s)

*Avianca, Inc. v. Corriea,*
    705 F. Supp. 666 (D.D.C. 1989),
    *aff'd sub nom., Avianca, Inc. v. Harrison,* 1995 U.S. App. LEXIS 28834
    (D.C. Cir. Oct. 17, 1995) ..................................................................................... 17, 18

*Bracco Diagnostics, Inc. v. Shalala,*
    963 F. Supp. 20 (D.D.C. 1997) ..................................................................................8

*Burnett v. Al Baraka Inv. and Dev. Corp.,*
    274 F. Supp. 2d 86 (D.D.C. 2003) ...........................................................................14

*Casco Marina Dev., LLC v. Dist. of Columbia Redevelopment Land Agency,*
    834 A.2d 77 (D.C. 2003) ..........................................................................................13

*Curaflex Health Servs., Inc. v. Larry M. Bruni, M.D., P.C.,*
    899 F. Supp. 689 (D.D.C. 1995) ..............................................................................14

*Ellis v. James v. Hurson Assocs., Inc.,*
    565 A.2d 615 (D.C. 1989) ..........................................................................................9

*Ellsworth Assocs., Inc. v. United States,*
    917 F. Supp. 841 (D.D.C. 1996) ..............................................................................15

*Entertainment Tech. Corp. v. Walt Disney Imagineering,*
    2003 WL 22519440 (E.D. Pa. Oct. 2, 2003) ............................................................15

*Experience Works, Inc. v. Chao,*
    267 F. Supp. 2d 93 (D.D.C. 2003) ..............................................................................8

*In re Fannie Mae Derivative Litig.,*
    227 F.R.D. 142 (D.D.C 2005) ...................................................................................15

*Forum Fin. Group, LLC v. President & Fellows,*
    199 F.R.D. 22 (D. Me. 2001) ........................................................................ 16, 18, 19

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .................................................................................14

*Houston Oilers, Inc. v. Neely,*
    361 F.2d 36 (10th Cir. 1966) ................................................................................9, 10

*Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of American, Local
    Union No. 523 v. Keystone Freight Lines, Inc.,*
    123 F.2d 326 (10th Cir. 1941) ..................................................................................12

*Int'l Controls Corp. v. Vesco,*
    593 F.2d 166 (2d Cir.1979) ........................................................................ 17, 18

*Levin v. Ruby Trading Corp.,*
    248 F. Supp. 537 (S.D.N.Y.1965) ..................................................................... 18

*Marchio v. Letterlough,*
    237 F. Supp. 2d 580 (E.D. Pa. 2003)............................................................... 9, 10

*Maryland Metals, Inc. v. Metzner,*
    382 A.2d 564 (Md. 1978) ............................................................................... 14

*Merrill Lynch, Pierce, Fenner & Smith v. Wertz,*
    298 F. Supp. 2d 27 (D.D.C. 2002) ............................................................... 9, 12

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ....................................................................... 8

*Mova Pharm. Corp. v. Shalala,*
    955 F. Supp. 128 (D.D.C. 1997),
    *aff'd in relevant part,* 140 F.3d 1060 (D.C. Cir. 1998) ...................................... 8

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ...................................................................................... 19

*Nassau Sports v. Peters,*
    352 F. Supp. 870 (E.D.N.Y. 1972)............................................................... 9, 11

*Nat'l Head Start Ass'n v. Dep't of Health &Human Servs.,*
    297 F. Supp. 2d 242 (D.D.C. 2004)................................................................... 8

*New England Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co.,*
    495 F. Supp. 73 (S.D.N.Y. 1980) ................................................................... 18

*Philadelphia Ball Club v. Lajoie,*
    51 A. 973 (Pa. 1902)...................................................................................... 10

*Qwest Comm'ns Int'l, Inc. v. Worldquest Networks, Inc.,*
    213 F.R.D. 418 (D. Colo. 2003)..................................................................... 15

*Radio TV Reports, Inc. v. Ingersoll,*
    1989 WL 121190 (D.D.C. Aug. 14, 1989) ..................................................... 14

*Regal Knitwear Co. v. NLRB,*
    324 U.S. 9 (1945) ........................................................................................ 12

*Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.,*
    966 F. Supp. 1250 (D.D.C. 1997) ................................................................. 14

*Rio Props., Inc. v. Rio Int'l Interlink,*
  284 F.3d 1007 (9th Cir. 2002)......................................................................... 16, 17, 18

*SEC v. Tome,*
  833 F.2d 1086 (2d Cir.1987)..................................................................................18

*Smith v. Islamic Emirate,*
  2001 WL 1658211 (S.D.N.Y. Dec. 20, 2001) ...........................................................18

*United States v. One Urban Lot,*
  885 F.2d 994 (1st Cir.1989) ...................................................................................19

