In The Matter Of

The Arbitration Between:

**The National Hockey League Players Association**
**And**
**The National Hockey League**
**(Ottawa Senators)**

Grievance of Alexei Yashin
Date of Award: June 28, 2000

## Preliminary Statement

Arbitration hearings involving the above-captioned matter were held in New York City on May 24 & 25 and in Ottawa on May 30, 2000. Representing the National Hockey League Players Association at such hearings was John R. McCambridge, Esq., and representing the Ottawa Senators and the National Hockey League was L. Robert Batterman, Esq.. Both parties argued orally upon the conclusion of the hearings.

## Issues

The parties agreed to submit the following issues for decision; they are:

"1. Whether Alexei Yashin's SPC expires on June 30, 2000, thus rendering Mr. Yashin a restricted free agent on July 1, 2000 subject to the Ottawa Senators' making a qualifying offer, or, in the alternative, whether by reason of Mr. Yashin's choosing not to play for the Ottawa Senators in the 1999/2000 season, Mr. Yashin's SPC does not expire until he provides an additional season of service to the Ottawa Senators under the terms of his SPC applicable to the 1999/2000 season?

"2. Damages

"a. Whether the Arbitrator has the authority and jurisdiction to award money damages to the Ottawa Senators, if any, as a result of Mr. Yashin's choosing not to play for the Ottawa Senators in the 1999/2000 season?

"b. If 2.a. is answered in the affirmative, is the Club entitled to money damages as a result of Mr. Yashin's choosing not to play for Ottawa Senators during the 1999/2000 season and, if so, in what amount?"

## Background

In the 1992 entry draft Alexei Yashin was the first round pick of the Ottawa Senators (hereinafter the Club). Mr. Yashin executed a standard player contract (hereinafter SPC) with the Club for a term of five years (4 & 1 at Club's option) commencing with the 1993-94 season. Following his first season of play (1993-94) in the NHL, Mr. Yashin asserted that an oral commitment had been previously made by the General Manager of the Club to renegotiate his contract and make him the Club's highest paid player if he proved to be the Club's best player, and that, therefore, he wanted his contract renegotiated. The Club initially resisted this demand on grounds that no such commitment had been made, but then it ultimately relented and agreed to modify certain terms of Mr. Yashin's SPC in January 1995. The 1994-95 season was curtailed due to the lockout and did not begin until January 13, 1995.

In the fall of 1995 following the abbreviated 1994-95 season, Mr. Yashin chose not to report to training camp and, instead, signed a contract to play hockey for the Red Army Team. In late October 1995 the Red Army Team refused to honor its contract with Mr. Yashin due to pressure from the International Ice Hockey Federation (hereinafter IIHF). Mr. Yashin argued that the Red Army's repudiation of its contract with him made him a restricted free agent even though his contract with the Ottawa Senators had years left to run. This claim became the subject of an arbitration before Arbitrator George Nicolau, and Arbitrator Nicolau rejected Mr. Yashin's claim in a decision rendered December 3, 1995.

In December 1995, the Club and Mr. Yashin again renegotiated Mr. Yashin's SPC including its term. This SPC specified that it ran for a

2

"term of 5 years commencing October 1, 1995". More specifically, in Addendum A to the SPC, the term was defined as follows: "This Contract shall be for a period of five (5) seasons commencing with the 1995-96 season and concluding with the 1999/2000 season." This SPC provided that Mr. Yashin's compensation for the 1999-2000 season would be a base sum of US$3,300,000 plus the potential of a bonus if Mr. Yashin received any NHL awards. Mr. Yashin finished in second place in the voting for the Hart Trophy following the 1998-99 season and thereby attained a US$300,000 bonus to be added to his compensation for the 1999-2000 season for a total compensation of US$3,600,000.

In July 1999, Mr. Yashin through his agent, Mark Gandler, informed the Club that he would not play the 1999-2000 season for the compensation specified in his SPC and requested to be traded. The Club refused to renegotiate the compensation specified in the SPC for the 1999-2000 season stating that Mr. Yashin's compensation would remain at 3.6 million not including various bonuses that could be earned for the 1999-2000 season; the Club also refused to consider a trade.

