IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                Plaintiff,              Case No.: 1:05 CV 02094 (HHK)

       v.

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

                Defendants.

**DEFENDANTS MARK GANDLER AND INTERNATIONAL SPORTS ADVISORS COMPANY INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN <u>OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

Defendants Mark Gandler ("Gandler") and International Sports Advisors Company, Inc. ("ISA") (collectively "Gandler") submit this memorandum in opposition to Plaintiff Lincoln Hockey Limited Liability Company's ("Capitals") motion for a preliminary injunction. Gandler and ISA are used interchangeably in this opposition and in the Gandler declaration. This memorandum is supported by the declaration of Mark Gandler filed herewith.

**SUMMARY OF ARGUMENT**

As both a matter of law and the facts, set forth here, the Capitals' motion for a preliminary injunction should be denied. First, the Capitals set forth no credible facts to support its theory that Gandler has tortiously interfered with a contract or aided and abetted in the breach of a contract. In fact, Gandler's conduct indicates a contrary conclusion. Gandler has expressed to Defendant Alexander Semin ("Semin") and to the Capitals Gandler's desire that Semin return and fulfill his contract with the Capitals. Gandler has made no effort to procure other contracts

for Semin, has not negotiated any contracts for Semin, and has not received any compensation from Semin.

Second, the Capitals fail to establish that its contract with Semin is viable. Semin believes that he is prohibited by Russian law from performing under his contract. Gandler has been presented with no evidence to the contrary and believes what Semin has told him. Thus, based on Semin's incapacity Gandler cannot be interfering with Semin's contract.

Third, the Capitals' motion should be denied as a matter of law. As agent for Semin, Gandler cannot be held liable for tortiously interfering with a contract between its principal, Semin, and the Capitals. A claim for tortious interference with a contract requires that the interfering actor be a third party. Thus, by definition and practice, Gandler cannot be considered a third-party to this dispute, and the Capitals' cause of action cannot stand.

**STATEMENT OF FACTS**

Defendant Mark Gandler was born in 1956 and emigrated to this country in 1976 from the Moldavian Republic of the former Soviet Union. (Gandler Decl. at ¶ 1, attached hereto as Ex. 1.) Since arriving in America, Gandler earned a bachelor's degree in Economics from New York University in 1979 and a master's degree in Economics from Columbia University in 1981. *Id.* From 1981-1987, Gandler worked in various marketing and sales positions for Joseph E. Seagram & Sons, a beverage importer. *Id.* In 1991, Gandler received his law degree from Columbia University. *Id.* While in law school, Gandler started representing hockey players in the NHL. Since 1996, Gandler has been a certified agent for players in the NHL (1996 was the first year certification of agents was required). *Id.* at ¶ 2. Gandler owns Defendant International Sports Advisors Company, Inc. a sports agency firm which specializes in representing hockey

players in the NHL. *Id*. Being a native Russian speaker, Gandler focused his efforts in the early stages f his career, on developing a client base of primarily young players from Russia. *Id.* Gandler scouts around the world for talented young prospects, and he works to sign those prospects as clients before the players are drafted into the NHL. *Id.* Gandler only receives compensation from the prospects after they sign a contract with a team in the NHL. *Id.* Gandler has never received compensation for a player playing under contract in one of the Russian professional hockey leagues. *Id.*

As part of ISA's scouting and client development, Gandler frequently communicates with coaches and management in the Russian hockey leagues. *Id.* at ¶*3*. Gandler's relationship with Petr Vorobiev, currently head coach for the Russian Super League team Lada Togliatti ("Lada") is not unlike his relationship with other coaches in Russia—cordial and professional. *Id.*

On or about September 10, 2005, Gandler was contacted by Valery Semin, the father of Defendant Alexander Semin "(Semin"). *Id.* at ¶ 4. Valery Semin told Gandler that Alexander was unhappy with his current agent IMG, and Valery asked Gandler if he could represent Alexander. *Id.* On September 14, 2005, the parties executed a "Standard Player-Agent Contract" ("SPAC") pursuant to and in accordance with the National Hockey League Players' Association Regulations Governing Agent Certification. (*Id.*, attached hereto as Ex. A.) Their agreement was not unlike Gandler's other agreements with players: Gandler would not collect any fees or compensation from Semin unless Semin played for an NHL team.

