IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                  Plaintiff,                   Case No:  1:05 CV 02094 (HHK)

       -against-

ALEXANDER SEMIN, et al.,

                  Defendants.

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES
IN REPLY TO THE OPPOSITION OF DEFENDANTS MARK GANDLER
AND INTERNATIONAL SPORTS ADVISORS COMPANY, INC.
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Telephone: (212) 969-3000

          -and-

Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC 20036-2396
Telephone: (202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey
Limited Liability Company, doing
business as the Washington Capitals*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 1

    1.    Semin's Alleged "Military Obligation" Is a Sham ........................................ 2

    2.    Gandler Was Hired for the Express Purpose of Keeping Semin in Russia ............ 4

    3.    Gandler Has Limited Financial Incentive To
        Facilitate Semin's Return to the Washington Capitals ........................................ 5

    4.    Gandler Has Every Incentive To Keep Semin in Russia ...................................... 6

    5.    Gandler Has Done Virtually Nothing To
        Facilitate Semin's Return To The Washington Capitals ...................................... 7

ARGUMENT ..................................................................................................................... 8

I.    This Case Meets the Standard for the Issuance of a Preliminary Injunction ..................... 8

    A.    The Washington Capitals Have Demonstrated
        A Substantial Likelihood of Success on the Merits ...................................... 10

        1.    Gandler May Be Enjoined Under Fed. R. Civ. P. 65(d) Incident
            To The Breach Of Contract Claim Against Mr. Semin ........................... 10

        2.    Gandler Has Tortiously Interfered with the Semin Contract .................... 11

            a.    The Evidence Establishes That Gandler
                Procured Semin's Continued Breach Of Contract ........................ 12

            b.    Whether A Contract Is "Viable" Is Irrelevant To A Tortious
                Interference Claim Against a Stranger to the Contract ................. 14

            c.    An Agent Can Interfere With The Contract Of His Principal
                Where His Acts Are Improper Or Where He Acts For His Own
                Interest ........................................................................................ 15

        3.    Gandler Aided and Abetted Semin's Breach of Fiduciary Duty to the
            Washington Capitals ............................................................................... 17

i

B.    The Washington Capitals Will Suffer Irreparable Harm
      If No Preliminary Injunction Issues ....................................................................18

C.    Gandler Will Not Be Substantially Injured If an Injunction is Granted ................. 19

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

PAGE(s)

## CASES

*Abdah v. Bush,*
     2005 WL 711814 (D.D.C. Mar. 29, 2005) (Kennedy, J.) .................................................9

*Al-Joudi v. Bush,*
     2005 WL 774847 (D.D.C. Apr. 4, 2005) .......................................................................19

*Bergman v. Parker,*
     216 A.2d 581 (D.C. 1966) ............................................................................................14

*Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency,*
     834 A.2d 77 (D.C. 2003) ..............................................................................................11

*Cleary v. Perfectune, Inc.,*
     700 F.2d 774 (1st Cir. 1983) ........................................................................................18

*Cuomo v. United States Nuclear Regulatory Comm'n,*
     772 F.2d 972 (D.C. Cir. 1985) .......................................................................................9

*Halberstam v. Welch,*
     705 F.2d 472 (D.C. Cir. 1983) .....................................................................................17

*Hamilton Watch Co. v. Benrus Watch Co.,*
     206 F.2d 738 (2d Cir. 1953)............................................................................................9

*Int'l Telecomm. Satellite Org. v. Colino,*
     1992 WL 93129 (D.D.C. Apr. 15, 1992) ......................................................................18

*Maryland Metals, Inc. v. Metzner,*
     382 A.2d 564 (Md. 1978) .............................................................................................18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz,*
     298 F. Supp. 2d 27 (D.D.C. 2002) ...............................................................................21

*Mova Pharm. Corp. v. Shalala,*
     140 F.3d 1060 (D.C. Cir. 1998) .....................................................................................8

*N.I.S. Corp. v. Swindle,*
     724 F.2d 707 (8th Cir. 1984) ........................................................................................21

*Nickens v. Labor Agency of Metro. Washington,*

600 A.2d 813 (D.C. 1991) .................................................................15, 17

*Radio TV Reports, Inc. v. Ingersoll,*
1989 WL 121190 (D.D.C. Aug. 14, 1989) ........................................18

*Raymen v. United Senior Ass'n,*
2005 WL 607916 (D.D.C. Mar. 16, 2005)....................................10, 19

*Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.,*
966 F. Supp. 1250 (D.D.C. 1997)....................................................18

*Serono Lab. v. Shalala,*
158 F.3d 1313 (D.C. Cir. 1998) ........................................................9

*Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.,*
565 A.2d 285 (D.C. 1989) ...............................................................15

*Transatlantic Financing Corp. v. United States,*
363 F.2d 312 (D.C. Cir. 1966) .........................................................14

*Trudeau v. FTC,*
384 F. Supp. 2d 281 (D.D.C. 2005) .................................................19

*Washington Capitols Basketball Club, Inc. v. Barry,*
304 F. Supp. 1193 (N.D. Ca.), *aff'd,* 419 F.2d 472 (9th Cir. 1969)....................................19