*Volkwangenwerk Aktiengesellschaft v. Schlunk,*
  486 U.S. 694 (1988) ...........................................................................................16

*Washington Metropolitan Area  Transit Comm'n v. Holiday Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977) ...............................................................................8

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 4(f) (2005).........................................................................................16

Fed. R. Civ. P. 65(d) (2005) ......................................................................................12

20 U.S.T 361, T.I.A.S. No. 6638 ...............................................................................16

4B Charles Alan Wright & Arthur K. Miller,
  *Federal Practice and Procedure* § 1134 (3d ed. 2004)..................................................17

http://www.hcch.net/index_en.php?act=status.comment&csid=418&disp=resdn
  (Hague Conference on Private International Law, Hague Convention Status
  Table).................................................................................................................17

Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals (the "Washington Capitals") submits this Statement of Points And Authorities in support of its motion for a temporary restraining order and preliminary injunction, expedited discovery, and alternate service of process.

## PRELIMINARY STATEMENT

The Washington Capitals have a three-year exclusive contract with a talented young Russian hockey player named Alexander Semin ("Semin"). The contract requires Semin to play hockey in the current 2005-2006 NHL season for the Washington Capitals and prohibits Semin from playing for any other professional hockey team. In breach of his contract, Semin is playing hockey for a professional hockey team called Lada Togliatti in the city of Togliatti in the Russian Federation.

Lada Togliatti is reported to be going through financial difficulties. Semin's agent, defendant Mark Gandler ("Gandler") of International Sports Advisors Co., Inc. ("ISA") has confirmed to the Washington Capitals that Lada Togliatti has advised its players that they may seek to play for another team. Gandler also advised the Washington Capitals that the management of Lada Togliatti is meeting to decide the fate of its players during the first week of November. Gandler states that he has received contract offers for Semin from other Russian hockey clubs. The potential for additional irreparable injury to the Washington Capitals if Semin signs with another club is imminent.

The Washington Capitals seek by this motion to prevent the continued violation of their exclusive contractual rights to Semin's services, first through a temporary restraining order prohibiting Semin to sign with a new team and prohibiting his agents Gandler and ISA from negotiating a contract for Semin to play for a new team or from facilitating a trade to another team. The Washington Capitals also seek a preliminary injunction enforcing their exclusive

rights to Semin's services by enjoining Semin from playing hockey for another team.
Specifically, the Washington Capitals seek the following relief:

      (i) a temporary restraining order and preliminary injunction against defendants
Semin, Gandler and ISA requiring them to cease and desist from any and all efforts to make, or
to take any action to facilitate the making of, any agreement, contract, trade, loan or other
arrangement whereby Semin will play any hockey games for any professional hockey team or
organization other than the Washington Capitals during the 2005-2006 National Hockey League
regular season,;

      (ii) a preliminary injunction against Semin requiring that Semin not play hockey
for any professional hockey team or organization other than the Washington Capitals, including
but not limited to Lada Togliatti of the Russian Super League, for the duration of the 2005-2006
National Hockey League regular season;

      (iii) expedited discovery in aid of the Washington Capitals' motion for a
preliminary injunction, including document requests directed to Gandler, ISA and Semin, to be
complied with within two weeks of their service, a deposition of Gandler in this district, a
videotaped and telephonic deposition of Semin in the Russian Federation, and expedited third-
party documentary and deposition discovery against Semin's former agents IMG Sports
Management; and

      (iv) an order authorizing the service on Semin of the summons, complaint, all
ancillary papers, and all papers submitted in connection with this motion by personal service on
Semin's certified agents Gandler or ISA and directing that an answer to the complaint be filed by
all defendants within two weeks of such service.

## STATEMENT OF FACTS

The facts of this matter are stated in the accompanying Declaration of George McPhee, the Washington Capitals' Alternate Governor, Vice President and General Manager, dated November 1, 2005 (the "McPhee Decl."). Those facts will be briefly summarized here.

**The Washington Capitals Select Alexander Semin In The NHL**
**Entry Draft And Sign Him To A Three-Year Exclusive Contract In 2003**

Alexander Semin is a twenty-one year old professional hockey player and a citizen of the Russian Federation. In 2002, Semin was drafted by the Washington Capitals in the first round of the NHL Entry Draft and in 2003 he was signed by the Washington Capitals to a three-year contract (the "Semin Contract"). The Semin Contract requires Semin to play hockey exclusively for the Washington Capitals for three seasons, including the current 2005-2006 NHL season, which began on October 5, 2005. (McPhee Decl. ¶¶4-5, Exh. A.)