Further correspondence ensued between the parties, and there was no change in either party's position. In a letter dated August 27, 1999 Marshall Johnston, General Manager of the Club, informed Mark Gandler that Mr. Yashin's failure to report to training camp in September 1999 would place Mr. Yashin in breach of contract resulting in his immediate suspension without pay. Mr. Johnston also informed Mr. Gandler in that same letter that should Mr. Yashin remain suspended throughout the 1999-2000 season, the Club would be entitled to one more year of performance from Mr. Yashin under the SPC and the collective bargaining agreement (CBA). Mr. Johnston further informed Mr. Gandler that the Club would also seek damages from Mr. Yashin as a result of his breach of contract. Mr. Johnston urged in this letter that Mr. Yashin reconsider his decision, but Mr. Yashin remained resolute and never returned to the Club during the 1999-2000 hockey season.

In a conversation held on September 5, 1999 Mr. Gandler proposed to Mr. Johnston a new three year contract for Mr. Yashin commencing

with the 1999-2000 season, and that Mr. Yashin be paid US3.3 million, US11 million and US12 million for each season respectively. The Club was unwilling to negotiate a new contract with Mr. Yashin until he had completed substantially all of his commitments for the last year of his contract, the 1999-2000 year.

The Association brought a grievance on behalf of Mr. Yashin asking that he be declared a restricted free agent upon the expiration of his 1999-2000 SPC, and the Club has resisted by stating that Mr. Yashin owes it one more year. The Club has brought a grievance seeking direct and consequential damages from Mr. Yashin due to his breach of contract, and the Association and Mr. Yashin have denied that damages are owed and state further that the Arbitrator has no jurisdiction/authority to award such damages. These two grievances have been consolidated for hearing, and the first phase of this case involves consideration of the restricted free agency issue only.

<u>Position of the Parties</u>

<u>Position of the Association</u>

The Association contends that Mr. Yashin's SPC expires at the end of the 1999-2000 season, namely, on June 30, 2000, and that at such time Mr. Yashin becomes a restricted free agent.

In particular, the Association observes that a restricted free agent is defined in Article 1 of the collective bargaining agreement and that it references contract expiration as the critical determinant. The Association says that since the term "expire", as used in Article 1, is not defined anywhere in the collective bargaining agreement, such word must be given its usual and ordinary meaning. Its usual and ordinary meaning must be construed to mean the date that Mr. Yashin's SPC is scheduled to expire. Mr. Yashin's SPC states that it is for a term of 5 seasons concluding with the 1999-2000 season. Therefore, June 30, 2000 must be found to be the contract's expiration date.

4

Since the contract language in question is clear and unambiguous on its face, there is no need to go beyond its plain meaning and consider parol evidence. The Association notes that in the recent IIHF case involving Mr. Yashin, the League referred to the stated expiration date of Mr. Yashin's contract as June 30, 2000.

The Association says that Mr. Yashin played for four seasons under his contract and withheld his services during the fifth season with the result that he was suspended and not paid for that final season. The Association argues that the Club has obtained benefits from the full five years of Mr. Yashin's contract. The Club enforced negative covenants against Mr. Yashin which prevented him from playing professional hockey for any other club on a worldwide basis during his fifth season. The Association says that the League is attempting to get a ruling that Mr. Yashin's SPC continues to run until he has given specific performance by playing for a fifth season, and that it is a well-established rule that courts will not grant specific performance with respect to contracts for personal services. The Association cites the Barry case in the NBA among others.

Also, the Association says that under Sec. 17.8 of the CBA, the Arbitrator may not grant a remedy unless it is provided for in the agreement, and that the remedy sought by the League is not provided for in the agreement. Under Sec. 17.8 the Arbitrator may not modify, add to or subtract from the parties' agreement or the player's SPC.