Prior to September 14, 2005, Gandler had only minimal contact with Semin. *Id.* at ¶ 5. The contact consisted of Gandler saying hello after games he saw Semin play in person in 2002 in the Czech Republic and complimenting Semin on his play. *Id.* Semin's previous agent, IMG, had represented him when he signed a three-year contract with the Washington Capitals prior to

3

the 2003-04 NHL hockey season. *Id.* Prior to the 2004-05 NHL season and while Semin was residing in Russia, Semin through his agents told the Capitals that he had been conscripted into the Russian military and that he could not leave Russia and report to the team. (*Id.,* Ex. B attached thereto.) IMG also informed the Capitals that Semin would be able to perform his military service by playing hockey for Lada. *Id.* The 2004-05 NHL hockey season was ultimately cancelled when the NHL owners locked out its players after the collective bargaining agreement between the league and the NHLPA expired. *Id.*

Gandler believes that Semin's previous agents at IMG negotiated Semin's player contract with Lada for the 2004-05 hockey season. *Id.* at ¶ 6. Gandler also believes that IMG was involved with Semin's conscription into the Russian military in October and November of 2004. *Id.* Moreover, Gandler also believes that IMG negotiated the terms of his service obligations with then-General manager of Lada Leonid Vaysfeld. *Id.* Further, Gandler believes that Semin's previous agents IMG also negotiated Semin's player contract with Lada for the current 2005-06 hockey season. *Id.*

Soon after entering into the player-agent agreement with Semin, Gandler received a brief letter explaining that Semin was serving in the military of the Central Sports Club of Russian Air Force and that Semin's discharge date was November 10, 2006. (*Id.* at ¶ 7, attached thereto as Ex. C.) The letter also attached a copy of Semin's military passport and a letter from the Central Sports Club of Air Force. Gandler thought that the documents appeared authentic, and he believed that he could not advise Semin that they were not. *Id.* At the same time, Gandler never advised nor encouraged Semin to stay in Russia. *Id.*

After Gandler began his representation of Semin, Gandler had several communications with Donald Fishman, the Capitals in-house legal counsel. *Id.* at ¶ 8. Gandler advised Fishman

4

that it was Gandler's preference that Semin return to play for the Capitals. *Id.* Gandler also explained that Semin believed that he was obligated under Russian law to remain in Russia. *Id.* Fishman told Gandler that Semin's previous agent from IMG named Dimitri Goryachkin had informed Capitals that he was "able to work out a deal with the Russian military." *Id.* The NHLPA, Capitals and Gandler worked together to find out more about this "deal." *Id.* The NHLPA was "advised that there was nothing in writing between Goryachkin and Lada or anyone else." *Id.*

Semin began playing for Lada again this season on September 19, 2005. *Id.* at ¶ 9. Gandler did not negotiate this contract nor did Gandler receive any compensation for it. *Id.* Gandler never encouraged or advised Semin to play for Lada or any other team in Russia. *Id.* And if, as the Capitals press clippings indicate, Semin begins to play for Khimik, another Russian team, Gandler will receive no compensation for Semin's contract from Semin, Lada, Khimik, or any other person or entity in the world. *Id.*

In Gandler's communication with the Capitals since September 14, 2005, Gandler has made it clear that he is not assisting Semin in playing hockey in Russia. *Id* at ¶ 10. Gandler has also made it clear that Gandler is only compensated if Semin plays in the NHL. *Id.* Gandler has insisted several times to Fishman that the Capitals should send a demand letter to Lada asking that Lada stop playing Semin. *Id.* Gandler also suggested to Fishman that the Capitals should write Semin a letter stating that if Semin played for Lada after the beginning of the current NHL season, Semin's return to the Capitals would be in serious jeopardy. *Id.* ¶

Gandler represents 17 players under NHL contracts and numerous young players throughout the world. *Id.* at 11. Among Gandler's clients are several star players such as Alexei Yashin of the New York Islanders, Patrik Elias of the New Jersey Devils, Tomas Vocoun of the