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
559 F.2d 841 (D.C. Cir. 1977) ..........................................................9

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(d) ...............................................................................10

Restatement (Second) of Torts § 766 cmt. f...........................................14

Restatement (Second) of Torts § 766 cmt. j ..........................................14

Restatement (Second) of Torts § 766 cmt. k...........................................14

Restatement (Second) of Torts § 766 cmt. s...........................................15

Restatement (Second) of Torts § 876 cmt. d...........................................17

Don Brennan, *Talking a Tough: Yashin's Hard-Headed Agent Gandler Takes Heat,*
OTTAWA SUN, Sept. 17, 2000, at 62.................................................20

Leonard Stern, *The Power Player: Always on Call, Mark Gandler is Many Things*
    *– Dealmaker, Cheerleader, Psychologist, Middleman, and to some*
    *"Cancer of the NHL,"* THE OTTAWA CITIZEN, Apr. 8, 2001, at C2 .................................20

*Prosser and Keeton on the Law of Torts* § 129 (5th ed. 1984) .......................................................13

Steve Simmons, *Gandler a Blight on the NHL*,
    THE TORONTO SUN, Sept. 2, 1999, at 81 ..........................................................................20

Tim Panaccio, *With Yushkevich, Flyers Get His Agent As Well*,
    PHILADELPHIA INQUIRER, Mar. 16, 2003, at D14.......................................................... 19-20

## PRELIMINARY STATEMENT

Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals (the "Washington Capitals"), submits this Statement of Points and Authorities in further support of its motion for a preliminary injunction and in reply to the Memorandum of Points And Authorities In Opposition submitted by Defendants Mark Gandler and International Sports Advisors Company Inc. (collectively "Gandler"), dated November 14, 2005 ("Gandler Opp.").

Alexander Semin ("Semin") is breaching his contract (the "Semin Contract") with the Washington Capitals. Neither he nor his agent Gandler should be permitted to continue to breach or to facilitate this breach, and a preliminary injunction prohibiting such conduct should be should be entered forthwith.

## STATEMENT OF FACTS

Pursuant to the Court's order of November 4, 2005, the Washington Capitals served document requests and deposition notices on Gandler and on Semin. Gandler produced some documents in response to the requests and appeared for his deposition in New York on November 10. Semin has produced no documents, and declined to appear for his deposition in Moscow, or anywhere else. In addition, the Washington Capitals have served a third-party subpoena on Semin's former agents at IMG, received some of IMG's documents and taken the 30(b)(6) deposition of a corporate representative of IMG in Calgary, Alberta, who clearly was unprepared to testify as to facts within the corporation's knowledge.

In short, discovery of the facts of this matter is just getting underway, and there is much yet to be learned. Even so, the facts known and discovered to date plainly support the issuance of the requested preliminary injunction. The deposition testimony and documentary evidence

1

relied on are annexed to the Declaration of Scott A. Eggers, dated November 22, 2005 ("Eggers Decl."), submitted herewith.  Certain of that evidence is summarized below.

### 1.    Semin's Alleged "Military Obligation" Is a Sham

Gandler claims that he has no basis to question the validity of Semin's "military obligation," which allegedly prevents him from returning to the Washington Capitals for the 2005-06 NHL season.  *See* Declaration of Mark Gandler, dated November 14, 2005 ("Gandler Decl.") ¶ 7.  To the contrary, Gandler has *every* basis to question the validity of this alleged "obligation."  Semin has been playing hockey for a million dollar salary and an apartment in Russia.  *See* Deposition of J.P. Barry, dated November 16, 2005 ("Barry Dep.," copy annexed as Exhibit B to the Eggers Declaration) at 64, 70.  That is not military service.  *See* Declaration of Anna Beliakova, dated November 1, 2005.

According to Semin's former agents and one of the largest player representatives in the industry, IMG, it is well-known in the community of agents who represent Russian players that Russian hockey clubs have arranged to have their players conscripted into the Russian military in order to avoid playing in the NHL.  *See* Barry Dep. at 66-67.  At least two such incidents are widely known within that community.  *See id*. at 67-68.

In this case, Semin was allegedly "conscripted" into the Russian military by personal delivery of a "conscription summons" on Saturday, September 25, 2004.  That was *one day* before Semin was scheduled to depart for the United States to report to the Washington Capitals minor league affiliate in Portland, Maine (the "Portland Pirates").  *See* Barry Dep. at 55-57.  It is a reasonable inference that this timing was no coincidence:

> Q:    Is it just a coincidence that Semin received a conscription
>       notice the day before he was to depart?

2

> A:    I don't know.  But timing seems odd.

*Id*. at 57.  Indeed, Gandler himself has stated that he believes that "IMG was involved with Semin's conscription into the Russian military in October and November of 2004."  Gandler Decl. ¶ 6.  At present, Semin is the only player on Lada Togliatti who has been conscripted into the Russian military.  *See* Barry Dep. at 68.  Semin is also the only player on Lada Togliatti who has an NHL contract.