Semin played hockey for the Washington Capitals in the first season of his contract, playing in fifty-two games for the Washington Capitals and in four regular season and seven playoff games for the Washington Capitals' minor league affiliate, the Portland Pirates of Portland, Maine in the American Hockey League. (McPhee Decl. ¶6.)

**Semin Breaches His Contract with the Washington Capitals in 2004**

The second season of the Semin Contract was the 2004-2005 season. The 2004-2005 NHL season was first delayed and then eventually cancelled due to the expiration of the collective bargaining agreement between the NHL and the National Hockey League Players Association (the "NHLPA"). At the beginning of that season, the Washington Capitals assigned Semin to the Portland Pirates to perform his contract with its minor league affiliate. Semin refused to appear for training camp and instead began playing for his old team in Russia. That team is called Lada Togliatti, and it is a private, commercial hockey club in the Russian "Super

3

League" located in the city of Togliatti, approximately 1,000 miles southeast of Moscow. (McPhee Decl. ¶¶3, 7-9.)

In September, 2004, the Washington Capitals suspended Semin due to his failure to report to the Portland training camp and imposed a fine on Semin of $1,000 per day for each day that Semin failed to report to the Portland Pirates. These efforts to secure Semin's compliance with the Semin Contract were unsuccessful during the 2004-05 season. Semin's suspension remains in effect today, and the fines imposed upon Semin continue to accrue at a rate of $1,000 per day. (McPhee Decl. ¶¶10-19.)[1]

**Semin Is Allegedly Conscripted Into The Russian Military**

In September 2004, Semin's agent, at the time a firm called IMG, reported that Semin was preparing to leave Russia to report to Portland when he was allegedly served with a conscription summons that required him to report for duty in the Russian military. Semin's agent reported, however, that he had managed to negotiate an "arrangement" with the local military officials under which Semin could perform his "military service" by playing hockey for Lada Togliatti. The Ice Hockey Federation of Russia (the "IHFR") stated to the International Ice Hockey Federation that "Alexander Semin can play with Washington after completion of [the NHL] lock out." (McPhee Decl. ¶¶11-12, 18.)

This arrangement was and is a sham. The Washington Capitals are submitting herewith the Declaration of Anna Beliakova, dated November 1, 2005 (the "Beliakova Decl."). Ms. Beliakova is a Russian lawyer with extensive experience in issues concerning Russian military conscription laws and regulations. Ms. Beliakova confirms that there is no provision in Russian law for a conscript to perform military service by playing hockey for a private hockey team. In

---

[1]    In July 2005, the NHL and the NHLPA signed a new Collective Bargaining Agreement. The Washington Capitals' right to impose, enforce, and collect these fines is addressed in that Collective Bargaining Agreement and is not a part of this action.

fact, if Semin even had a contract to play for Lada Togliatti, that contract was terminated on the day he was allegedly "conscripted." (Beliakova Decl. ¶¶ 5-8.)

Several additional facts also expose Semin's alleged "conscription" as a sham. *First*, Semin's alleged "conscription" suspiciously coincided with the date he was required under the Semin Contract to report to the Portland Pirates. *Second*, in November 2004, the General Secretary of the IHFR assured the International Ice Hockey Federation that "Alexander Semin can play with Washington after completion of [the NHL] lock out" (McPhee Decl. Exh. J.) Indeed, Semin's former agent represented to the Washington Capitals in 2005 that he "was able to work out a deal with the Russian military" that would allow Semin to leave. (McPhee Decl. Exh. K.) There is no provision in Russian law for a conscript to negotiate a reduction of the two-year military service obligation. (Beliakova Decl. ¶ 9.) *Third*, Semin himself has been quoted in the Russian press as stating that serving in a military unit "is not one of the possible outcomes" of his alleged "military service". (McPhee Decl. Exh. N.)

Nor is this the first time that Russian hockey teams have attempted to keep their players away from the NHL by having them "conscripted" into the Russian military. For example, one recent arbitration between the NHL and the IHFR also involved a claim that an NHL player had been conscripted into the Russian military. In that case, Ms. Beliakova concluded that the player could not have been validly conscripted. The Moscow military prosecutor eventually confirmed the conclusion that the player's conscription was in violation of Russian law. The arbitrator held that the alleged conscription was based on "fabricated" documents. (Beliakova Decl. ¶3.)

Semin did not actually perform any military service. Rather, he played hockey for Lada Togliatti for the duration of the 2004-2005 hockey season and reportedly received a one-million dollar salary for doing so. His suspension was never lifted by the Capitals. (McPhee Decl. ¶19.)

**Semin Fails To Report For The Current NHL Season**

After the NHL lockout ended in July 2005, the Washington Capitals contacted Semin's agent and requested that Semin report to the Washington Capitals training camp on September 11, 2005. Not surprisingly, Semin's agent reported that "I was able to work out a deal with the Russian military," and that Semin would report to the Washington Capitals as requested. Semin did not play in the scheduled regular season games of Lada Togliatti on September 7, 9, 12 or 14. (McPhee Decl. ¶¶20-21.)