Specifically, the Association says that the League sought unsuccessfully to obtain during the 1995 bargaining the very remedy which it seeks in this case, and that the Arbitrator should not now grant the League what it failed to obtain in bargaining. During bargaining the League sought a definition of restricted free agent which would have required full performance under the contract's stated term of years, and ultimately the League withdrew this proposal; the League never stated across the table that expiration meant that the contract did not expire until full performance had been rendered. Thus, there is no basis for reading the term "expire" to include full performance.

5

The Association also says that League negotiator, Jeffrey Pash, never saw the documents on which Gil Stein was relying but had, simply, been told about them by Mr. Stein. All the bargaining notes have been produced by the Association. Mr. Pash's recording of the "dangerous" comment is fully consistent with the Association's explanation that it did not desire to leave this type of power in the League's hands.

The Association also cites <u>Yashin 1</u>, decided by Arbitrator George Nicolau in December 1995, as evidence that Arbitrator Nicolau believed that contract expiration meant the contract's stated expiration date. That case involved a circumstance wherein Mr. Yashin did not fulfill the terms of his SPC before defecting to an unaffiliated club and then when he became free of his obligations to the unaffiliated club, he requested that he be declared a restricted free agent. The Association cites Arbitrator Nicolau's opinion in which he ruled that Mr. Yashin cannot become a restricted free agent before the expiration date of his SPC and in which he also said that a SPC could expire without the player fulfilling its terms.

The Association argues that in the 1994-95 negotiations the parties scrapped old concepts of free agency including By-Law 9A and agreed upon a new system of free agency contained in Article 10 of the collective bargaining agreement. Consequently, documents from the Ziegler-Stein era should not be regarded as efficacious any longer since they were superseded by the new regime of free agency written into the 1995 collective bargaining agreement. The Association says that the current collective bargaining agreement supersedes all prior memoranda and understandings between the parties. Further, it should be noted that the Stein-Simpson correspondence as well as the Ziegler interpretation pertained to By-Law 9A which is now a dead letter; none of these relics from the past govern any longer under the newly devised Article 10.

The Association argues that former President Ziegler's interpretation should not be deemed to be a League Rule. The Association points out that it made a sustained, diligent effort to

6

obtain League Rules both through steady correspondence as well as by filing a grievance which went to arbitration before Arbitrator Sands, and that nowhere among all the League Rules that were eventually produced was there any reference to former President Ziegler's interpretation that a player must render full performance under his SPC. Arbitrator Sands noted in his opinion that the Association should not be bound by what it has not been given. The Association says that the only pertinent rule that it was given in this area was a resolution indicating that a player who failed to perform could be suspended.

The Association also argues that there was no previous policy governing this subject matter. It notes that over a 30 year period there have been various holdouts, and that no player holding out has had his player contract tolled. The Association says that no Club has threatened tolling under the 1995 contract with respect to a dozen or so holdouts until now. The fact that a Club always capitulated to a player's demands is not a viable explanation.

The Association says that the focus in this case should be strictly upon what happened in collective bargaining and not upon some independent notion of where the equities ought to lie. The Association says that the answer must be that no remedy of tolling and contract extension exists; Mr. Yashin should be declared a restricted free agent at the end of the 1999-2000 season. The Association asks that its grievance be granted.

Position of the Club

The Club contends that Mr. Yashin must fulfill the terms of his contract and play a fifth year before he is eligible for restricted free agency.

The Club first observes what this case does not concern. It says that it does not concern the issue of whether a mandatory injunction should be imposed upon Mr. Yashin. It is not asking that Mr. Yashin be forced to play hockey; he does not have to play if he decides not to

play. The Club says that it is not seeking to overturn many years of Anglo-American jurisprudence[1]. The Club points out that the full performance concept which is expressly written into the NFL and NBA agreements is a proper concept; otherwise, it would not exist in those agreements. The Club says that the difference between those agreements and the instant one is that in the NHL, while the same understanding exists, it is found in different content than in the NFL and NBA collective bargaining agreements.