5

Nashville Predators and Olli Jokinen of the Florida Panthers, who are the best players on their respective teams. *Id.* Gandler believes that Capitals has brought these claims against him as a pressure tactic to have Semin perform his contract. *Id.* Furthermore, Gandler believes that the NHL and the Capitals are attacking Semin through him because Gandler is an aggressive sports agent who has enjoyed well-known success representing several other players in the NHL. *Id.* Moreover, Gandler believes that this suit is an attempt to discredit him in the eyes of his clients and competition. *Id.*

Gandler has always expressed to the Capitals that Semin prefers to return to the United States. *Id.* at ¶ 12. Gandler has also conveyed to Semin that it would be in Semin's best interests to return to Washington as well, but Gandler has also told Semin that he could not predict whether Semin would be prosecuted by the military for deserting his military obligation.. *Id.*

### ARGUMENT

**I.     THE STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF**

The Capitals bear the burden of proving that a balancing of four factors favors preliminary injunctive relief: (1) that the Capitals have demonstrated a substantial likelihood of success on the merits, (2) that the Capitals would suffer irreparable injury if an injunction does not issue, (3) that the injunction would not substantially injure other interested parties, and (4) that the public interest would be served by issuing the injunction. *Mova v. Shalala*, 140 F. 3d 1060, 1066 (D.C. Cir. 1998); *Morgan Stanley DW v. Rothe*, 150 F. supp. 2d 67, 72 (D.D.C. 2001). Each factor is not necessarily judged equally by the courts, but instead certain factors such as a higher or lower likelihood of success on the merits may reduce the primacy of the remaining factors. *See Bracco Diagnostics, Inc. v. Shalala*, 963 F. supp. 20, 27 (D.D.C. 1997).

**II.   THE CAPITALS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF ITS TORTIOUS INTERFERENCE WITH CONTRACT AND AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY CLAIMS**

The Capitals' motion for injunctive relief against Defendants Gandler and ISA is based on two substantive counts of its Complaint: tortious interference with a contract and aiding abetting the breach of a fiduciary duty. Neither claim has merit.

**A.   The Capitals' Motion for Preliminary Injunction Contains No Evidence Establishing that Mark Gandler Interfered with The Capitals' Contract With Semin**

No proof exists in the Capitals' motion papers, pleadings or in the November 10, 2005 Gandler deposition that Gandler engaged in any conduct that constitutes a tortious interference with contract  And although the Capitals' motion attempts to string a sequence of inferences to create a "substantial and direct link" between any actions by Gandler and those by Semin to prove an intentional interference with contract, the Capitals' effort fails. *See Curaflex Health Services, Inc. v. Bruni*, 899 F. Supp. 689, 694 (D.D.C. 1995). In fact, Gandler has had precious little involvement with events that have occurred in connection with this matter. Gandler's representation of Semin only began two months ago on September 14, 2005. (Gandler Decl. at ¶ 4.) Prior to that date, Semin had been represented by IMG. *Id.* at ¶ 5. During IMG's engagement with Semin prior to the 2003-2004 season, Semin first signed a three-year contract with the Capitals. *Id.* at 6. It was also during Semin's relationship with IMG that Semin signed a two one-year contracts to play for Lada in 2004-05 and 2005-06 seasons. *Id.* And it was IMG that informed the Capitals that Semin had been conscripted into the Russian military and that he would not be returning to play for the Capitals minor league team during the 2004-05 hockey season. *Id.* In contrast to IMG's representation, since being engaged by Semin, Gandler has not negotiated a contract on behalf of Semin nor contacted any teams in any European or Russian

7

hockey leagues on Semin's behalf. *Id.* at 9. Moreover, Gandler has received no compensation from Semin or anyone else in connection with Semin's playing hockey there nor will he. *Id.* Indeed, even if Semin contracted to play with another hockey team in Russia or Europe this year or the next, Gandler would earn no compensation from his representation of Semin. *Id.*

It is also undisputed that Gandler has conducted himself entirely unlike someone attempting to interfere with a contract. Gandler has expressed to all parties that it is his sincere desire that Semin return to play for the Capitals. *Id.* at 8. Gandler has conveyed this message to Fishman of the Capitals in several communications. *Id.* Gandler has also advised Semin that it would be in the young player's best interests to return to the Capitals. That Gandler believes his young client's word--that Semin is conscripted into the Russian military and is unable to leave Russia—and conveys that simple message to the Capitals is simply not conduct that amounts to interference with a contract.