While Semin was allegedly "conscripted" into the Russian military for two years, his former agents at IMG were under the impression that his "military obligation" could be limited to a shorter period.  *See* Barry Dep. at 58.  Sure enough, in the summer of 2005, less than one year into Semin's "military obligation," Semin's former agents were moving forward on a deal to get Semin out of the Russian military.  *See id*. at 80.  And by August 25, 2005 – still less than one year into Semin's "military obligation" – IMG was of the view that it had been "able to work out a deal with the Russian Military."  *See id*. at 85.  On September 29, 2005 – again, less than one year into Semin's "military obligation" – Semin was issued a visa by the U.S. Embassy in Moscow to leave Russia.  *See* Declaration of George McPhee, dated November 1, 2005 ("McPhee Decl.") ¶ 25.

Gandler's own client also apparently knows that his "military obligation" is a sham.  In an October 12, 2005 interview in the Russian newspaper Sport Express, Semin was asked:  "You didn't go to the NHL because you are in active military service.  Is there possibility that you may end up in a regular military unit?"  *See* McPhee Decl. ¶ 28, Exh. N.  Semin replied:  "No.  This is not one of the possible outcomes."  *See id*.

3

If Gandler were to be believed, it seems that only he is unaware of any basis to question whether Semin's alleged "military obligation" is legitimate. *See, e.g.*, Gandler Opp. at 8-9. The evidence is to the contrary. Gandler's clients are principally Russian. *See* Gandler Decl. ¶ 2. Arrangements by Russian hockey clubs to purport to have their players conscripted into the military in order to avoid playing in the NHL are well-known in the community of agents who represent Russian players. *See* Barry Dep. at 66-68. Gandler himself is aware that IMG was able to make "a deal" to get Semin out of the Russian military. *See* Deposition of Mark Gandler, dated November 10, 2005 ("Gandler Dep.," copy annexed as Exhibit A to the Eggers Declaration) at 79, 159-60. Gandler had a lengthy discussion with Lada Togliatti's Executive Director, Vladimir Vdovin, in which it was made clear to him that Lada Togliatti believed it could put an end to Semin's "military obligation." *See id.* at 69-71. Gandler also claims to have expressed in a call to the Russian Super League "that this military promised [Semin] to leave[.]" *See id.* at 119. In addition, Gandler knew that the Ice Hockey Federation of Russia had stated in 2004 that Semin could play in the NHL after the lockout ended, notwithstanding his alleged "military obligation." *See id.* at 189-191.

Everything of which Gandler was aware, as well as Gandler's own actions, belie any assertion by Gandler that Semin's military obligation is anything other than a sham. Yet he has employed Semin's "military obligation" repeatedly to impede the Washington Capitals' efforts to secure the return of an invaluable player.

### 2.    Gandler Was Hired for the Express Purpose of Keeping Semin in Russia

Gandler contends he was hired by Semin because Semin was unhappy with the services of his former agents at IMG. *See* Gandler Decl. ¶ 4. Gandler provides no elaboration as to why

Semin was unhappy with IMG's services. *See* Gandler Dep. at 84-85. In fact, Semin never once complained about IMG's services. *See* Barry Dep. at 37. Rather, Semin was unhappy with IMG's advice that Semin return to the NHL. *See id.* at 93-94; Eggers Decl. Exh. C (e-mail from J.P. Barry).

Gandler also misleadingly claims that when Semin's father contacted him in September 2005 about becoming his son's agent, Gandler had virtually no prior contact with Semin. *See* Gandler Decl. ¶ 5. In fact, three years before, in 2002, Gandler had "ma[de] overtures towards [Semin's father] regarding representing [Semin]," that IMG deemed intrusive enough to send a cease and desist letter to Gandler. *See* Barry Dep. at 24; Eggers Decl. Exh. D.

IMG told Semin that he should either listen to IMG's advice to play in the NHL or else fire IMG as his agents. *See* Eggers Decl. Exh. C. Just as Semin was literally packing his bags to return to the Washington Capitals, having missed Lada Togliatti's first four regular season games of the 2005-06 season, Semin fired IMG on September 14, 2005. *See* Barry Dep. at 88-93. Semin hired Gandler the same day. *See* Gandler Decl. ¶ 4. By September 19, Semin was again playing with Lada Togliatti. *See* Gandler Dep. at 120-21; McPhee Decl. ¶ 24.

### 3.    Gandler Has Limited Financial Incentive To Facilitate Semin's Return to the Washington Capitals

Gandler states that his client's only desire is to return to the Washington Capitals for the 2005-06 season. *See* Gandler Dep. at 88-89, 104, 110. But Gandler has no real financial incentive to facilitate Semin's return to the Washington Capitals. Gandler will receive no commission if Semin plays for the Washington Capitals in the 2005-06 season. *See id.* at 93. The same would hold true next season if Semin's contract with the Washington Capitals is tolled.

*See id.* at 106-109.  In either case, the agent's commission would, even according to Gandler himself, go to IMG.  *See id.* at 93, 108-109.  IMG concurs.  *See* Barry Dep. at 29.

### 4.    Gandler Has Every Incentive To Keep Semin in Russia

Gandler claims that he has never received any compensation for negotiating a contract in Russia.  Gandler Dep. at 51.  In his Declaration, Gandler states that "I have never received any compensation for players playing in any one of the European professional leagues, including Russia." Gandler Decl. ¶ 2.