On September 14, however, Semin fired his agents at IMG. They stated in an e-mail to the Washington Capitals that "[u]nfortunately, the player does not listen to our advice." (McPhee Decl. ¶22.) On or before September 14, Semin hired Gandler and ISA as his agents. Within a few days, Semin began playing for Lada Togliatti. According to the Russian scouting reports, Semin began playing for Lada Togliatti on September 19, 2005. Semin told the Washington Capitals that Gandler "told me I'm staying." (McPhee Decl. ¶¶23-24.)

Although Semin's former agent was "able to work out a deal with the Russian military," Gandler has repeatedly told the Washington Capitals that Semin's sham "military obligations" prevent Semin from leaving Russia. But Gandler repeatedly assured the Washington Capitals that he was attempting to get the player out. For example, Semin appeared at the U.S. Embassy in Moscow on September 29 and secured a visa to leave Russia and report to work for the Washington Capitals. (McPhee Decl. ¶¶25-26.)

On October 7, the Washington Capitals advised Gandler that if the player had not reported by October 14, one week later, it would commence legal action to enforce its rights. On October 10, however, the Washington Capitals were informed that Lada Togliatti is experiencing financial difficulties and has advised its players that they may make arrangements to play for other professional hockey clubs. (McPhee Decl. ¶¶27-28.) This information, which was

confirmed by reports in the Russian press, including an interview with Semin, raised the strong possibility that Lada Togliatti was prepared to release Semin to the Washington Capitals.

These developments have regrettably not resulted in the return of Semin to the Washington Capitals.  Gandler has advised the Washington Capitals that he has received offers for Semin from other Russian teams, and that Lada Togliatti's management is meeting during the first week of November to decide their players' fates.  (McPhee Decl. ¶29.)

**The Relevant Terms Of The Semin Contract**

The Semin Contract (McPhee Decl. Exh. A) provides that Semin must report to the Washington Capitals training camp at a time and placed fixed by the Washington Capitals and "play hockey only for the [Washington Capitals] unless his contract is released, assigned, exchanged, or loaned by the [Washington Capitals]."  Semin Contract ¶ 2(a), (c).  Additionally, under the Semin Contract, Semin "represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages.  [Semin] therefore agrees that [the Washington Capitals] shall have the right . . . to enjoin him by appropriate injunctive proceedings without first exhausting any other remedy which may be available to the [Washington Capitals] from playing hockey for any other team[.]"  Semin Contract ¶ 6.  The same provision appears in the current form of Standard Player's Contract in the Collective Bargaining Agreement that the NHL and the NHLPA signed in July 2005.  (See McPhee Decl. Exh. O.)

7

## ARGUMENT

**I.     This Case Meets The Standard For Issuance Of A Temporary Restraining Order And A Preliminary Injunction**

The issuance of a temporary restraining order and the issuance of a preliminary injunction require that the moving party meet the same four-pronged standard.  See Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)).  In either case, the moving party must demonstrate:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction [or temporary restraining order] is not granted, (3) that an injunction [or temporary restraining order] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction [or temporary restraining order].

Nat'l Head Start Ass'n v. Dep't of Health & Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (quoting Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).

A moving party is not required to prevail under all four prongs.  Rather, "the factors must be viewed as a continuum, with more of one factor compensating for less of another."  Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20, 27 (D.D.C. 1997).  For example, "[where] the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction."  Mova Pharm. Corp. v. Shalala, 955 F. Supp. 128, 131 (D.D.C. 1997), aff'd in relevant part, 140 F.3d 1060 (D.C. Cir. 1998).  In this case, however, each of the four factors favors the award of injunctive relief.

**A.     Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits**

The Semin Contract is an exclusive personal services contract which provides that Semin will "play hockey only for [the Washington Capitals]" and that "[the Washington Capitals] shall

8

have the right . . . to enjoin him by appropriate injunctive proceedings . . . from playing hockey for any other team[.]" Semin Contract ¶ 6. By playing hockey for Lada Togliatti, Semin is plainly and unambiguously in violation of the exclusivity provision of the Semin Contract.

This Court unquestionably has the authority to issue a negative injunction ordering a party to refrain taking action in breach of a valid agreement. See Ellis v. James V. Hurson Assocs., Inc., 565 A.2d 615, 619-21 (D.C. 1989) (employer entitled to preliminary injunction against former employee to enforce noncompetition agreement); Merrill Lynch, Pierce, Fenner & Smith v. Wertz, 298 F. Supp. 2d 27, 35 (D.D.C. 2002) (employer entitled to temporary restraining order and preliminary injunction against former employees to enforce non-solicitation provisions in former employees' employment contracts).