The Club underscores the importance of this case to it by pointing out that in bilateral negotiations each party assumes certain risks, and that if players can default upon their obligations, the risk becomes one way rather than two way with potentially adverse consequences for all concerned. The Club argues that once a player enters into a binding contract, the player should have as much of an obligation to fulfill it as a club has. The Club asks why should a player obtain the benefits of free agency without fulfilling his contractual obligations. The Club cites opinions from the outside world which support its view of this case. The Club points out that this is the first time there has been a full season holdout by a player inasmuch as this is the first time that a club has been willing to take a resolute stand. The Club says that the decision in this case should be limited to a discussion involving a full season holdout and should not go beyond that circumstance.

The Club says that the fundamental question presented by this case is when does a SPC expire. The Club says that an SPC expires after a player has rendered full performance, and that such conclusion is buttressed by the following. The Club points out that the SPC in question speaks of years of service and not years under contract; the Club says that there is no fixed expiration date but, rather, that the SPC speaks in terms of the number of seasons and the compensation for each.

---

[1] The Club contends that reference to state law precedent, as provided by the Association, should be considered in light of the federal pre-emption doctrine contained in sec. 301 of the LMRA.

The Club says that Article 30.1 of the collective bargaining agreement provides that each player is bound by League Rules[2], and that League Rules encompass League By-Laws as well as official interpretations of League Rules. In 1980, when the League President was the final arbiter of issues surrounding the interpretation of League By-Laws, President Ziegler was asked to give an official interpretation of what happened when a player did not complete the term of his contract, and President Ziegler ruled that a SPC did not expire until a player had given complete performance. In subsequent correspondence in 1991 between Gil Stein, the League's General Counsel, and Sam Simpson, the Players Association Director of Operations, such advice was confirmed. Additionally, President Ziegler testified that in his many dealings with Alan Eagleson, the Association's then Executive Director, Mr. Eagleson was informed of this policy and expressed no challenge or objection.[3] Thus, the Club says that either as a matter of League Rule or as a matter of League policy and past practice, the Association was well aware of the League's position and was bound by it.

The Club contends that the Association has an erroneous view of the inferences to be drawn from the 1995 bargaining history. The Club says that the proper interpretation of what occurred during the 1995 bargaining was that the League was looking to obtain a bilateral codification of existing policy and not an additional right with respect to this issue. The Club cites a statement made by Jeffrey Pash in bargaining about which there is no dispute; Mr. Pash said to the Association that it "would be a useful statement of policy" to indicate that expiration of contract would require full performance. Notes taken by Mr. Pash indicate that from the Association's perspective it was "dangerous" to enter into discussions on this subject. The Club says that the League negotiators interpreted this to

---

[2] The Club says that a League Rule can exist in the absence of notification to the Association and references dicta in the decisions of Arbitrators Nicolau and Sands.

[3] The Club says the fact that Mr. Eagleson was subsequently disgraced does not invalidate either the benefits obtained or the obligations undertaken during his regime.

mean that the area was politically dangerous, and that when the League withdrew its proposal, it was understood that the status quo would prevail. The Club cites a document prepared by Association negotiator, John McCambridge, indicating "status quo".[4]

The Club also argues that the restructure of free agency during the 1994-95 negotiations does not change the outcome here. The restructure of free agency did not affect the remedies available to clubs when a player failed to fulfill the term of his contract. The Club says that the remedies for breach of contract are multiple and, as Arbitrator Nicolau pointed out in Yashin 1, include remedies broadly referenced but not specifically named in the CBA or the SPC.

The Club further contends that Yashin 1 did not involve in any shape or manner a tolling issue, and that any inference attributed to Arbitrator Nicolau should be regarded as dictum since he was not addressing the issue and was not presented with evidence regarding the issue.

In sum and for the reasons recited above, the Club asserts that Mr. Yashin must play a fifth year under his SPC before he is eligible for restricted free agency; it, therefore, asks that the grievance be denied.