The Capitals' allegations also fail to establish a prima facie case showing that Gandler has engaged in any behavior constituting a breach. First, relying on triple hearsay, the Capitals states that its scout in Russia was told by Semin that "Gandler told me I'm staying." Mem. at 13. Assuming the truth of that statement, it delivers nothing and certainly does not rise to the level of intentionally procuring a breach. Gandler has no control over Semin. Gandler cannot make or direct Semin to do anything. Moreover, Gandler has never told Semin to stay in Russia. In fact, Gandler has told Semin that he would prefer that Semin return and play for the Capitals. The alleged statement could mean a myriad of things, but none in this instance that can be equated with causing interference with a contract.

Second, the Capitals allege that Gandler's "disingenuous" statements that Semin is conscripted into the Russian military amount to an intent to procure a breach. Gandler is not an

expert in military conscription.  He can only rely on what he sees and hears.  Gandler has been given copies of Semin's military passport and a letter from the president of the military sports club that allegedly has conscripted Semin.  *Id.* at ¶ 7.  The papers look authentic to Gandler.  It is apparent to Gandler that Semin believes that he remains under military obligation and cannot leave Russia.  *Id.*

Third, the Capitals allege that Gandler must be interfering with Semin's return because Semin's prior agents, IMG, were close to bringing him home before Gandler began his representation.  The facts, however, do not support that inferential leap either.  As the Capitals know, IMG's efforts to secure Semin's return were frustrated as well when the general manager for Lada, Leonid Vaysfeld stopped working for the team.  *Id.* at ¶ 8.  As reported in an e-mail to both  Gandler and the Capitals, Goryachkin, Semin's former IMG agent, "advised that he had nothing in writing between him and Lada" and that "all of his progress was achieved in dealings with Vajsfeld."  *Id.*

Fourth, the Capitals allege a single motive for Gandler to pursue interference: the furtherance of Gandler's relationship with Lada coach Petr Vorobiev.  Compl. at ¶ 54.  The Capitals make no other allegation about intent nor do they indicate why furtherance of that relationship would be of such value that Gandler would risk pursuing it at the expense of his client's and by extension his own worth.  Gandler's relationship with Vorobiev is no different than the business relationships he maintains with several coaches and officials in the Russian hockey leagues.  *Id.*  at ¶ 3.  None of the Capitals' inferences is credible, and even if considered collectively, they do not amount to a claim of tortious interference that has a likelihood of succeeding on the merits.

      **B.**      **The Capitals Do Not Prove That Gandler Tortiously Interfered With A Contract**

9

The Capitals have not met the burden of establishing a *prima facie* case of intentional interference with contractual relations. In order to do so in the District of Columbia, the Capitals must show (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach. *Paul v. Howard University*, 754 A.2d 297, 309 (D.C. 2000).

As a threshold matter, it is not clear that a viable contract exists here. Gandler has no reason to believe that Semin does not have an honest belief that he is prevented from performing under his contract due to the fact that he has been conscripted into the Russian military. The Capitals allege that Semin's conscription is a "sham." Whether it is or isn't, Gandler has had no involvement with Semin's conscription issue. Gandler's receipt of copies of Semin's relevant military documents shows that Gandler had a good faith belief that the conscription issue constituted a potential impediment to Semin performing under his contract. Moreover, the Capitals offer only supposition and inference to argue that Semin's conscription is a sham. Gandler, on the other hand, obtained a copy of Semin's military passport and letters memorializing Semin's conscription. Furthermore, Semin apparently believes that he is legally conscripted. Plaintiffs have failed to adequately allege that Semin is capable of performing under the agreement. Thus, Semin's failure to perform under his contract may well be justified as impossible to perform and is therefore not a breach. *See Transatlantic Financing Corp. v. United* States, 363 F.2d 312, 315. (D.C. Cir. 1966).