Gandler does not appear to be telling the truth.  The Washington Capitals are submitting herewith English translations of a copy of a contract dated February 2005, under which Gandler agreed to procure a player for Ak Bar in the Russian Super League from Bern in the Swiss League.  In exchange, the contract provides that Gandler would receive a $150,000 payment from Ak Bar.  In addition to a two-page contract to pay the commission, the submitted documents include a single page document that is in effect a release, indicating that the player arrived and Gandler was paid.  The documents each bear Gandler's signature.  *See* Eggers Decl. Exh. I.[1]

Even if no one is receiving a commission from Semin's play in Russia – and so far neither IMG nor Gandler appears to be willing to admit that they are – Gandler clearly receives other benefits from Semin's continued play in Russia.  A high percentage of Gandler's professional hockey clients were or are coached by Petr Verobiev, the coach of Lada Togliatti. *See* Gandler Dep. at 52-61.  By all indications, where Verobiev goes, so goes Gandler's business. *See id*.  It comes as no surprise, then, that after Semin hired Gandler, Semin resumed play for

---

[1]    These documents may be authenticated under Fed. R. Evid. 901(b)(3), by comparing the signatures on the documents to Gandler's signature on his agent's contract with Semin, which Gandler identified.  *See* Gandler Dep. at 173-74; Eggers Decl. Exh. J.

Lada Togliatti on September 19, 2005 –Verobiev wants Semin to stay with Lada Togliatti. *See id.* at 112. Semin's alleged wish to play in the NHL this season is not met by the present circumstances, and yet Gandler's relationship with Verobiev is fostered.

On October 10, 2005, shortly after Semin hired Gandler and resumed play for Lada Togliatti, the club announced that it was suffering financial difficulties and was prepared to release many of its players, including Semin. *See* Gandler Dep. at 123; McPhee Decl. ¶ 27. This opportunity to secure Semin's return to the Washington Capitals for the 2005-06 season appears to have been missed. Although Gandler claims that he is "not assisting Semin in playing hockey in Russia" and that he is "only compensated if Semin plays in the NHL" (Gandler Decl. ¶ 10), his client stated in an interview on October 12 with the Russian newspaper Sport Express: "Where am I going to continue my career? I don't know. [Gandler] is working on this question." *See* McPhee Decl. ¶ 28, Exh. N. On November 8, 2005, Semin was again quoted as stating that Gandler was "working to find [Semin] a team in Russia." Gandler has "no idea" how Semin might have come by that understanding. *See* Gandler Dep. at 133-34. Gandler has spoken to Semin approximately fifteen times since becoming his agent on September 14. *See id.* at 29.

### 5. Gandler Has Done Virtually Nothing To Facilitate Semin's Return To The Washington Capitals

Gandler has done virtually nothing to facilitate Semin's return to the Washington Capitals for the 2005-06 season, although he claims that is his client's wish. He has made no investigation into the terms of Semin's contract with Lada Togliatti. *See* Gandler Dep. at 31-32, 114-15. He has never inquired whether Semin has been released from that contract. *See id.* at 32. He never explored the topic of Semin's "military obligation," or the deal to get him out of

the military, with Petr Verobiev.  *See id.* at 63-64.  He never inquired of Semin whether Semin's "military obligation" entailed anything remotely related to military services.  *See id.* at 65-67. He never asked Semin how Semin came to be "conscripted" into the Russian military.  *See id.* at 73.  Nor did he ask the Executive Director of Lada Togliatti, Vladimir Vdovin.  *See id.* at 72.  He never sought to see a copy of Semin's "conscription summons."  *See id.* at 180.  He never talked to IMG regarding the deal they had arranged to get Semin out of the Russian military, or inquired of anyone concerning the nature of that deal.  *See id.* at 79-81.  He never asked Semin or Semin's father about the deal.  *See id.* at 112-113, 136.  He never inquired as to why Semin was unhappy with IMG's services.  *See id.* at 83.

A proactive agent looking out for his client's alleged desires might have done more than this.  Choosing action over inaction might have facilitated Semin's return to the Washington Capitals for the 2005-06 season.  Gandler can do no better in explaining his role than to say:  "I keep my nose to my own business."  *Id.* at 93.

## **ARGUMENT**

## I.      **This Case Meets the Standard for the Issuance of a Preliminary Injunction**

As stated in the Washington Capitals' Statement of Points and Authorities in Support of Its Motion for a Preliminary Injunction, dated November 1, 2005 ("Capitals Mem."), there is a four-part test for issuance of a preliminary injunction:  (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) no substantial injury to other interested parties; and (4) the public interest.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). Gandler devotes the bulk of his opposition to whether the Washington Capitals have demonstrated likelihood of success on the merits, and very little to the other parts of the test.

As we explain below, the Washington Capitals have demonstrated a likelihood of success on the merits. In any event, this Court has noted that the four factors "'interrelate on a sliding scale' and must be considered in relation to one another." *Abdah v. Bush*, 2005 WL 711814, at *3 (D.D.C. Mar. 29, 2005) (Kennedy, J.) (quoting *Serono Lab. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998)). A preliminary injunction may be issued "with either a high probability of success and some injury, or vice versa." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). As the Court of Appeals for the District of Colombia Circuit has explained:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).