The exercise of such authority is commonplace in the context of personal services contracts with professional athletes. See Houston Oilers, Inc. v. Neely, 361 F.2d 36, 40-41 (10th Cir. 1966) (affirming the grant of an injunction restraining football player from playing professional football for any team other than plaintiff to enforce exclusive personal services contract); Marchio v. Letterlough, 237 F. Supp. 2d 580, 590 (E.D. Pa. 2003) (boxing promoter with an exclusive promotional agreement entitled to a preliminary injunction restraining boxer from engaging in professional fights unless the promoter was identified as the promoter or co-promoter); Nassau Sports v. Peters, 352 F. Supp. 870, 875, 882 (E.D.N.Y. 1972) (citing cases) (granting preliminary injunction prohibiting hockey player under exclusive personal services contract with plaintiff club from playing for any other club, and noting "it has long been settled that injunctive relief may be granted to restrain an employee's violation of negative covenants in a personal services contract and such enforcement has in fact been granted in numerous cases involving professional athletes"). The basis for such an injunction in cases such as the present

9

one is clear: "[A]thletes . . . are bound by their contracts to the same extent as anyone else, and should not be allowed to repudiate them at their pleasure." Houston Oilers, 361 F.2d at 41.

**B.    The Washington Capitals Will Suffer Irreparable Injury If an Injunction Is Not Granted**

Semin agreed in the Semin Contract that his breach of the contract would deprive the Washington Capitals of the services of a player with "unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages." Semin Contract ¶ 6. Thus, the loss of Semin's services, by the nature of those services, constitutes irreparable harm to the Washington Capitals. As one District Court has recently noted:

> [W]here one person agrees to render personal services to another, which require and presuppose a special knowledge, skill and ability in the employee, so that in case of a default the same service could not easily be obtained from others, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach . . . . The damages for breach of such contract cannot be estimated with any certainty, and the employer cannot, by means of any damages, purchase the same service in the labor market.

See Marchio, 237 F. Supp. 2d at 587 (quoting Philadelphia Ball Club v. Lajoie, 51 A. 973, 973 (Pa. 1902)).

Moreover, if Semin continues to pursue his prospects for playing in Russia with another professional hockey club besides Lada Togliatti, an additional impediment would be placed in the way of the Washington Capitals' efforts to enforce their contractual rights – the claimed contractual rights of yet another professional hockey club. Such a circumstance could make it more difficult for the Washington Capitals to enforce their contractual rights. The potential for the intrusion and interference by yet another party on the Washington Capitals' exclusive rights

10

to Semin's services under the Semin Contract constitutes irreparable harm to the Washington Capitals.

Furthermore, because only one NHL season remains on the Semin Contract, denial of immediate relief would be tantamount to denial of all the remaining benefits to which the Washington Capitals are entitled under the Semin Contract. The 2005-2006 NHL regular season ends in mid-April, less than six months from now. Simply put, "delay could forever deprive [the Washington Capitals] of appropriate redress." Nassau Sports, 352 F. Supp. at 881. If the relief sought herein is not granted, the Washington Capitals will be without a means of effecting the rights provided under the Semin Contract.

**C.     Defendants Will Not Be Substantially Injured If an Injunction Is Granted**

The Washington Capitals are unaware of any legitimate claim that Semin or Gandler would suffer injury if an injunction is granted. Semin willingly bargained away, in exchange for millions of dollars in compensation, the right to play hockey for any professional hockey team other than the Washington Capitals. The inability to breach a contract, or in Gandler's case to assist Semin in breaching his contract, plainly does not constitute "substantial injury" cognizable under the law governing the grant of preliminary injunctions.

Plaintiff is hard-pressed to conceive that Semin would actually come to this Court and plead his sham "military obligation" as a source of potential injury. In any event, such a claim would be unworthy of belief. In addition to Semin's assertion that actual service in the military is "not one of the possible outcomes" of his alleged "military service," the potential to negotiate a "deal" to get out of it has already been demonstrated.

11

**D.    Relief That Aids the Washington Capitals in Enforcing Their Contractual Rights Furthers the Public Interest**

Semin has an exclusive personal services contract with the Washington Capitals. He is in breach of that contract. Semin's actions are plainly contrary to the public interest in having parties honor, and holding parties responsible for, contractual agreements into which they have voluntarily entered. See Merrill Lynch, 298 F. Supp. 2d at 34-35 ("the public interest is served by protecting . . . and enforcing valid contractual provision, to which parties have voluntarily entered").