## Analysis

Alexei Yashin withheld his services in breach of contract for the entire 1999-2000 playing season because he wanted more compensation than his contract provided. The Club responded to this breach by suspending him so that it would not be obliged to pay him. This breach occurred during the fifth and final season of Mr. Yashin's SPC. The issue to be decided in this phase of the case is whether or not Mr. Yashin's SPC has been tolled by virtue of the fact that he withheld his services for the entire 1999-2000 hockey playing season. If the SPC has been tolled, Mr. Yashin owes his Club another year of service

---

[4] The Club says that any credibility contests regarding bargaining history should be resolved in the League's favor and cites a decision by ALJ Kern.

before he is eligible to become a restricted free agent; if the SPC has not been tolled, Mr. Yashin becomes eligible for restricted free agency as of June 30, 2000.

The inquiry here begins with the definition of "Restricted Free Agent" as set forth in Article 1 of the collective bargaining agreement. That definition is as follows:

"'Restricted Free Agent' means a player whose Player Contract has expired, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club as described in Article 10 (Free Agency)."

The fundamental question to be answered here is whether or not Alexei Yashin's SPC will have expired as of June 30, 2000. For all the reasons previously set forth herein the Club maintains that it will not have expired, and the Association asserts that it will have expired.

The Association contends that the word "expire" ought to be given its usual and ordinary meaning, and that if it were given such meaning, there would be no need to resort to parol evidence.

A significant amount of evidence was introduced as to the manner in which "expire" had been construed in the past and as to the parties' discussions during the 1995 bargaining. A fair question is whether, in light of such evidence, "expire" has taken on a special meaning. I believe it would be a serious mistake to rely on a dictionary definition without considering the evidence referenced above.[5] Therefore, I shall consider parol evidence in arriving at the meaning of the word "expire".

One critical factor in the determination to be made here is the interpretation to be placed upon the 1995 bargaining history. During the 1995 negotiations the League proposed a definition of restricted

---

[5] I do not find any language in Mr. Yashin's SPC to be dispositive in and of itself as to when the SPC expires. The SPC merely identifies the contract term and states the seasons; it does not specify what happens to the term, if anything, in the event that the player breaches the SPC by voluntarily withholding his services for a full season. Moreover, the standard form SPC states: "(A)ny provisions of this Contract inconsistent with such Collective Bargaining Agreement are superseded by the provisions of the Collective Bargaining Agreement."

11

free agent which included, as an element, "fully rendering the playing services called for thereunder" (hereinafter referred to as the full performance concept). This proposal was ultimately withdrawn by the League in favor of the "expire" language recited earlier in this opinion. The League's position is that its proposal, which was later withdrawn, was, simply, an attempt to codify existing policy, and that it so stated this purpose to the Association's bargainers. The Association's position is that it did not understand this to be a codification proposal but, rather, a definition which the League was unsuccessful in obtaining through bargaining.

The recollection of participants from opposing sides of the bargaining table differed over what was said about the full performance concept during bargaining. I believe that each party testified as to its own sincere, good faith recollection as to what was said during bargaining. A resolution of this difference in recollections is not necessary to the outcome of this case inasmuch as the parties' intent can be derived on the basis of reasonable inferences drawn from documents made during bargaining. The Association's notes from bargaining (PA #37) contain the following:

"They want statement that player fully perform his contract. They think it's a useful statement of policy."

The notes go on to reference statements attributable to Jeffrey Pash, a League bargainer:

"Pash: Does not mean a guy who's injured. Means a guy under contract that holds out or goes overseas and misses last year of his contract."

These notes, particularly, the note indicating that "it's a useful statement of policy", tend to support the notion that the League's proposal was presented as one designed to codify policy.

In addition, another bargaining document drawn up by the Association summarizing the status of bargaining (NHL #24) stated with respect to the definition of restricted free agent:

"RFA/UFA -- 'completely fulfilled' - status quo".