  **C.**  **The Capitals Tortious Interference Claim Fails As A Matter Of Law Because Gandler Cannot Be Found Liable For Tortiously Interfering With The Contract Of Its Principal**

In order to prevail on its claim against Gandler that he tortiously interfered with Semin's contract with the Capitals, the Capitals must allege that the interference was with a contract

10

between the plaintiff and a third party. *Church of Scientology Int'l. v. Eli Lilly Company*, 848 F. Supp. 1018, 1028 (D.D.C. 1994). It is undisputed here that Gandler and ISA are agents for Semin. Thus, the Capitals cannot prevail on its claim because Semin and Gandler are effectively one party. Put another way, it is axiomatic that one cannot interfere with his own contract. *Press v. Howard University*, 540 A.2d 733, 736 (D.C. App. 1988) ("Appellants assertion of this claim [that officers of the university acting as agents were liable for interference with a contract between the university and an employee] as a separate cause of action borders on the frivolous."); *D'Amico v. Building Material, Lumber Box, Shaving roofing and Insulating Chauffeurs*, 2005 WL 483436 at *10 (Mar. 1, 2005 N.D. Ill.) ("[O]nly a third party can tortiously interfere with the business relationship between plaintiffs and [union]"); Palmer *v. Arkansas Council on Econ. Educ.*, 344 Ark. 461, 473 40 S.W.3d 784, 791 (2001) ("[I]t is well settled that party to a contract, and its agents acting in the scope of their authority, cannot be liable for interfering with the party's own contract."); *Multi-Service Contractors, Inc. v. Town of Vernon*, 193 Conn. 446, 451, 477 A.2d 653, 655 (1984) (". . . there can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contracts."). There is no question here that Gandler has acted at all times since September 14, 2005 as Semin's agent, and it would be counter to well-established law to determine that the Capitals would have a likelihood of success on the merits for a claim of tortious interference against Semin's agent.

      The Capitals' discussion of Federal Rule of Civil Procedure 65(d) in its motion papers supports Defendant's position, but not the Capitals'. The Capitals contend that Rule 65(d) provides "injunctive relief that is binding upon [] parties to the action, other officers, agents, servants, employers and attorneys and upon those in active concert or participation." Mem at 12.

It stands to reason then that if an agent is bound by the orders that bind its principal, there cannot be a separate action to enjoin Gandler from any conduct here.

### D. The Capitals Fail to Allege or Prove The Elements Of The Tort Of Aiding and Abetting

In its motion, the Capitals allege almost in passing that they believe Gandler aided and abetted a breach of fiduciary duty based on the "actions described above." Mem. at 14. As shown here above, there is no merit to the allegations made by the Capitals. Moreover, the Capitals' argument in this section consists of citing two cases in its brief and not even identifying for the Court the elements for aiding and abetting, which include (1) aiding a person performing a wrongful act that causes injury; (2) being generally aware of his role in an overall or tortious activity at the time he provides assistance; and (3) that the defendant knowingly and substantially assists the principal violation. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). In the Complaint, the Capitals allege that "Gandler's assistance to Semin in breaching his duty of loyalty has been with full knowledge that they are fostering and perpetuating the deception that Semin is performing 'military service.'" Compl. at ¶ 70.

The Capitals are frustrated because Gandler has been unable to persuade Semin to return from Russia. Therefore, cynically and without factual basis, they claim Gandler is interfering with their contract with Semin. They allege no facts to support aiding and abetting.

### III. THE CAPITALS WILL NOT SUFFER IRREPARABLE HARM IF NO PRELIMINARY INJUNCTION IS ISSUED

The Capitals rely on paragraph six of the Standard Players Contract to argue that it is entitled to injunctive relief. That clause, however, only applies to Semin not Gandler. The Capitals cannot suffer irreparable harm from the actions of Gandler because he is not a player governed by that contract.

**1V.  GANDLER WILL BE SUBSTANTIALLY INJURED IF AN INJUNCTION IS GRANTED**

An injunction against Gandler would substantially injure Gandler's reputation.  It would send a signal to the hockey community—including his clients, his competitors, and his potential clients—that Gandler has engaged in conduct that warranted action by a United States District Judge.  He has not engaged in such conduct, so any injunction would harm his reputation.

## CONCLUSION

For the reasons stated above, the Capitals' motion for a preliminary injunction should be denied.

Respectfully submitted,

_____/s/_____
William L. Gardner
(D.C. Bar No. 004747)
David M. Hibey
(D.C. Bar No. 466856)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, D.C.  20036

Dated:  November 14, 2005         202.739.5185

Attorneys for Defendants
Mark Gandler and International
Sports Advisors Company, Inc.