Moreover, the temporary injunction sought is particularly appropriate in this case, as Semin's breach is clear and because, in even its best light, Gandler *claims* to have engaged in none of the activities that the Washington Capitals' proposed order would temporarily enjoin and, indeed, to have no interest in or incentive to engage in any such activities. *See* Gandler Opp. at 13. At the same time, Gandler's client Semin, although he refuses to appear for his deposition, is telling the world that Gandler is his agent in Russia and is negotiating his future arrangements to play hockey in that country. *See* Exh. A to the Declaration of Robert Bernstein, dated November 2, 2005 (the "Bernstein Decl."). Given this record, an order enjoining Gandler from engaging in activities that he claims he has no desire to engage in is plainly appropriate.

9

*See Raymen v. United Senior Ass'n*, 2005 WL 607916, at *5 (D.D.C. Mar. 16, 2005) (party cannot be harmed where injunction "would only prevent the [party] from engaging in actions that [it] has already informed the Court it will not engage in").

**A.    The Washington Capitals Have Demonstrated**
**A Substantial Likelihood of Success on the Merits**

**1.    Gandler May Be Enjoined Under Fed. R. Civ. P. 65(d) Incident**
**To The Breach Of Contract Claim Against Semin**

According to Gandler, he did not tortiously interfere with Semin's contract, or aid and abet Semin's breach of fiduciary duty, and he has acted at all times in the interests of his principal Semin. *See* Gandler Opp. at 7-12.  Even if these self-serving statements were credited, Gandler's status as Semin's agent cannot shelter Gandler from injunctive relief because of Federal Rule of Civil Procedure 65(d).  As stated in the Capitals Mem. (at 12), Gandler is subject to an injunction in this case because Semin is in breach of his contract.  As Semin's agent, Gandler may be enjoined from taking any further action to assist Semin's continued breach.

Gandler's only response to this argument is to state, without the benefit of any authority, that "[i]t stands to reason then that if an agent is bound by the orders that bind its principal, there cannot be a separate action to enjoin Gandler from any conduct here."  Gandler Opp. at 12.  As discussed below, that is not the law.  An agent is capable of tortiously interfering with the contract of his principal, for example, where the agent is serving his own interests rather than those of his principal.  *See* Part I(A)(2)(c), *infra*.  More fundamentally, this response misses the point.  If, as Gandler has claimed, he is only following the instructions of his young principal, then the requested injunction is still appropriate under Rule 65(d).  Thus, in this case, whether the Washington Capitals have demonstrated a likelihood of success on their tortious interference

and aiding and abetting claims assumes relatively less significance than it might in another case. An injunction against Gandler is appropriate either way.

### 2. Gandler Has Tortiously Interfered with the Semin Contract

A party is liable for tortious interference with contract where the following elements are established: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach. *See Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003). The Washington Capitals have established a *prima facie* case of tortious interference with contract against Gandler.

Gandler's principal arguments with respect to the Washington Capitals' tortious interference claim are (1) that Gandler did not procure a breach of the Semin Contract (*see* Gandler Opp. at 7-9), (2) that "it is not clear that a viable contract exists here" (*see* Gandler Opp. at 10), and (3) that an agent cannot be found liable for interfering with a contract of his principal (*see* Gandler Opp. at 10-12). These arguments are addressed in turn.[2]

---

[2]     It is abundantly clear from Gandler's deposition testimony that Gandler was at all times aware of the existence of the Semin Contract:

| | |
|---|---|
| Q: | When Semin signed a contract with the Washington Capitals in 2003, were you aware of that contract? |
| A: | Yes. |
| Q: | How did you become aware of that contract? |
| A: | I'm aware of every contract. |
| Q: | Every contract signed by any -- |
| A: | By any NHL player. |
| ... | |
| Q: | And you knew in 2003 that that was a three-year contract? |
| A: | Yes. |

Gandler Dep. at 81-82.

a.     **The Evidence Establishes That Gandler**
**Procured Semin's Continued Breach Of Contract**

Gandler contends that the evidence establishes that he did not "procure" a breach of the

Semin Contract and accuses the Washington Capitals of "string[ing]" a sequence of inferences

that do not together add up to a "substantial and direct link" between Gandler's conduct and

Semin's breach.  Gandler Opp. at 7-9.  The evidence in this case amply supports the conclusion

that Gandler has procured Semin's continued breach of contract and, indeed, that he was hired

precisely because he was willing to do so.  Gandler's self-serving denials of any such intent fly

in the face of the facts.

IMG's advice to Semin was that he should play in the NHL.  *See* Barry Dep. at 85, 89-94.

Indeed, according to an internal e-mail that IMG produced after its deposition in this case, IMG

told Semin either to listen to its advice or fire them.  *See* Eggers Decl. Exh. C.  Semin did not

like IMG's advice and chose to fire them instead.  *See* Barry Dep. at 90-94.  Gandler testified

that IMG was fired because of complaints about IMG's "service."  Gandler Dep. at 83-85; *see*

*also* Gandler Decl. ¶ 4. According to IMG, Semin never once complained about IMG's services.