**II.    Injunctive Relief Is Warranted Against Gandler And ISA**

Federal Rule of Civil Procedure 65(d) provides that injunctive relief is "binding [] upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation." This Rule "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14 (1945). Were the rule otherwise, a defendant would be able to "nullify the decree by carrying out the prohibited acts through its servants, agents, employees or those identified with it." Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America, Local Union No. 523 v. Keystone Freight Lines, Inc., 123 F.2d 326, 329 (10th Cir. 1941).

Thus, under Fed. R. Civ. P. 65(d), Gandler and ISA may be enjoined from taking any action in furtherance of a new contract between Semin and another professional hockey team, or any efforts to trade Semin to another professional hockey team, incident to the Washington Capitals' claim for injunctive relief to remedy Semin's breach of contract.

12

In addition, the facts so far adduced in this case are sufficient to demonstrate a likelihood of success on the merits of the Washington Capitals' claims of tortious interference with contract and aiding and abetting a breach of fiduciary duty.

A party is liable for tortious interference with contract where the following elements are established: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach. See Casco Marina Dev., LLC v. Dist. of Columbia Redevelopment Land Agency, 834 A.2d 77, 83 (D.C. 2003).

Here, Semin has an exclusive personal services contract with the Washington Capitals. Gandler and ISA, as confirmed by their communications with the Washington Capitals, are plainly aware of the Semin Contract. Gandler, by and through his company ISA, has intentionally procured the breach of the Semin Contract. Only upon hiring Gandler did Semin being play with Lada Togliatti in 2005, after not playing in the club's first four scheduled regular season games. Indeed, soon after hiring Gandler, Semin informed the Washington Capitals' scout in Russia that Gandler "told me I'm staying." Gandler has disingenuously informed the Washington Capitals that Semin's "military obligation" prevents him from fulfilling his contractual obligations. And Gandler and ISA report that they are receiving offers from other Russian professional hockey clubs on Semin's behalf.

Gandler's representations and actions are contrary to: (1) assurances from Semin's prior agent, IMG, shortly before Semin fired IMG, that Semin would return to the Washington Capitals to fulfill his contractual obligation to play with the Washington Capitals during the 2005-2006 NHL season; and (2) IMG's statement to the Washington Capitals that Semin's "military obligation" would not prevent him from returning to the Washington Capitals. By all

13

indications, but for the recent engagement of Gandler as Semin's agent, Semin would presently be playing for the Washington Capitals. These facts overwhelmingly establish a *prima facie* case of tortious interference with contract by Gandler and ISA. See Curaflex Health Servs., Inc. v. Larry M. Bruni, M.D., P.C., 899 F. Supp. 689, 694 (D.D.C. 1995).

Based on the facts just summarized, it is also clear that Gandler and ISA are aiding and abetting Semin's breach of fiduciary duty to the Washington Capitals. Semin's breach of his contract with the Washington Capitals is also a breach of his fiduciary duty to the club as an employee. "Every contract of employment [carries] an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self interest." Maryland Metals, Inc. v. Metzner, 382 A.2d 564, 568 (Md. 1978) (cited with approval in Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C., 966 F. Supp. 1250, 1264 (D.D.C. 1997); Radio TV Reports, Inc. v. Ingersoll, 1989 WL 121190, at *3 (D.D.C. Aug. 14, 1989)). An employee's duty entails an "undivided and unselfish loyalty" to his employer. Id. Semin has patently disregarded this duty to the Washington Capitals.

The actions of Gandler and ISA described above establish a claim of aiding and abetting of Semin's breach of fiduciary duty to the Washington Capitals. See Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983) ("the separate tort of aiding-abetting . . . find[s] vicarious liability for support of wrongful action through knowing substantial aid or encouragement"). See also Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 104-05 (D.D.C. 2003) (reaffirming Halberstam's analytical approach to civil aiding and abetting).

Accordingly, the Washington Capitals are entitled to a temporary restraining order and a preliminary injunction against Gandler and ISA from taking any steps to assist Semin in

breaching his contract with the Washington Capitals, or from interfering with the Washington Capitals' efforts to enforce its contractual rights.

**III.    The Washington Capitals Are Entitled To Expedited Discovery**

Any delay in the Washington Capitals' ability to enforce its contractual rights risks rendering those rights forever unenforceable.  Less than six months remain in the current NHL regular season.  Accordingly, the Washington Capitals seek expedited discovery in order to request on an expedited basis the production of documents from Gandler, ISA and Semin, the depositions of Gandler and Semin and to seek third party discovery from Semin's former agents at IMG.