12

At the top of the document was a note in Mr. Pash's handwriting which said: "can't do completely fulfill language. Too dangerous."[6]

The strong inference here is that in the case of restricted free agency, both parties agreed to have the issue of full performance be governed by the "status quo". All of the above evidence leads me to the conclusion that the League was, indeed, seeking to codify existing policy with respect to full performance rather than seeking an additional right, and that the withdrawal of its codification proposal left the subject matter to be governed by existing policy, i.e., the "status quo".

This, then, leads to consideration of the other critical element in this case, namely, what was the existing policy or the "status quo". The Club introduced evidence of policy from an earlier time when there was a different administration in office at both the League and the Players Association. John Ziegler, League President from 1977 to 1992 and counsel to the Chicago Blackhawks before that, testified that full performance had been policy during his tenure as League President and even before that. His testimony was supported by documentation indicating that he had rendered an official interpretation in 1980 concerning full performance. The report on that interpretation read as follows:

"The President was requested to provide his interpretation as to the rights of a Member Club in a situation where a player does not fulfill the full length of the term of his contract. The President stated that the player is obliged to fulfill the term of the contract including option year." (NHL #16)

The Club also introduced evidence concerning an exchange of memoranda in January 1991 between Sam Simpson, Director of Operations for the Association and Gil Stein, League Counsel. While one of the issues in that correspondence referenced rules under By-Law 9A, the other issue did not. Even though the parties replaced By-Law 9A with a

---

[6] The parties have argued over whether the "too dangerous" concept meant politically dangerous or dangerous in some other respect. That issue does not need to be resolved here.

13

new structure for free agency in the 1994-95 negotiations, they did not rework remedial consequences in the event of player refusal to serve a full contract term as I point out later herein. Given the fact that only one of the following scenarios specifically referenced By-Law 9A and the fact that, in any event, remedial consequences were not reworked, I think that this exchange of correspondence remains relevant and supports the testimony of former President Ziegler that full performance was the operative policy.

The correspondence follows. Sam Simpson of the Association initially wrote to Gil Stein of the League as follows:

"I have the following scenarios:
"1. A player playing out his option and who decides to leave the club in the middle of the season, does his contract expire the following July 1 and become a free agent subject to the rules of 9A?
"2. A player who is in his third year of professional hockey and who is in the middle of his contract and who leaves his club in the middle of the season, does the present year of his contract expire at the end of the year and is he considered a three year veteran at the end of the year?" (NHL #17)

Gil Stein's response was as follows:

"I respond to your two stated scenarios as follows:
"1. The scenario describes a player who has played only half of the full season remaining on his contractual obligation, but has refused to perform the other half. Applying the principal (sic) that a player cannot become free of his contractual obligation to play for a club by failing to perform it, he would not become a free agent on the following July 1. Obviously where less than a full season is owed, the question will then arise whether he would become a free agent in the middle of the following season or have to wait until the following July 1.
"2. I know of no precedent dealing with whether a player's three-year veteran status is impacted by his failure to perform a portion of his first three seasons. However, it would seem consistent that the above principle should lead to a similar conclusion, i.e., that a player who has refused to perform one of the first three seasons under his contract would not be considered a three-year veteran." (NHL #18)

While evidence of policy arising under prior League and Association administrations should be carefully scrutinized, I find no sound reason to discount the efficacy of the evidence provided by former President Ziegler's testimony and the Simpson-Stein

14

correspondence. No evidence of a contrary nature was introduced except, possibly, the case of Ken Dryden during the 1973-74 season[7]. Even if that case is on point, it is not sufficient to overcome the weight of the evidence behind the policy identified herein. Therefore, the testimony of former President Ziegler and the Simpson-Stein correspondence satisfactorily establishes what the existing policy was[8], and that the Association was on notice as to such policy. Also, there is no evidence that the Association expressed any objection to such policy during the time frame covered by the above evidence.