*See* Barry Dep. at 37.  Of course, it is conceivable that Semin was not really sure why he was

firing his agents, and that he told IMG one thing and Gandler another.  But Gandler has a motive

to testify falsely if the reason he was hired was to help Semin stay in Russia.[3]

---

[3]     That is not the only instance in which Gandler has given testimony that is misleading, at best.  In addition
to the statement in Gandler's declaration about never receiving any compensation for players to play in
Russia, Gandler also states in his declaration that his only contact with Semin before September 2005 was a
couple of passing hellos at hockey games.  Gandler Decl. ¶ 5.  In fact, a document that was produced by
IMG after Gandler signed his declaration establishes that in 2002, Gandler had solicited Semin's father to
become Semin's agent, prompting a cease and desist letter from IMG telling him to stop.  Barry Dep. at 24-
27, Eggers Decl. Exh. D.

Gandler has chalked up to mere "coincidence" the fact that within several days after he was hired as Semin's agent, Semin began playing for Lada Togliatti, having missed the club's first four regular season games. Couple that with the following additional "coincidences" and a clear picture starts to emerge:

- IMG was fired for advising Semin to leave Russia and play in the NHL (*see* Barry Dep. at 90-94);

- Once IMG was fired, suddenly the "deal" that had been worked out to get Semin out of the military lost all momentum (*see* Barry Dep. at 80-81, 84-88);

- Semin publicly stated that his agent Gandler was making arrangements for him to play for another Russian team (*See* Bernstein Decl. Exh. A);

- Gandler neglected to mention to Semin that these public statements were allegedly false (*see* Gandler Dep. at 131-133);

- Gandler has received commissions in the past for players to play in Russia (*see* Eggers Decl. Exh. I);

- Gandler admits that he spoke to several teams in the two weeks before his deposition that were publicly reported to have been interested in acquiring Semin, though he denies that they ever discussed the subject (*see id*. at 127-28);

- Gandler denies any intent to help Semin stay in Russia, and yet he confirmed in his deposition that he has made no real efforts to bring him here (*see supra* pp. 7-8).

Semin continues to breach his contract with the Washington Capitals. These inferences establish a causal link between that continued breach and the hiring of Gandler. IMG was fired precisely because they insisted on advising Semin to play in the NHL, and Gandler was evidently hired precisely because he was willing to give Semin contrary advice. As Gandler testified in this case, he believes that "[t]here's nothing wrong with breaking a deal." *Id*. at 154-55. And so long as an actor knows a breach is "a necessary consequence of his action" – in this case persuading Semin that Gandler could assist him to stay in Russia –interference with the contract

is established. Restatement (Second) of Torts § 766 cmt. j; *see also id*. cmt. k ("persuasion exerting only moral pressure" establishes procurement of a breach).

> **b.      Whether A Contract Is "Viable" Is Irrelevant To A Tortious Interference Claim Against a Stranger to the Contract**

Relying on the doctrine of impossibility, Gandler argues that "it is not clear that a viable contract exists here" and that Semin's failure to perform therefore may not be a breach. Gandler Opp. at 10.[4] As support for this argument, Gandler cites to a single case, *Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C. Cir. 1966). *See* Gandler Opp. at 10. That case did not involve a tortious interference with contract claim, and is wholly inapposite. Until a party to the contract successfully asserts an impossibility defense, the contract is assumed to be valid, and a stranger to the contract may not interfere with it. As explained in the Restatement:

> [i]t is not . . . necessary that the contract be legally enforceable against [a party to a contract] . . . The third person may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly . . . The defendant actor is not . . . free to interfere with performance of the contract before it is avoided [by a party to it].

Restatement (Second) of Torts § 766 cmt. f (citations omitted); *see also Bergman v. Parker*, 216 A.2d 581, 583 (D.C. 1966) ("the burden rests upon the party [to the contract] asserting [the impossibility] defense to prove it").

---

[4]    Whether or not the contract is "viable," there is no question that Gandler believes the Semin Contract is "valid":

> Q:    Gandler, leaving aside the conversation or any information you may have learned from your conversations with counsel, do you have any reason to believe that the contract between Alexander Semin and the Washington Capitals is not valid?
> A:    I have no reason to believe that.

Gandler Dep. at 150.

     **c.**    **An Agent Can Interfere With The Contract Of His Principal Where His Acts Are Improper Or Where He Acts For His Own Interest**

Gandler argues that he cannot be found to have interfered with the Semin Contract because an agent cannot interfere with the contract of his principal. *See* Gandler Opp. at 10-12. Gandler fails to note the exceptions to this general rule. "[An agent] may be held liable for interfering with the contract of [his principal] provided he is shown to have acted maliciously or for his own benefit, rather than for the benefit of the [principal]." *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 820 (D.C. 1991) (citing cases). Where this is the case, "the [agent] should be viewed as acting in his individual capacity and interest rather than on behalf of the [principal]." *Id.*

In this context, "malice" does not mean "ill will," but merely "intentional interference without justification" (Restatement (Second) of Torts § 766 cmt. s) or interference for an improper purpose. *See Nickens*, 600 A.2d at 820; *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 291 (D.C. 1989) (citing *Prosser and Keeton on the Law of Torts* § 129 (5th ed. 1984)).