In evaluating a motion for expedited discovery, the Court should take into account the circumstances surrounding the request, including:  "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request [is] made."  In re Fannie Mae Derivative Litig., 227 F.R.D. 142, 143 (D.D.C. 2005).  Where, as in the instant case, a party is seeking preliminary injunctive relief, expedited discovery is particularly appropriate.  See Ellsworth Assocs., Inc. v. United States, 917 F. Supp. 841, 844 (D.D.C. 1996).  See also Entertainment Tech. Corp. v. Walt Disney Imagineering, 2003 WL 22519440, at *3 (E.D. Pa. Oct. 2, 2003); Qwest Comm'ns Int'l, Inc. v. Worldquest Networks, Inc., 213 F.R.D. 418, 419 (D. Colo. 2003).

Here, the discovery requested is narrowly tailored.  So far as Gandler and ISA are concerned, the documents sought will relate to a client relationship of one and one-half months' duration.  A single deposition of those two defendants is sought.  Neither Semin, Gandler nor ISA are in any way burdened by a deposition of Semin's former agent IMG.  The Washington

Capitals' request for a deposition of Semin goes to the heart of this case. A great many of the relevant facts are exclusively within Semin's knowledge.

**IV.    The Washington Capitals Are Entitled to An Order Providing that Service of Process May Be Effected On Semin Through His Agent Gandler**

The Washington Capitals seek an order authorizing it to serve the summons and complaint in this matter, together with a Russian translation of those documents, upon Alexander Semin via personal service upon his agent Gandler.

Federal Rule of Civil Procedure 4(f)(3) permits service of process upon a foreign defendant "by . . . means not prohibited by international agreement as may be directed by the court." Court-directed service under Fed. R. Civ. P. 4(f)(3) is no less favored than any other means provided for service of process upon a foreign defendant under the Federal Rules, including service of process through diplomatic channels. See Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002). Such service is neither a "last resort" nor "extraordinary relief". Id. (quoting Forum Fin. Group, LLC v. President & Fellows, 199 F.R.D. 22, 23 (D. Me. 2001)).

The service requested herein is not prohibited by international agreement; specifically, it is not prohibited by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"), to which both the United States and the Russian Federation are signatories. 20 U.S.T. 361, T.I.A.S. No. 6638. Indeed, since "service abroad" within the meaning of Article 1 of the Hague Convention is not requested herein, the Hague Convention is not even implicated. See Volkswangenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 707 (1988) ("The only transmittal to which the Convention applies is a transmittal abroad that is required as a necessary part of service . . . [And] the Due Process

Clause does not require an official transmittal of documents abroad every time there is service on a foreign national.")

Court-directed service is particularly appropriate "when there is a need for speed that cannot be met by following the Hague Convention methods[.]" 4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1134 (3d ed. 2004). See also Rio Props., 284 F.3d at 1015 (quoting Fed. R. Civ. P. 4(f)(3) advisory committee notes) ("in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods of service remain incomplete or unattempted"); Int'l Controls Corp. v. Vesco, 593 F.2d 166, 276 (2d Cir.), cert. denied, 442 U.S. 941 (1979) ("[t]he district court . . . is authorized to fashion a method of service . . . to satisfy the requirements of the case at hand").

Plaintiff has been advised that service in the Russian Federation under the Hague Convention methods takes, on average, six months. More expedient methods of service permitted under Article 10 of the Hague Convention, such as service by international mail and personal service, are prohibited in this case because the Russian Federation has made a reservation as to Article 10 of the Hague Convention. See http://www.hcch.net/index_en.php?act=status.comment&csid=418&disp=resdn (Hague Conference on Private International Law, Hague Convention Status Table). In six-months' time, however, the 2005-2006 NHL regular season will be over. Thus, despite the substantial merit of the Washington Capitals' claims in this case, absent alternative methods of service directed by this Court, the Washington Capitals stand to be deprived of all redress concerning those claims.

This Court has broad flexibility to direct alternative methods of service under Fed. R. Civ. P. 4(f)(3), so long as those methods of service are reasonably calculated to provide actual notice to the defendant, as required under the Due Process Clause. See Avianca, Inc. v. Corriea,

705 F. Supp. 666, 685 (D.D.C. 1989), aff'd sub nom. Avianca, Inc. v. Harrison, 70 F.3d 637

(D.C. Cir. 1995).  See also Int'l Controls Corp., 593 F.2d at 276 ("The constitutional

determination is derived from the necessities of each case rather than from a preconceived notion

of what will provide actual notice in every case.").  "Trial courts have authorized a wide variety

of alternative methods of service including publication, ordinary mail, mail to the defendant's last

known address, delivery to the defendant's attorney, telex, and most recently, email."  See Rio

Props., 284 F.3d at 1016 (affirming court-ordered service of process by regular mail and email).