    The Association argues that in the 1994-95 negotiations the parties scrapped By-Law 9A, which contained the prior iteration of free agency, and replaced it with a new structure for free agency. This thoroughgoing revision, says the Association, eliminated any full performance requirement that might have existed. While the parties did rework the entire structure of free agency in the 1994-95 negotiations, they did not rework remedial consequences in the event of player refusal to serve a full contract term. In fact, as this opinion makes clear, the parties during the 1994-95 bargaining chose to go with the status quo in terms of full performance requirements.

    In sum, then, the foregoing reveals that the existing policy at the time of the 1995 negotiations was one of full performance, and that the parties' intent in the 1995 negotiations was to leave the status quo unchanged.

    Nevertheless, the Association argues that there are other considerations which influence the outcome here. The Association argues that adoption of a full performance requirement here is the equivalent of granting a mandatory injunction for the performance of personal services under a personal services contract, and that our jurisprudence does not approve of such injunctions. I am not persuaded

---

[7] While Mr. Dryden held out in the final year of his contract, it is not entirely clear whether or not that contract had a perpetual option clause in it. In cases unlike Dryden where there had been partial season holdouts, the parties had apparently settled all those cases to everyone's satisfaction.

[8] The Club argued that this existing policy also took the form of a League Rule, but it was not among the League Rules submitted to the Association as a result of Arbitrator Sands' ruling or before. Arbitrator Sands noted in his decision on League Rules a statement by a League official that "Obviously, you can't be bound by what you don't have." P. 5 (Aug. 17, 1998)

15

that the full performance requirement amounts to the equivalent of a mandatory injunction. What the full performance concept requires is that the player render performance for the full term of years specified in a SPC without illegally holding out if the player wants to obtain the negotiated benefit of free agency. If a player chooses not to play at all, then that is the player's decision.[9] Pressure to render full performance may exist because a player desires the benefit of free agency or because a player desires to avoid damages stemming from a default on his contract; since the latter circumstance does not translate into the equivalent of granting a mandatory injunction, neither does the former.[10]

    The Association further argues that Arbitrator Nicolau in <u>Yashin 1</u> indicated that the benefit of restricted free agency did not become realized until contract expiration and that a player did not have to play until contract expiration if he chose not to (pp. 16 & 17). I point out that <u>Yashin 1</u> involved an altogether different issue than the issue presented here, and that most of the evidence introduced here was not presented to Arbitrator Nicolau. Consequently, I think that the Association makes too much of a remark made in passing (i.e., dictum) which was not central to the disposition of <u>Yashin 1</u>.

    The Association also argues that full performance is not a remedy specifically identified in the collective bargaining agreement or the standard form SPC, and that it, therefore, should not be adopted here. The Association cites language found in Sec. 17.8 of the CBA in support of this position. I point out once again that I am not ordering full performance of Mr. Yashin's SPC; whether he plays again or not is his decision to make as I have previously stated. Sec. 17.8 of the CBA gives me the "authority to interpret, apply and determine compliance with any provision of this Agreement, or an NHL Player Contract", and I have exercised that authority to determine what the

---

[9] This observation is not intended to prejudge the next phase of the Yashin case which is whether or not Mr. Yashin is liable for damages by withholding his services in violation of his contractual obligation.

[10] I further note that the full performance concept has been incorporated into the NFL & NBA collective bargaining agreements.

16

term "expire" means as used in the definition of restricted free agent. In sum, I find this Association argument to be without merit.

In conclusion and for all of the reasons recited herein, I find that Mr. Yashin's contract has been tolled by virtue of the fact that he withheld his services for the entire playing season, 1999-2000, and that his SPC does not expire until he provides one additional season of service to the Club.

Therefore, after having considered the evidence and arguments of the parties, I award as follows:

By reason of Mr. Yashin's choosing not to play for the Ottawa Senators in the 1999-2000 season, Mr. Yashin's SPC does <u>not</u> expire until he provides an additional season of service to the Ottawa Senators under the terms of his SPC applicable to the 1999-2000 season.

*[signature]*

Lawrence T. Holden, Jr.
Arbitrator