The evidence adduced to date establishes that Gandler has acted both for his own benefit and for an improper purpose. For three reasons, Gandler cannot escape liability for tortious interference with the Semin Contract based on the argument that he was simply acting as Semin's agent.

First, according to Gandler, it is Semin's wish to return to play for the Washington Capitals in the 2005-06 season. *See* Gandler Dep. at 88-89, 104, 110. Yet Gandler made no real attempt to facilitate Semin's return to the Washington Capitals. *See supra* pp. 7-8. If Semin's

wishes are as Gandler represents them to be, then Gandler's inaction cannot be explained as carrying out his client's wishes.

Second, if Semin's wishes are as Gandler represents them to be, then having Semin remain in Russia will foster Gandler's future business interests, but will not serve Semin's wishes. Gandler's larger financial interests are served by fostering his own relationship with Lada Togliatti's coach, Petr Verobiev. Mr. Verobiev has historically been a principal source of Gandler's clients. *See id.* at 52-61. For example, from 1996 to 2000, while Mr. Verobiev was the coach of the Russian team Yaroslavl, approximately nineteen Yaroslavl players entered the NHL draft, of whom approximately fifteen were represented by Gandler. *See id.* at 56. Indeed, the Yaroslavl player contract had a provision that required any player who wanted to negotiate an NHL contract to use an agent approved by the team. Gandler was such an agent. *See id.* at 56-60. Gandler never signed any Lada Togliatti players to NHL contracts before Mr. Verobiev arrived at the team. *See id.* at 60. Gandler knows that Lada Togliatti definitely wants Semin to stay in Russia and play with Lada this season, and he assumes that his friend Mr. Vorobiev, the coach of Lada, wants Semin to stay, although Gandler claims never to have discussed it with him. *See id.* at 111-12.

Third, Gandler acknowledges that he has persistently peddled the argument to the Washington Capitals that Semin's "military obligation" prevents his return to the Washington Capitals this season. *See, e.g.*, Gandler Opp. at 5. Yet he also believes that "IMG was involved with Semin's conscription." Gandler Opp. at 4. Such a sham "conscription" into the Russian military to avoid commitments to the NHL is a known fact among the community of agents who represent Russian hockey players. *See* Barry Dep. at 66-67. At least two recent incidents of such "conscription" are widely known within the hockey community. *See id.* at 67-68. Gandler,

16

like the rest of the hockey community, knows that such "conscriptions" are a sham, despite all

his protestations to the contrary. *See* Gandler Dep. at 119 ("I called the [Russian Super League]

and . . . I told them that this military promised [Semin] to leave"). Gandler's perpetuation of this

charade defeats his contention that he cannot be found liable for tortiously interfering with the

Semin Contract because he merely acts as Semin's agent. *See Nickens*, 600 A.2d at 820 (there is

no principal-agent defense to a tortious interference claim where the agent intentionally

interferes out of improper purpose).

### 3.    Gandler Aided and Abetted Semin's Breach of Fiduciary Duty to the Washington Capitals

Gandler's response to the Washington Capitals' aiding and abetting claim appears to rest

principally on the notion that the Washington Capitals did not devote sufficient space to the

claim in its moving brief. *See* Gandler Opp. at 12. This argument bears no relation to the

substance of the Washington Capitals' claim.

The elements of aiding and abetting require that:

> (1) the party whom the defendant aids must perform a wrongful act
> that causes an injury; (2) the defendant must be generally aware of
> his role as part of an overall illegal or tortious activity at the time
> that he provides the assistance; (3) the defendant must knowingly
> and substantially assist the principal violation.

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (citing cases). *Halberstam* explains

the rationale for such liability: "Advice or encouragement to act operates as a moral support to a

tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the

liability of the adviser as participation or physical assistance." *Id.* (quoting Restatement

(Second) of Torts § 876 cmt. d). "Substantial assistance may be rendered by words of

encouragement or by action and may be provided at the scene of the tort or other illegal activity

or at a time and location less immediate." *Int'l Telecomm. Satellite Org. v. Colino*, 1992 WL
93129, at *13 (D.D.C. Apr. 15, 1992).  In addition, substantial assistance may be rendered
through inaction.  *See Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir. 1983) (citing cases).

        The facts stated above with respect to the tortious interference claim equally state a clear
case that Gandler has aided and abetted Semin's breach of fiduciary duty to the Washington
Capitals to "act solely for the benefit of his employer in all matters within the scope of
employment[.]" *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978) (*cited with
approval in Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1264
(D.D.C. 1997)); *Radio TV Reports, Inc. v. Ingersoll*, 1989 WL 121190, at *3 (D.D.C. Aug. 14,
1989)).  Gandler's general awareness of his role in Semin's breach and his knowledge and
substantial assistance with respect to it are unquestionable.

### B.    The Washington Capitals Will Suffer Irreparable Harm If No Preliminary Injunction Issues

        Gandler contends very briefly and with no explanation that the Washington Capitals
cannot be harmed by his actions because he is not a party to the contract between the
Washington Capitals and Semin.  *See* Gandler Opp. at 12.  We are frankly at a loss to understand
or explain this argument.  The essence of the claims against Gandler – tortious interference with
contract and aiding and abetting a breach of fiduciary duty – is that a party complicit in
actionable conduct may be held liable to the same extent as the primary violator.  The irreparable
injury that those actions have caused to the Washington Capitals is clear:

> [Irreparable harm] exists when an athletic team is denied the
> services of an irreplaceable athlete . . . [T]he mere signing of a
> player to a professional [athletic] contract is substantial evidence
> of his outstanding qualities.  When [such] a player has proven his
> superior ability under the rigorous conditions of [a professional
> sport], it is clear that money alone cannot replace his loss.

18

*Washington Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1197-98 (N.D. Ca.),

*aff'd*, 419 F.2d 472 (9th Cir. 1969).

### C.    Gandler Will Not Be Substantially Injured If an Injunction is Granted

Gandler asserts, with no legal or factual support, that an injunction in this case would "substantially injure Gandler's reputation." Gandler Opp. at 13. This argument suffers from several flaws. First, no concrete harm could result from an injunction requiring a party to refrain from an activity in which he allegedly does not engage. *See Raymen*, 2005 WL 607915, at *5 (party cannot be harmed where injunction "would only prevent the [the party] from engaging in actions that [it] has already informed the Court it will not engage in").

Second, Gandler's claim of substantial injury is wholly speculative and conclusory. Such conclusory allegations, devoid of factual support, fail to establish the harm that a party would suffer if enjoined. *See Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) (claim of harm to reputation is tenuous and speculative where no evidence demonstrates that the party's reputation would be harmed); *Al-Joudi v. Bush*, 2005 WL 774847, at *5 (D.D.C. Apr. 4, 2005) ("vague premonitions" unsupported by concrete evidence are insufficient to establish harm).

Third, Gandler has injected the issue of his reputation into this proceeding. The Court should therefore be aware of just what that reputation is. Even if Gandler had attempted to offer concrete evidence of harm to his reputation, it is extremely unlikely that the Court could afford such a claim any weight at all.

Gandler's attitude toward honoring contracts has been widely publicized. He believes that there is nothing wrong with advising players to breach their contracts or with assisting them in doing so. *See, e.g.*, Tim Panaccio, *With Yushkevich, Flyers Get His Agent As Well*,

PHILADELPHIA INQUIRER, Mar. 16, 2003, at D14, attached as Exh. E to Eggers Decl. ("This is America; contracts are broken all the time."); Leonard Stern, *The Power Player: Always on Call, Mark Gandler is Many Things – Dealmaker, Cheerleader, Psychologist, Middleman, and to some "Cancer of the NHL,"* THE OTTAWA CITIZEN, Apr. 8, 2001, at C2, attached as Exh. F to Eggers Decl. ("A contract…'has nothing to do with morality. … I can tell you that breaking a contract is just as important as signing a contract.'"); Don Brennan, *Talking a Tough: Yashin's Hard-Headed Agent Gandler Takes Heat*, OTTAWA SUN, Sept. 17, 2000, at 62, attached as Exh. G to Eggers Decl. ("And in some cases it doesn't matter that you have a contract with Mark Gandler. As he points out, it is only a piece of paper.").

     Gandler echoed these sentiments during his deposition in this case:

| | |
|---|---|
| Q | In this article you're quoted as saying in this third paragraph of Page 4, quote, "There's nothing wrong with breaking a deal. In fact, it's economically beneficial. Everyone acts in his own best interests." Did you say those words? |
| A | Yes. |
| Q | Did you believe them? |
| A | Yes. |
| Q | You believe them today? |
| A | Yes. |

Gandler Dep. at 154-55.

     Another NHL agent has stated: "[Gandler] gives all of us a bad name. He has no respect for a contract and he counsels his clients to have no value for what a contract means. I don't think it is a healthy situation. It makes the whole business look bad." Steve Simmons, *Gandler a Blight on the NHL*, THE TORONTO SUN, Sept. 2, 1999, at 81, attached as Exh. H to Eggers Decl. Gandler has also been publicly referred to as "cancer of the NHL." Eggers Decl. Exh F. Obviously, Gandler's reputation is not such that an injunction from this Court could possibly

cause much sting.  Gandler's claim that an injunction could "substantially injure Gandler's reputation" must be rejected out of hand.[5]

---

[5]    Gandler makes no argument at all with respect to the fourth prong of the preliminary injunction test, that granting an injunction in this case will further the public interest.  *See* Capitals Mem. at 12 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002)); *see also N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("if [contractual] agreements are valid, the public interest calls for their enforcement").

21

## CONCLUSION

For the foregoing reasons and for the reasons stated in the Washington Capitals' previous submissions, the Washington Capitals' motion for a preliminary injunction should be granted.

Dated: November 22, 2005

Respectfully submitted,

PROSKAUER ROSE LLP

By:  s/ Scott A. Eggers
Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Telephone:  (212) 969-3000

-and-

By:  s/ Robert M. Bernstein
Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC  20036-2396
Telephone:  (202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey*
*Limited Liability Company, doing*
*business as the Washington Capitals*