See also Int'l Controls Corp., 593 F.2d at 176-78 (approving service by mail to last known

address); SEC v. Tome, 833 F.2d 1086, 1094 (2d Cir. 1987) (service of process by publication in

the *International Herald Tribune*); Smith v. Islamic Emirate, 2001 WL 1658211, at *2-* 6

(S.D.N.Y. Dec. 20, 2001) (authorizing service of process on Osama bin Laden and al-Qaeda by

publication); Forum Fin. Group, 199 F.R.D. at 23-24 (authorizing service on Russian defendant

through defendant's New York-based attorney); New England Merchs. Nat'l Bank v. Iran Power

Generation & Transmission Co., 495 F. Supp. 73, 80 (S.D.N.Y. 1980) (allowing service by telex

for Iranian defendants); Levin v. Ruby Trading Corp., 248 F. Supp. 537, 541-44 (S.D.N.Y. 1965)

(employing service by ordinary mail).

     Under the circumstances of this case, service of process upon Semin through his agent

Gandler is especially appropriate.  Gandler, as Semin's professional representative in the United

States, is situated such that service upon him is highly likely to provide Semin with actual notice

of this ongoing action.  Both Gandler and Semin were apprised of the imminence of this lawsuit

in a letter from the Washington Capitals' counsel dated October 7, 2005.  (See McPhee Decl.

¶27.)  The filing of this case has been reported in the Russian press.  Gandler was served with a

copy of the summons and complaint in this action on October 28, 2005 (the affidavits of service

are on file with the Court).  Further, Gandler's communications with the Washington Capitals indicate that he is in frequent contact with Semin.

Given Gandler's intimate involvement with Semin's professional relations, and the fact that the entirety of this case concerns those professional relations, "service via [Gandler] is likely to fulfill the due process requirement of being reasonably calculated to give [Semin] notice of the case and an opportunity to be heard."  Forum Fin. Group, 199 F.R.D. at 25.  See also United States v. One Urban Lot, 885 F.2d 994, 998-99 (1st Cir.1989) ("Well-known and oft-repeated Supreme Court precedent states that notice of a legal proceeding satisfies due process even if not actually received so long as 'notice is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'") (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

## CONCLUSION

For the foregoing reasons, the Washington Capitals respectfully request that this Court grant their motion and issue a temporary restraining order and order for expedited discovery and alternate service on defendant Semin in the form submitted with this motion, and on the return date of its motion grant a preliminary injunction.

Dated:  November 1, 2005

Respectfully submitted,

PROSKAUER ROSE LLP

By:  s/ Scott A. Eggers
Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
Telephone:  (212) 969-3000

-and-

By:   s/
Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC  20036-2396
(202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey*
*Limited Liability Company, doing*
*business as the Washington Capitals*

20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                                Plaintiff,                    Case No:  1:05 CV 02094 (HHK)

        -against-

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

                         Defendants.

**CERTIFICATE PURSUANT TO FED. R. CIV. P. 65(b)(2) AND LOCAL RULE 65.1(a)**

       I, Scott A. Eggers, one of the attorneys for the Plaintiff in the above-captioned case,

pursuant to Rule 65(b)(2) of the Federal Rules of Civil Procedure and Rule 65.1(a) of the United

States District Court for the District of Columbia, certify that on this date at approximately 7:00

p.m., I telephoned Defendant Mark Gandler of Defendant International Sports Advisors

Company, Inc. at his place of business, International Sports Advisors Company, Inc.'s offices in

New Jersey.  I left a voice message for Mr. Gandler stating that Plaintiff would be filing a motion

seeking a temporary restraining order and a preliminary injunction.  I stated that I would be

sending the papers to the e-mail address that I have used to contact him before and asked him to

advise me if that e-mail address was incorrect.  I also requested that he forward the papers to his

client Alexander Semin.

       On November 1, 2005, at approximately 7 p.m., I called the cell phone number of Mr.

Gandler.  He did not answer, and the voice mailbox message, identifying it as Mr. Gandler's,

stated that the voice mailbox was full.

On November 1, 2005, at approximately 7:15 p.m., I sent via e-mail to Defendant Mark Gandler copies of : (a) Plaintiff's motion for a temporary restraining order, expedited discovery, a preliminary injunction and for alternate service of process, dated November 1, 2005, (b) the Statement of Points and Authorities in Support of Plaintiff's Motion, dated November 1, 2005, (b) the Declaration of George McPhee, dated November 1, 2005, together with exhibits; (c) the Declaration of Anna Beliakova, dated November 1, 2005, together with exhibits; and (d) proposed forms of order on the motion and a proposed form of preliminary injunction; and (e) this document.  I also requested that Mr. Gandler forward these documents to his client Defendant Alexander Semin.

Dated:  November 1, 2005

Respectfully submitted,

PROSKAUER ROSE LLP


By:   /s Scott A. Eggers
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
Telephone:  (212) 969-3000

-and-

Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC  20036-2396
Telephone:  (202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals*