IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                    Plaintiff,                    Case No.: 1:05 CV 02094 (HHK)

          v.

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

                    Defendants.

**DECLARATION OF ALEXANDER BERKOVICH IN SUPPORT OF DEFENDANT
ALEXANDER SEMIN'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
OF HIS MOTION TO DISMISS THE COMPLAINT HEREIN AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED
DISCOVERY**

          ALEXANDER BERKOVICH hereby declares as follows:

          1.     I will be appearing as Alexander Semin's attorney in this action on a *pro hac vice*

basis. I respectfully submits this declaration in support of Alexander Semin's motion to dismiss

the complaint herein on the grounds of forum non conveniens, under doctrines of international

comity and the Act of State, and in the alternate, on the grounds of arbitration agreements, and in

opposition to plaintiff's motion for a preliminary injunction and expedited discovery, and for

stay of discovery pending decision on the dispositive motion.

          2.     The purpose of this declaration is to place before the Court true and correct copies

of the following documents:

3.      Attached as <u>Exhibit A</u> is a true and correct copy of "Information On Private Alexander Valerievich Semin" from Central Sports Club of Russian Air Force to the Hockey Club "Lada" Togliatti that states that Alexander Semin took his military oath on November 11, 2004, was serving in the military in the Central Sports Club of Russian Air Force, that term of his compulsory military service is two years and that Alexander Semin's military discharge date was November 10, 2006, in Russian and the English certified translation.

4.      Attached as <u>Exhibit B</u> is a true and correct copy of "Reference" issued by the Russian Ministry of Defense dated September 15, 2005 that states that Alexander Semin is performing military service in the Central Sports Club of the Russian Air Force, in Russian and the English certified translation.

5.      Attached as <u>Exhibit C</u> is a true and correct copy of Agreement as of January 7, 2005, whereby Central Sports Club of Russian Air Force, in the city of Samara, the Russian Federation, authorized Alexander Semin to perform his military service by playing for Hockey Club "Lada" Togliatti, in Russian and the English certified translation.

6.      Attached as <u>Exhibit D</u> is a true and correct copy of Alexander Semin's Military Card, in Russian and the English certified translation.

7.      Attached as <u>Exhibit E</u> is a true and correct copy of the Agreement between the National Hockey League and the International Ice Hockey Federation dated June 9, 2001.

2

8.    I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 24, 2005

_____
Alexander Berkovich, Esq.
Attorney for Alexander Semin
*Pro hac vice* application pending
230 East 30th Street
Room 7G
New York, NY 10016
Tel. (917) 282-7752
Fax (212) 213
Email: aberkovich@nyc.rr.com

To: Hockey Club LADA, City of Togliatti

INFORMATION ON PRIVATE
ALEXANDER VALERIEVICH SEMIN

The Administration of the Hockey Club TsSK VVS[1] of the City of Samara hereby informs you that compulsory military service soldier SEMIN, LEXANDER VALERIEVICH, born in 1984, took his oath on November 11, 2004, and is serving now at the Central Air Force Sports Club.

The term of the compulsory military service is two calendar years. The military discharge is scheduled for November 10, 2006.

Director of the TsSK VVS Hockey Team, Colonel        M. I. Nichepurenko
/signature/

OFFICIAL SPORTS CLUB SEAL

---

[1] Central Air Force Sports Club

Exhibit A

В хоккейный клуб «Лада»
г.Тольятти

**Информация по военнослужащему
рядового Сёмина Александра Валерьевича**

Руководство хоккейного клуба ЦСК ВВС г.Самары информирует в том, что военнослужащий срочной службы Сёмин Александр Валерьевич 1984г.р. принял присягу 11 ноября 2004г. и проходит военную службу в рядах центрального спортивного клуба Военно – Воздушных Сил

Срок действительной службы составляет два календарных года.

Демобилизация военнослужащего намечена на 10 ноября 2006 года.

Начальник хоккейной команды
ЦСК ВВС подполковник            М.И. Ничепуренко

Russian Federation
Ministry of Defense
Air Force Central Sports Club

Date: 15.09.2005
Reg./Ref. № 670

# REFERENCE

To Whom It May Concern:

This reference is issued to private ALEXANDER VALERIEVICH SEMIN to certify that he does his military service at the TsSK VVS.

Head of the TsSK VVS        D. Shliakhtin
/signature/

OFFICIAL ROUND SEAL



Exhibit B

**СПРАВКА**

МИНИСТЕРСТВО ОБОРОНЫ
РОССИЙСКОЙ ФЕДЕРАЦИИ

ЦЕНТРАЛЬНЫЙ
СПОРТИВНЫЙ КЛУБ
ВОЕННО-ВОЗДУШНЫХ СИЛ

13. 05. 2002 г.
№ 670

ЦСКА\* • Самара, Фрунзенский проспект, 19

Выдана    Рядовому   СЕМИНУ АЛЕКСАНДРУ ВАЛЕРЬЕВИЧУ

в том, что он проходит военную службу в    ЦСК ВВС

Выдана для представления    по месту требования

Начальник ЦСК ВВС    Д. ШЛЯХТИН

AGREEMENT № 2

City of Samara
January 7, 2005

We, the undersigned, the Director of the Hockey Club TsSK VVS, city of Samara, Mikhail Ivanovich Nichepurenko on the one part, and the Executive Director of the Hockey Club LADA Vladimir Nikolaevich Vdovin on the other part, concluded the present Agreement as follows:

1.      SUBJECT OF THE AGREEMENT.
1.1.    Settlement of the legal relations between Hockey Club LADA Togliatti and TsSK VVS Samara with respect to transfer of the hockey players executed pursuant to the PHL Regulations on players' transfers.

2.      OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES
2.1.    Hockey Club TsSK VVS Samara transfers regular term soldier of the Military Forces of the Russian Federation Alexander Valerievich Semin, born in 1984 and gives permission to his participation in the Championship of Russia as well as other national and international tournaments with the hockey team LADA Togliatti till the end of the 2005-2006 hockey season.
2.2.    HC (Hockey Club) LADA Togliatti receives the player Alexander Valerievich Semin, born in 1984 and shall provide him with lodging, food, social insurance and gear.
2.3.    HC LADA Togliatti undertakes to return the soldier of the Military Forces Alexander Valerievich Semin, born in 1984 to HC TsSK VVS Samara upon request of the Administration of the HC TsSK VVS for the further active service in the Military Forces of the Russian Federation.

3.      OTHER TERMS AND CONDITIONS
3.1.    The Agreement comes into effect upon signing by the parties and is valid till the expiration of the 2005-2006 hockey season.
3.2.    All amendments to the present Agreement are made only upon written consent of both parties.
3.3.    All disputes related to this Agreement shall be resolved by means of negotiations. If the parties cannot come to an agreement, the dispute shall be considered by the Expert Commission of the PHL.
3.4.    The relations between the parties in the event they cannot reach agreement shall be regulated by the present legislation.
3.5.    The present Agreement has been executed in two copies, both of which have legal force and are kept by the parties.

Address and account information          Address and account information
HC TsSK VVS Samara                        HC LADA Togliatti
Director M. I. Nichepurenko               Executive Director V. N. Vdovin
/signature/                               /signature/
OFFICIAL ROUND SEAL                       OFFICIAL ROUND SEAL

Certified Translator
atio
Mark Vaintroub
2005

Exhibit C

ДОГОВОР № 2

г. Самара

« 7 » января   2005г.

Мы, нижеподписавшиеся, Директор ХК «ЦСК ВВС» г. Самара, Ничепуренко Михаил Иванович с одной стороны, и Исполнительный Директор ХК «ЛАДА» Вдовин Владимир Николаевич г. Тольятти с другой стороны, заключили настоящий Договор о нижеследующем:

1. ПРЕДМЕТ ДОГОВОРА

1.1. Урегулирование правовых отношений между   ХК «ЛАДА» г. Тольятти и «ЦСК ВВС» г. Самара о процессе перехода хоккеистов, осуществляемого  в соответствии с Положением о переходе хоккеистов в ПХЛ.

2. ОБЯЗАННОСТИ И ОТВЕТСТВЕННОСТЬ СТОРОН

2.1. ХК «ЦСК ВВС» г. Самара  передает военнослужащего по призыву ВС РФ: Сёмина Александра Валерьевича 1984г.р. и дает разрешение на его  участие в Чемпионате России и других, национальных и международных соревнованиях в составе ХК «ЛАДА» г. Тольятти   до окончания хоккейного сезона 2005-2006г.г.

2.2. ХК «ЛАДА» г. Тольятти    принимает игрока Сёмина Александра Валерьевича 1984г.р.  и  обеспечивает  его  проживанием,  питанием,  экипировкой  и соцстрахованием.

2.3.   ХК «ЛАДА» г. Тольятти    обязуется вернуть военнослужащего по призыву Сёмина Александра Валерьевича 1984г.р. в ХК «ЦСК ВВС» г. Самара  по первому требованию руководства ХК ЦСК ВВС  для прохождения дальнейшей службы в рядах вооруженных сил РФ.

3 . ПРОЧИЕ УСЛОВИЯ

3.1. Договор  вступает в силу с момента его подписания и действует до окончания хоккейного сезона 2005-2006г.г.

3.2. Изменения и дополнения вносятся лишь по соглашению сторон и оформляются в письменном виде.

3.3. Споры и разногласия разрешаются по возможности путем переговоров. При не достижении согласия спор рассматривает в экспертной комиссии ПХЛ.

3.4. Отношения между сторонами в случае не достижения  согласия путем переговоров регулируется в соответствии с действующим законодательством.

3.5. Настоящий договор составлен в двух экземплярах, каждый из  которых  имеет одинаковую силу и хранится у обеих сторон.

ЦСК ВВС г.Самара,443071
Волжский проспект 10,
Р/С 40503810000000000050
ИНН 6315942101/631501001
в ГУЦБ РФ «Речное» г.Самара
БИК 043680002
ОКПО 080253363
ОКОНХ 97920

г.Тольятти Приморский б-р, 37
ИНН 6321015909
р/с 40703810100000185001
в КБ «Автомобильный банкирский дом»
БИК 043678928, к/с 30101810800000000928
в Приморском РКЦ

Хоккейный клуб
ЦСК ВВС г.Самара
Директор

М.И. Ничепуренко

Хоккейный клуб «ЛАДА»
г.Тольятти
Исполнительный директор

В.Н. Вдовин

MILITARY CARD
AE № 1898894

Surname: SEMIN
Given name: ALEXANDER
Patronymic: VALERIEVICH
Date of birth: 3 March 1984
Nationality (Entered if requested by the citizen):
Personal signature of the holder: /signature/
Issued by the military office: Zheleznodorozhiy District of the city of Samara
Date of issue: 9 November 2004
OFFICIAL ROUND SEAL
Military Commissioner: /signature/

1.    GENERAL INFORMATION
1. Place of birth: Krasnoyarsk, Krasnoyarskiy Krai
2. Education: Grade 11 of Secondary School № 1, city of Krasnoyarsk
3. Civil profession:
4. First sports category or sports rank:
5. Marital status: Single

2.    INFORMATION ON TRAINING FOR THE MILITARY SERVICE

3.    RELATION TO THE MILITARY SERVICE / ACTIVE SERVICE
6. 28.10.2004 Conscription Commission of the Military office of the Zheleznodorozhny District, city of Samara: Able-bodied for the military service.
   OFFICIAL ROUND SEAL
   [illegible]
   9.11.04  departed to the place of active military service. Military office of the Samara Oblast
   OFFICIAL ROUND SEAL
   Military Commissioner    /signature/
7. On _____ joint the military forces on a contract basis
   Category of eligibility for military service _____
   Military Commissioner (Commander of the military unit) _____
8. On _____ dismissed from the military service. Grounds _____
   Must report to the destination and register with military authorities till _____
   Commander of the military unit _____
9. On _____ joint the military forces on a contract basis
   Category of eligibility for military service _____
   Military Commissioner (Commander of the military unit) _____
10. On _____ dismissed from the military service. Grounds _____
    Must report to the destination and register with military authorities till _____
    Commander of the military unit _____
11. Peacetime service
    a) Military
    - Military Unit / Rank: TsSK VVS
    - Full code of the military occupational specialty:
    - [illegible]
    - Date of enrollment / dismissal from the military unit, order number: 10.11.04
    - Seal / signature

Exhibit D

b) Alternative civil
c) Service

12. Participation in the military combat in the territory of other countries; performance of duties in the state of emergency and during the armed conflicts; participation in the international peacekeeping activity (where, what period of time, which military unit and which military rank): _____

13. Military unit command decision on usage during wartime (full code of the military occupational specialty, types of arms and equipment mastered): _____

14. On _____ conscripted to the military service based on the
_____
Military commissioner (Commander of the military unit) _____

15. On _____ dismissed from the military service. Grounds _____
Must report to the destination and register with military authorities till _____
Commander of the military unit _____

16. On _____ conscripted to the military service based on the
_____ and forwarded for work at civil position.
Military commissioner (Commander of the military unit) _____

17. On _____ dismissed from the military service. Grounds _____
Must report to the destination and register with military authorities till _____
Commander of the military unit _____

18. Military service at wartime.
- Military Unit / Rank: TsSK VVS
- Full code of the military occupational specialty:
- [illegible]
- Date of enrollment / dismissal from the military unit, order number: 10.11.04. № 251
    - Seal / signature

19. Took military oath
[illegible] 2004
TsSK VVS
/signature/
OFFICIAL ROUND SEAL

20. Military rank awarded and qualification in military specialty granted:
Military rank: Private
[illegible]
/signature/
OFFICIAL ROUND SEAL

21. State awards and badges:

22. Wounds, injuries, concussions, diseases _____

4.    ARMS AND SUPPLY (RECORD IS CERTIFIED BY AN OFFICIAL AND SEALED)
System and registration number of the arms and number of supply _____
Issued by _____ on _____
Returned to _____ on _____

5.    RESERVE
23. Reserve category
24. Group of registration
25. Structure
26. Number of Military occupational specialty
27. Name of the military position and military specialty
28. Military reserve duty training
   • Year
   • Period
   • Military unit
   • Type / category of [illegible]
   • Signature / seal

6.    INFORMATION ON MEDICAL EXAMINATIONS AND VACCINATIONS
      (date, drug, dose)

29. On _____ considered able-bodied for the military service
    Subject to second medical examination.
    Date: _____
    Personal signature _____
    Date: _____
    Military Commissioner _____

30. On _____ considered able-bodied for the military service
    Subject to second medical examination.
    Date: _____
    Personal signature _____
    Date: _____
    Military Commissioner _____
Vaccinated three times: [illegible] and diphteria and tetanus toxoids and pertussis vaccine
complex medication.
/signature/
OFFICIAL ROUND SEAL

7.    NOTES ON ISSUING AND DELETION OF MOBILIZATION DESIGNATION
Issued:
Deleted:

31. Main anthropometrical information
Date:
Height:
Hat size:
Size of gas mask:
Clothing size:
Footwear size:

8.    SPECIAL NOTES
Military Office of the Samara Oblast
Mandatory fingerprinting registration passed on 9.11.2004
Material carriers are forwarded to the Information Center of the Main Department of the Interior of the Samara oblast.

9.    REGISTERED                    REGISTRATION CANCELLED

32. Information on national fingerprinting registration
33. Information on individual radiation doses

10.    DISCHARGED FROM MILITARY CONSCRIPTION
34. By decision of _____ dated _____ discharged from military service and military registration cancelled.

Military Commissioner _____

11.    CITIZENS' OBLIGATIONS WITH RESPECT TO MILITARY REGISTRATION, MOBILIZATION TRAINING AND MOBILIZATION

        1. Citizens obligations with respect to military registration.
1.   For the purpose of military registration, citizens shall
   • register with the military offices at the place of their residence or with the local government bodies in the event there is no military office;
   • report according to the order to the prescribed place and time to the military office or other body responsible for military registration at the place of residence or stay;
   • report and register within two-week period after the discharge from the military service to the military office or other body responsible for military registration at the place of residence;
   • inform the military office or other body responsible for military registration at the place of residence on any changes in the marital status, level of education, place of work or position, place of residence within the district, town, city or other municipality;
   • cancel military registration at the time of relocation to a new place of residence or stay (for the period over three months) as well as upon leaving the Russian Federation for the periods over six months and register within two-week period at the new place of residence or stay or upon return to the Russian Federation;
   • keep the military card or temporary certificate issued as a substitute document for the lost military card and a conscription certificate. In the event the above documents are lost, citizenы shall report to the military office or other body at the place of residence or stay responsible for military registration in order to obtain the new documents.
2.   Citizens subjects to conscription leaving the place of residence during the conscription period for a period of more than three months, shall personally inform the military office or other body responsible for military registration about it.

        2. Citizens' obligation with respect to mobilization training and mobilization
1.   To ensure mobilization training and mobilization, citizens shall
   • report according to the order to the military office to have their designation defined during mobilization and war time;;
   • execute all orders stated in the mobilization certificate, other documents and orders of the military commissioner;

2. During the mobilization period and wartime, citizens are engaged in activities to ensure the defense of the country and security of state and also signed into special units in the prescribed order.

3. Citizens, who are registered with the military authorities, shall not leave their places of residence from the moment of mobilization without special permissions of the military offices of the districts or towns.

4. Citizens are liable for the execution of the duties during mobilization period according to present legislation of the Russian Federation.

Acknowledged with citizen's duties with respect to military registration, mobilization training and mobilization _____(personal signature of the military card holder) /signature/

Date: _____





ВОЕННЫЙ БИЛЕТ

АЕ 1898894

Фамилия
Имя
Отчество
Дата рождения
Национальность
Личная подпись владельца

Военный комиссариатом
комиссар

I. Общие сведения

2. Образование
3. Гражданская специальность
4. Наличие первого спортивного разряда или спортивного звания
5. Семейное положение

| 2 | II. Сведения о подготовке гражданина к военной службе |
|---|---|

АЕ 1898894    3

7. _____ 20___ г. поступил на военную
службу по контракту.
Категория годности к военной службе _____
Военный комиссар (командир воинской части)
М.П. _____
(звание, подпись)

8. _____ 20___ г. на основании _____
_____
уволен с военной службы и направлен _____
_____
Обязан прибыть к месту назначения и встать на воинский
учёт до « » _____ 20___ г.
М.П. Командир воинской части _____
(звание, подпись)

**Отношение к военной службе,**
**прохождение военной службы**

6. _____ 20___ г. призывной комиссией ___
_____
_____
_____
_____
_____
_____ 20___ г. убыл к месту прохождения
военной службы _____
_____
М.П. Военный комиссар _____

9. _____ 20___ г. поступил на военную
службу по контракту.
Категория годности к военной службе _____
Военный комиссар (командир воинской части)
М.П. _____
(звание, подпись)

10. _____ 20___ г. на основании _____
_____
уволен с военной службы и направлен _____
_____
Обязан прибыть к месту назначения и встать на воинский
учёт до « » _____ 20___ г.
М.П. Командир воинской части _____
(звание, подпись)

11. Прохождение службы в мирное время

а) военной

| Воинская часть, должность | Наличие военного билета ВУС | Дата, номер приказа, статья (из стати этой воинской части и) | Дата постановки на воинский учёт (или снятие с учёта), отметка о снятии с учёта |
|---|---|---|---|
| ВВС | | | № 251. |
| | | | |
| | | | |
| | | | |

б) альтернативной гражданской

в) службы

12. Участие в боевых действиях на территории других государств, выполнение обязанностей военной обязанности и при вооружённых конфликтах, участие в деятельности по поддержанию или восстановлению между-народного мира и безопасности (где участвовал, в какой период времени, в составе какой воинской части и в какой воинской должности):

13. Заключение командования воинской части об использовании в военное время (полное кодовое обозначение ВУС, освоенные типы (марки) вооружения и военной техники):

№ В 1898894

3

**9**

14. _____
   (звание, подпись)

Военный комиссар (командир воинской части) _____
   (подпись)

15. _____
   20 __ г. на основании _____
   (звание, подпись)

Убыл с военной службы в _____

Обязан прибыть к месту жительства и встать на воинский
учет до _____ 20 __ г. на основании _____
   (звание, подпись)

М.П.  Командир воинской части _____
   (звание, подпись)

16. _____
   20 __ г. на основании _____

Направлен по мобилизации (в военное время) для работы
на должности гражданского персонала.

Военный комиссар (командир воинской части) _____

М.П.

17. _____
   20 __ г. на основании _____

Уволен _____ в/ч _____

Обязан прибыть к месту жительства и встать на воинский
учет до _____ 20 __ г. _____

М.П.  Командир воинской части _____
   (звание, подпись)

## 18. Прохождение военной службы в военное время

| Военная должность | Воинская часть, военное учебное заведение (орган), № и дата приказа в/ч, дата зачисления в в/ч | Дата назначения (избрания, зачисления) в списки в/ч, № и дата приказа, подпись, печать | |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |



20. Присвоение воинских званий и классной квалификации по специальности

Присвоено воинское звание (классный квалификация)

Кем присвоено (№ и дата приказа, и т. п.)

ЦСК ВВС

АЕ 1898894

21. Государственные награды и знаки...

22. Полученные увечья (ранения, травма, контузии), заболевания



[10]

## IV. Оружие и материальные средства
(запись о закреплении военнослужащего в мирное время)

| Наименование, номер оружия и размеры (номер) материального | Дата выдачи и чья роспись | Дата сдачи и чья роспись |
|---|---|---|

## V. Пребывание в запасе

А.Е. 1898894

[11]

| 23. Категория запаса | 24. Группа учета | 25. Состав |
|---|---|---|
| 26. № ВУС | Полное наименование ВУС | |

27. Наименование воинской должности и военно-учетной специальности







14 AE 1898894

30 «____» ________ 20___ г. ________
(наименование ВВК)

________

признан ________
(указать категорию годности к военной службе)

________

Подлежит повторному медицинскому освидетельствованию

«____» ________ 20___ г.

Личная подпись владельца военного билета

«____» ________ 20___ г. ________

Военный комиссар ________

М.П. ________

________
(звание, подпись)

15 AE 1898894

Привит 3х кратно
БЦЖ и АКДС комп-
лексом [illegible] прививок
Л-к [illegible] [illegible]

Военный комиссариат Железнодорожного района г. Самара

АЕ 1808894

18

Выдано

Изъято

31. ОСОБЫЕ ДАННЫЕ
антропометрические данные

| Дата | Рост | Размер<br>Примет,<br>лица<br>шеи | Размер<br>Размер<br>рубашки | Размер<br>№<br>муж. бельё<br>рост | Размер<br>обувь |
|---|---|---|---|---|---|

VIII. Особые отметки

ВК Самарской обл.

Обязательную государственную
дактилоскопическую регистрацию
прошёл .... ....
.............. 20.. г.
Материальные носители информации
о .... ЖК РУВД Самарской обл.
....... прошёл





24

АЕ 1898894

Принят

Снят

32. Сведения о государственной регистрации
свадебной регистрации

33. Сведения об индивидуальных дозах
облучения



## X. Отметки об освобождении от исполнения воинской обязанности

АЕ 1898894

## XI. Обязанности граждан по воинскому учету, мобилизации

освобожден от исполнения воинской обязанности на основании

в связи с возрастом

Военный комиссар
20 ___ г.
(звание, подпись)

М.П.

За неисполнение гражданами воинской обязанности виновные лица несут ответственность в соответствии с законодательством Российской Федерации.

Военный комиссар _____
(звание, подпись)



Nov-11-05   12:21pm   From-NHLPA                                    +416 313 2405        T-111   P 002    F-229

# APPENDIX II

## EXHIBIT C

### MEMORANDUM OF AGREEMENT

between the

### NATIONAL HOCKEY LEAGUE ("NHL")

and the

### INTERNATIONAL ICE HOCKEY FEDERATION ("IIHF")

WHEREAS, the National Hockey League ("NHL") is a league of professional ice hockey teams employing professional ice hockey players, and the International Ice Hockey Federation ("IIHF") is the recognized worldwide governing body for the sport of ice hockey, and

WHEREAS, the NHL and the IIHF seek to enact provisions pursuant to which (a) players may transfer between IIHF teams and NHL teams according to a procedure that will maintain good order within the sport, and (b) the IIHF will be compensated for player development in respect of players that transfer to NHL teams, and (c) the NHL and the NHL teams will honor existing and validly binding player contracts signed with IIHF teams, and (d) the IIHF and the IIHF teams will honor existing and validly binding player contracts signed with NHL teams, and (e) NHL players shall, in appropriate circumstances, be given permission by their NHL teams to participate in the IIHF World Championships;

NOW, THEREFORE, the NHL and the IIHF hereby agree as follows:

1.  **DEFINITION**
    For the purpose of this agreement:

    (a)  The term "IIHF national association" shall mean any national association or federation recognized by the IIHF as the governing body for the sport of ice hockey within that association's or federation's respective territory except that, in relation to this Agreement and unless otherwise stated, the term "IIHF national association" excludes the national associations of Canada and the U.S.A.

    (b)  The term "IIHF team" shall mean a team that is a member of a national association that is affiliated to the IIHF except that, in relation to this Agreement and unless otherwise stated, the term "IIHF team" excludes IIHF team in the U.S.A. and Canada.

    (c)  The term "IIHF player" shall mean any hockey player who is playing or last played for a IIHF team, or who has signed a player contract to play for a IIHF team in the future. For purposes of calculating the number of IIHF players signed pursuant to Section 3.4 below, "IIHF player" shall also include players who have been drafted from a IIHF club, regardless of whether such player last played for a IIHF Club.

Exhibit E

# APPENDIX II

## EXHIBIT C

(d)    The term "IIHF season" shall mean the period of time beginning on 16 May in any one year and ending upon the conclusion of the IIHF World Championships the following year (e.g. the 2001/02 IIHF season runs from 16 May, 2001 until the conclusion of the IIHF World Championships 2002).

(e)    The term "player contract" shall mean (a) a written agreement between a player and an ice hockey team requiring the performance of services as an ice hockey player for a specified term and for a specified or other compensation, or (b) a written agreement between the player and his national association or league affiliated to his national association requiring the performance of services as an ice hockey player for a IIHF team for a specified term and for a specified or other compensation.

A player shall not be deemed to have entered into a player contract merely by virtue of the fact that he has been drafted by an NHL team or the fact that he is subject to a right of first refusal of an NHL or a IIHF team; nor shall a player be deemed to have entered into a player contract merely because of the fact that he has been registered with his national association.

A player shall be deemed to have a player contract or to be a "player under contract" notwithstanding the fact that the player's contract includes any kind of buy-out, opt-out, release or other related clause which gives the player an option to set aside or suspend the contract in order to transfer to the NHL outside the prescribed signing schedule as specified in article 2.

(f)    The term "free agent" shall mean a player who is not under a player contract as specified in article 1(e).

(g)    The term "NHL season" shall mean the period of time beginning on the first day of NHL training Camps, which date is defined in accordance with the provisions of Article 15 of the NHL/NHLPA Collective Bargaining Agreement or by other agreement by and between the NHL and the NHLPA, and ending on the last day of the Stanley Cup Playoffs.

(h)    The term "NHL player" shall mean any ice hockey player who is playing for an NHL team , or any player who is not a free agent and who last played for an NHL team, or any player who has signed a player contract to play for an NHL team in the future.

2.        PLAYER TRANSFERS TO THE NHL
2.1       SIGNING SCHEDULE FOR FREE AGENTS
Any player who is not under contract to a NHL team may be signed by an NHL team at any time subject only to applicable NHL rules regarding eligibility and allocation of negotiating rights.

2.2       SIGNING SCHEDULE FOR PLAYERS UNDER CONTRACT
In respect of the 2001/02 season any player under contract to a IIHF team and who has been drafted by an NHL team prior to the Entry Draft 2001 may be signed by an NHL team from 15 March through and including 15 July, 2001, for one or any number of the following NHL seasons.

8

# APPENDIX II

# EXHIBIT C

In respect of the 2002/03 and 2003/04 seasons, any player under contract to an IIHF team and who had been drafted by an NHL team prior to the Entry Drafts in 2002 or 2003, respectively, may be signed by an NHL team for one or any number of following NHL seasons from March 15 through and including July 15, 2002, and July 15, 2003, respectively.

Players under contract to a IIHF team may be signed by any NHL team for one or any number of the following NHL seasons in the year they are drafted through and including 15 July, or through and including 15 August provided that for any player signed between 16 July and 15 August the NHL will pay the sum of USD 100,000 (one hundred thousand U.S. dollars) to the IIHF in addition to the NHL payments as specified in article 3.

Once the signing deadlines (the July 15 signing deadline, or the August 15 signing deadline, as applicable) have passed, any player under a player contract to a IIHF team or having signed a player contract with a IIHF team after the applicable signing deadline has passed, may not be signed to a player contract for the upcoming NHL season.

Any player under a player contract to a IIHF team may be signed for any of the following NHL seasons as long as (a) the player is signed during the period March 15 and applicable signing deadline related to the NHL season for which the player signs a player contract with an NHL team, and (b) players participating in the World Championships are not signed until the conclusion thereof.

## 3.    NHL PAYMENTS
### 3.1    DEVELOPMENT FEE
Effective with the 2001/02 season the NHL will pay to the IIHF the following sums to support the development of hockey outside the U.S.A. and Canada.

| | |
|---|---|
| 2001/02 NHL Season | USD 9,000,000 million (nine million U.S. dollars) |
| 2002/03 NHL Season | USD 9,600,000million (nine million six hundred thousand U.S. dollars) |
| 2003/04 NHL Season | USD 10,200,000 million (ten million two hundred thousand U.S. dollars) |

The development fee in respect of a specific NHL season is related to the IIHF players who sign player contracts with NHL teams for that particular season (e.g., the development fee for the 2001/02 NHL seasons relates to the IIHF players who sign player contracts with NHL teams for the 2001/02 NHL season).

### 3.2    ADJUSTMENT FOR EXPANSION
If during the term of this Agreement the NHL expands beyond the thirty (30) NHL teams then in respect of each and every new team that joins the NHL during the said term the NHL shall (a) make a one-time payment of USD 300,000 (three hundred thousand dollars) which shall be due in the year the new team first begins to play in the NHL, and (b) increase the development fee as specified in article 3.1 by USD 300,000 (three hundred thousand U.S. dollars) per team if the expansion takes place in the 2001/02 NHL season, and USD 320,000 (three hundred and twenty thousand U.S. dollars) per team if the

# *APPENDIX II*

## *EXHIBIT C*

expansion takes place in the 2002/03 NHL season, and USD 340,000 (three hundred and forty thousand U.S. dollars) per team if the expansion takes place in the 2003/04 NHL season.

### 3.3        FEE ADJUSTMENT FOR CONTRACTION

If during the term of this Agreement any existing NHL team elects to suspend or cease its operations, then the development fees as specified in article 3.1 shall automatically be reduced by USD 300,000 (three hundred thousand U.S. dollars) per team if the contraction takes place in the 2001/02 NHL season, and USD 320,000 (three hundred and twenty thousand U.S. dollars) per team if the contraction takes place in the 2002/03 NHL season, and USD 340,000 (three hundred and forty thousand U.S. dollars) per team if the contraction takes place in the 2003/04 NHL season.

### 3.4        IIHF REOPENER

The development fees as prescribed in article 3.1 on the assumption that not more than seventy (70) IIHF players will sign player contracts with NHL teams in respect of the 2001/02 NHL season, and not more than sixty (60) IIHF players will sign player contracts with NHL teams in respect of the 2002/03 and 2003/04 seasons.

Should there be more than seventy (70) IIHF players signed by the NHL teams during the period 15 March 2001 and 14 March 2002, the IIHF shall have a right, exercisable upon written notice given to the NHL within seven (7) days of 14 March 2002 to negotiate for an increase of the development fee as specified in article 3.1 in respect of the following NHL season (i.e., if there are more than seventy (70) IIHF players signed between 15 March 2001 and 14 March 2002, the IIHF shall request negotiations regarding an increase of the development fee in respect of the 2002/03 NHL season within seven (7) days of 14 March 2002). In such event, the NHL will undertake to negotiate in good faith a reasonable increase in the development fee to reflect the additional value derived by the NHL on account of IIHF players signed over and above seventy (70).

Should there be more than sixty (60) IIHF players signed by NHL teams during the period 15 March 2002 and 14 March 2003, the IIHF shall have a right, exercisable upon written notice given to the NHL within seven (7) days of 14 March 2003 to negotiate for an increase of the development fee as specified in article 3.1 in respect of the following NHL season (i.e., if there are more than sixty (60) IIHF players signed between 15 March 2002 and 14 March 2003, the IIHF shall request negotiations regarding an increase of the development fee in respect of the 2003/04 season within seven (7) days of 14 March 2003). In such event, the NHL will undertake to negotiate in good faith a reasonable increase in the development fee to reflect the additional value derived by the NHL on account of IIHF players signed over and above sixty (60).

Should there be more than sixty (60) IIHF players signed by NHL teams during the period 15 March 2003 and 14 March 2004, then the NHL shall have an obligation to pay the IIHF an additional fee of USD $170,000.00 (one hundred seventy thousand U.S. dollars) per player signed over and above sixty (60) players. The NHL shall remit such additional fee to the IIHF by no later than 15 July 2004.

The assumption of sixty (60) IIHF players signing player contracts with NHL teams in respect of the 2002/03 and 2003/04 NHL seasons is based on the fact that there are and will be 30 teams in the NHL during the full term of this Agreement. However, if the development fee is reduced in accordance with article 3.3 due to the fact that any existing NHL team elects to suspend or cease its operations, then the assumption of sixty (60) players will be reduced by (2) players per NHL team that suspends or ceases its operations when calculating the extra development fee as specified in the previous paragraphs of article 3.4.

# APPENDIX II

## EXHIBIT C

**3.5**        **PAYMENT SCHEDULE**
In respect of each season the payment from the NHL to the IIHF of (a) the development fee pursuant to article 3.1, and (b) the expansion fee pursuant to article 3.2, and (c) the fee pursuant to article 2.2 in respect of players who are signed in the year they are first drafted by an NHL team, shall be due one-half (½) in September and one-half (½) in February in respect of each of the NHL seasons covered by this Agreement beginning in September 2001.

**4.**        **PLAYERS ASSIGNED TO MINOR LEAGUES**
**4.1**        **IIHF PLAYERS SUBJECT TO MINOR LEAGUE ASSIGNMENT**
Players not under contract to a IIHF team or who were selected in the first round of the NHL Entry Draft or have reached their 20th birthday may be assigned by an NHL team to a minor league team at any time.

**4.2**        **IIHF PLAYERS SUBJECT TO RETURN**
Any player who

| | | |
|---|---|---|
| (i) | is under contract to a IIHF team; | |
| (ii) | signs an NHL player contract; | |
| (iii) | played for his IIHF team during the season prior to his being signed by his NHL team; | |
| (iv) | has not yet reached his 20th birthday; | |
| (v) | is unable to earn a roster position on his NHL team by the first day of his NHL season; and | |
| (vi) | was not selected in the first round of the NHL Entry Draft | |

may not be assigned by his NHL team to a minor league team (whether affiliated with the NHL team or not), but will instead be offered by his NHL team to his previous IIHF team, which return shall be for the balance of the IIHF season. IIHF teams are free to refuse such offer in which case the player may be assigned by his NHL team to a minor league team. With respect to players who are returned to their IIHF teams pursuant to this provision, NHL teams will have no responsibility for the payment of salary owed under the player's contract with his previous IIHF team.

**4.3**        **IIHF PLAYERS RETAINED**
Any player who would otherwise be subject to return to his IIHF team under 4.2 above, but who is retained by his NHL team because he is able to earn a roster position on his NHL team by the first day of his NHL season, may not be assigned to a minor league team prior to December 1 without first being offered to his previous IIHF team for the balance of the IIHF season.

**4.4**        **IIHF PLAYERS RETURNED**
Any player who is returned to his IIHF team under 4.2 or 4.3 above shall not be included in the "IIHF Reopener" calculation set forth in article 3.4 until the season in which the player returns to and starts to play with his NHL team or its minor league team(s).

**4.5**        **PARTICIPATION IN THE IIHF WORLD CHAMPIONSHIPS**
Players who have been assigned to a minor league team in accordance with the terms of this Agreement will be permitted by the NHL, their NHL teams, and their minor league teams to play for their national teams in the IIHF World Championships unless such participation will conflict with the player's minor league team's regular season or play-off schedule (i.e., the players will be free to play for their national team as soon as their minor league team has completed its regular season schedule or has been eliminated from the playoffs, whichever is later). Any player who is first assigned by his NHL team to a minor league team on or after March 1, must be released to participate for his national team in the IIHF

11

# APPENDIX II

# EXHIBIT C

World Championships at the conclusion of his NHL team's season regardless of whether the player's minor league team has completed its season.

The IIHF warrants that any minor league player who is selected and released by his NHL team and his minor league team will, in fact, participate in the World Championships.

5.          TRANSFER PROCEDURE
5.1         PLAYER TRANSFERS FROM A IIHF TEAM TO AN NHL TEAM
The NHL will promptly notify the IIHF and a player's national association when a player signs a player contract with an NHL team. In addition, the NHL will use its best efforts to advise the IIHF of negotiations with IIHF players that may result in a player being signed for any of the following NHL seasons covered by this Agreement.

Upon receiving written confirmation that a player has signed a player contract with an NHL team the IIHF team will immediately release the player from any and all remaining contractual obligations and will assert no requirement of the player's services during the term of his player contract with the NHL team/teams. Any required transfer card, letter of clearance or other documentation will be promptly supplied by the IIHF. Neither the IIHF nor any national association nor any IIHF team will make any effort to interfere with the prompt relocation of the player to his NHL team, nor shall the IIHF, any national association, or any IIHF team assert a right to receive any additional compensation, liquidated damages, or other things of value from the player or his NHL team as a result of such player's decision to sign with an NHL team.

5.2         PLAYER TRANSFERS FROM AN NHL TEAM TO A IIHF TEAM
A player who is playing or last played for an NHL team, or who has signed a player contract to play for an NHL team, and wishes to play for a IIHF team will be subject to the prevailing IIHF statutes, by-laws and regulations.

5.3         CONFIRMATION OF CONTRACTUAL STATUS
In the event that a player who is playing or last played for an NHL team, or who has signed a player contract to play for an NHL team, proposes to enter into or has signed a player contract to play with a IIHF team, the IIHF team shall contact the NHL in writing, and request a written statement that the player is not subject to an existing and validly binding player contract with an NHL team. The only ground on which such statement may be denied is that the player is subject to an existing and validly binding player contract. The written request for such a statement must be sent by e-mail or fax (with confirmation of arrival).

If within seven (7) days after the sending of such written request, the IIHF receives a written statement from the NHL expressly stating that the player is subject to an existing and validly binding player contract, the IIHF shall deny the transfer and the player shall not be permitted to play for any IIHF team during the term of his existing and validly binding player contract. No response within seven (7) days will mean that he is free to play with the IIHF team.

In the event that an NHL team shall decline or otherwise fail for whatever reason to proceed to arbitration in accordance with the procedures set forth in article 5.4.1 with respect to a player whose contractual status is the subject of the dispute, then the IIHF shall be relieved of the obligation to deny the transfer and the player shall be free to sign a player contract with and play for a IIHF team.

12

# *APPENDIX II*

## *EXHIBIT C*

The same procedure relative to the applicable parties shall apply where an NHL team wishes to sign any player who is currently playing or last played for a IIHF team except during the applicable signing periods as specified in article 2.2 above.

The IIHF separately agrees that it will, upon request by the NHL, endeavor to produce written evidence of a player's contractual status with a IIHF team, including a copy of the player's actual contract or a letter from the player's IIHF team and/or national association certifying the player's contractual status.

The NHL agrees to continue to produce written evidence of a player's contractual status with an NHL team, including a copy of the player's actual contract.

**5.4          DISPUTED VALIDITY OF CONTRACTS**
**5.4.1          NHL CONTRACTS**
Any dispute as to whether a player is presently subject to a player contract with any NHL team, or whether such player contract has been properly and effectively terminated, shall be resolved as provided for in any Collective Bargaining Agreement then in effect. The IIHF shall be entitled to participate in those proceedings.

**5.4.2          IIHF CONTRACTS**
Any dispute as to whether a player is presently subject to a player contract with any IIHF team, or whether such player contract has been properly and effectively terminated, shall be resolved as provided for in article 6.

**5.5          PLAYERS UNDER NHL CONTRACT PLAYING FOR IIHF TEAM(S)**
An IIHF player who signs a player contract with an NHL team may, upon the mutual agreement of his NHL team and IIHF team, remain with his IIHF team for any number of future IIHF seasons, or be subject to assignment by his NHL team to his IIHF team on terms which are mutually agreed to. Such player can be recalled by his NHL team subject to the requirement of the Collective Bargaining Agreement and the terms agreed to by the player's NHL team and IIHF team, which terms must be contained in writing signed by both parties and filed with both the NHL and the IIHF at the time the NHL team and the IIHF team decide that the player shall remain with his IIHF team or the time when the player is assigned to his IIHF team. In the absence of any such writing, the player will not be subject to recall by his NHL team at any time during the IIHF season and must wait until the following NHL season to return and play for his NHL team and/or its minor league team(s).

A player returned or assigned to a IIHF team under article 5.5 must be returned or assigned only to the IIHF team with which he was playing or last played for when he signed a player contract with his NHL team.

The above notwithstanding, a player returned or assigned to a IIHF team under article 5.5 may not be recalled to the NHL between 16 January and the conclusion of the player's IIHF season (including the World Championships if such player is asked to participate).

Conditional returns or assignments under this article 5.5 are not permitted with respect to players returned or assigned pursuant to article 4.2 or 4.3 above.

13

# APPENDIX II

# EXHIBIT C

**6.        INTERNATIONAL ARBITRATION**

**6.1        SCOPE OF ARBITRATION**

These parties shall refer any dispute regarding the application and enforcement of this Agreement to arbitration as specified below. This specifically includes but is not limited to any dispute as to whether a player is presently subject to an existing and validly binding player contract with any IIHF team, or whether such player contract has been properly and effectively terminated.

**6.2        INTERNATIONAL ARBITRATOR**

The NHL and IIHF shall designate two reputable arbitrators, one of whom shall be located in Europe and one in North America, who shall serve as the international arbitrators. The arbitrators shall hear disputes on an alternating basis, except that the same arbitrator may hear two or more disputes either by agreement of the NHL and the IIHF or if the arbitrator may hear two or more disputes either by agreement of the NHL and the IIHF or if the arbitrator who would normally hear the dispute is unavailable. The arbitrators shall serve one year terms, subject to renewal, and may be dismissed by either the NHL or IIHF on thirty (30) days notice.

**6.3        ARBITRATION PROCEDURE**

(a)      The existence and nature of the dispute shall be asserted by notice in writing given to the other party to the Agreement (i.e., the IIHF or the NHL) and to the international arbitrator.

(b)      The international arbitrator shall convene a hearing with respect to the dispute at the earliest possible time convenient to the parties, but in no event later than ten (10) days following his receipt of such notice. If neither arbitrator is available to convene a hearing within this period and the IIHF and the NHL are unable to agree upon another international arbitrator, the two agreed-upon international arbitrators shall appoint an international arbitrator, who shall hear the particular dispute only.

(c)      The award shall be issued no later than 72 hours after the conclusion of the hearing.

(d)      Proceedings shall be conducted in English. Both parties to the proceeding (i.e., the IIHF and the NHL) and all other interested parties shall have the right to be represented by counsel. So long as it functions as the collective bargaining agent for NHL Players, the NHL Player's Association ("NHLPA") shall be entitled to participate in all proceedings which could impact the status of an NHL player subject to sub-article (e), below.

(e)      An award of the international arbitrator shall constitute a full, final and complete disposition of the dispute and shall be binding upon the IIHF and the NHL, the NHLPA (if it participates), and all other interested parties participating in the proceeding. Judgment upon an award of the International Arbitrator may be entered by a court of competent jurisdiction. All costs of arbitration, including the fees and the expenses of the international arbitrator, shall be borne equally by the parties to the arbitration (i.e., the IIHF and the NHL); but each party shall bear the cost of its own witnesses, counsel and the like.

14

# *APPENDIX II*

# *EXHIBIT C*

**7.        INTERNATIONAL COMPETITIONS**
**7.1        OLYMPIC GAMES**
The NHL and the IIHF agree to work together to explore the feasibility of NHL players participating in
the 2006 Olympic Winter Games.


**7.2        IIHF WORLD CHAMPIONSHIPS**
**7.2.1        PERMISSION TO PARTICIPATE**
Through to and including the IIHF World Championships 2004, and subject to article 4.5 above, any
player who is qualified under the IIHF regulations to play for a national team of a national association
shall be permitted by the NHL and the NHL teams to play for such national team in the IIHF World
Championships, the World Cup, the Continental Championships (e.g., European Championships), and
any competitions in which the national team is required to participate under the IIHF regulations in order
to qualify for the preceding competitions or the Olympic Games unless the dates of these competitions
conflict with the regular NHL season or play-off schedule of the NHL team to which such player is under
contract (i.e., the player is free to play for his national team as soon as his NHL team has completed its
regular season schedule or has been eliminated from the play-offs, whichever is later), or unless the player
is under a valid suspension which prohibits him from playing under his NHL contract.

The IIHF warrants that any player who is selected and released by his NHL team will, in fact, participate
in the World Championships.

**7.2.2        NHL OBLIGATIONS**
The NHL and the NHL teams undertake not to erect any barriers, directly or indirectly, financial or
otherwise, which are intended to work as a disincentive for the players to play in the above-referenced
competitions. The NHL and the NHL teams will not request any fee or the like from the IIHF, the player
or the national association in question provided that reasonable and adequate insurance protection (in
amounts sufficient to cover the remaining value of the player's NHL contract for accidental death and
disability and not greater than have heretofore been provided for participation in such events) will be
purchased and paid for by the IIHF prior to the players's departure from North America.

**7.2.3        SCHEDULING OF THE IIHF WORLD CHAMPIONSHIPS**
It is acknowledged that the IIHF World Championships have been scheduled through to 2006. The IIHF
and the NHL will consult on the scheduling of future World Championships and will attempt to avoid
scheduling the World Championships at the same time as the Stanley Cup Finals.

**7.3        WORLD CUP**
It is acknowledged that the NHL and the NHLPA will organize a second World Cup of Hockey
Tournament in the fall of 2004. The NHL and the IIHF agree that the NHL and the NHLPA shall have a
right to schedule and hold additional World Cup of Hockey tournaments from time to time subject to the
agreement of the IIHF not to be unreasonably withheld. Such tournaments shall be approved by the
national association(s) in the country in which the tournament shall be played and such games will be
organized in cooperation with this national association(s).

**7.4        OTHER INTERNATIONAL EVENTS**
The IIHF acknowledges that the NHL may desire to have one or more NHL teams play exhibition games
against one or more IIHF teams, both in and outside of North America. The NHL agrees to obtain
approval from the IIHF for any such exhibition games, such approval not to be unreasonably

15

# APPENDIX II

# EXHIBIT C

withheld. The NHL acknowledges the fact that according to the IIHF statutes the IIHF can approve such games only with the consent of the national association of the country wherein such games are intended to be played. In addition, games involving two NHL teams played outside of North America shall also be subject to the approval of both the IIHF, such approval not to be unreasonably withheld, and the national association of the country wherein such games are intended to be played. The NHL agrees to inform the IIHF about such intention before any negotiations start with IIHF teams, arenas, etc. The IIHF will not approve any exhibition game involving an NHL team without the consent of the NHL.

**7.5       UNAUTHORIZED OFF-SEASON EVENTS**
The IIHF and each of its national associations hereby accept and acknowledge that every NHL player who is under an existing player contract with an NHL team has an express contractual obligation to play hockey only for the NHL team, and is therefore not entitled to play hockey for any other team or organization, or in any non-NHL game or exhibition, without the express written consent of the NHL and the NHL team. Accordingly, the IIHF and each of its national associations agree not to organize, sanction, or consent to any hockey game, hockey exhibition, or other on-ice hockey event which features the participation of an NHL player or players without having consulted in the first instance with, and having received the prior written consent of, the NHL/NHLPA. Moreover, the IIHF and each of its national associations agree to use their best efforts to promptly report to the NHL (or to the IIHF in the case of the national associations) whenever they become aware of plans for any hockey game, hockey exhibition, or other on-ice hockey event which features the participation of an NHL player or players, regardless of whether they (the IIHF or one of its national associations) have been asked to sanction or consent to such event.

The NHL/NHLPA may or may not agree to a player's participation in a non-NHL/NHLPA proposed game, exhibition or other on-ice hockey event in their sole discretion and, where NHL/NHLPA consent is provided, it will be provided on the following basis: (1) for each NHL player participating, the organizing body must obtain and produce to the NHL written consent from that player's NHL General Manager before the player can be permitted to participate; (2) for each NHL player participating, the organizing body must obtain and produce to the NHL written evidence that the player has been adequately insured for accidental death and disability for 100% of the value of the remaining term of his NHL player contract; and (3) the organizing body must demonstrate that 100% of any proceeds generated by the game, exhibition, or other on-ice event will be directed to a charity acceptable to the NHL/NHLPA.

In the event that, at any time during the term of this Agreement, the IIHF or a national association does, in fact, organize, sanction, or consent to any game, exhibition, or other on-ice hockey event which features the participation of a player or players under contract to an NHL team without obtaining the prior consent of the NHL/NHLPA, such national association shall be liable for a penalty fee payable to the NHL of USD $100,000.00 (one hundred thousand U.S. dollars).

**8.       JOINT WORKING GROUP**
The joint working group that was established by the NHL and the IIHF under the previous Agreement between the NHL and the IIHF in respect of, among other things, the logistics of player transfers between NHL teams and IIHF teams will (a) review the operation of this Agreement and discuss their future relationship, and (b) explore opportunities for a game or series of games being played between the Stanley Cup Winner and the European Champion team as determined and specified by the IIHF, and (c) explore the joint development of a European professional ice hockey league, and (d) consult further on the NHL's role in marketing the World Championships, particularly on television, in North America

16

# APPENDIX II

# EXHIBIT C

and elsewhere. The joint working group may also consider any other matters referred to it by the President of the IIHF or the Commissioner of the NHL.

## 9.        GENERAL PROVISIONS
### 9.1        BINDING EFFECT
The IIHF represents that upon obtaining the necessary approvals to sign this Agreement the Agreement will be binding on the IIHF national associations. The NHL represents that upon obtaining the necessary approvals to sign this Agreement the Agreement will be binding on all current and future NHL teams. The NHL recognizes that this Agreement requires the approval of the national associations of the following countries: the Czech Republic, Finland, Germany, Russia, Slovakia, Sweden, and Switzerland. The IIHF recognizes that this Agreement requires the approval of the NHL Board of Governors and the NHLPA.

The NHL may withdraw from this Agreement and cease making further payments in respect of the NHL season(s) following the NHL season in which the Agreement becomes not binding on the national associations or, alternatively, may request the renegotiation of the Agreement if the Agreement should no longer bind the national associations (including the leagues within each of the national territories of these national associations and the IIHF teams affiliated to those leagues or the IIHF teams playing in those countries) of any of the following countries: Czech Republic, Finland, Germany, Russia, Slovakia, Sweden and Switzerland.

Nothing in this Agreement is intended to nullify any obligations a player had or may have to his IIHF team under his player contract or according to IIHF statutes, by-laws and regulations, provided any such obligations are not otherwise inconsistent with the provisions of this Agreement.

### 9.2        NHL WARRANTIES
The NHL warrants that neither the NHL nor any NHL team will enter into separate negotiations or conclude separate agreements with any IIHF teams regarding the release and transfer to the NHL of any player under contract to a IIHF team. No NHL team may offer any money or other thing of value in exchange for a player's release except insofar as such funds are paid directly by the IIHF from the amounts described in articles 2.2, 3.1, 3.2, 3.4, and 9.4 of this Agreement.

The NHL warrants that the present Collective Bargaining Agreement with the NHLPA limits generally the eligibility of players for the NHL to players aged 19 years or older subject to the right of an 18 year old player to opt to be eligible for selection in the annual NHL Entry Draft.

### 9.3        IIHF WARRANTIES
The IIHF warrants that neither the IIHF, any national association, nor any IIHF team will enter into separate negotiations or conclude separate agreements with any NHL team or any player regarding the release and transfer to the NHL of any player under contract to a IIHF team. No IIHF team may accept any money or other thing of value in exchange for a player's release except that insofar as such funds are paid directly from the IIHF as described in article 2.2, 3.1, 3.2, 3.4, and 9.4 of this Agreement.

### 9.4        DISTRIBUTION OF NHL PAYMENTS
The IIHF and the IIHF national associations shall at their sole discretion decide how all NHL payments under this Agreement shall be utilized.

17

# *APPENDIX II*

## *EXHIBIT C*

**9.5        TERM**
This Agreement shall be effective from the date hereof and shall continue through and including the conclusion of the 2003/04 season.

**9.6        MILITARY SERVICE**
Nothing in this Agreement is intended to permit any player to avoid his country's obligation of compulsory military service. The NHL will transmit electronically to the IIHF each year a copy of its final Central Scouting Rankings of players outside North America organized by country origin. The IIHF will promptly return that list to the NHL and the list shall be annotated to indicate a player's current contractual status and to identify those players that IIHF national associations claim in good faith to be subject to an obligation of military service and the dates covered by that obligation.

**9.7        APPLICABLE LAW**
This Agreement shall be governed by the substantive laws of Switzerland, without reference to conflict of law rules.

**9.8        INTEGRATION**
In relation to player transfers between the NHL teams and the IIHF teams this Agreement replaces all previous related Agreements.


Signed this 9th day of June 2001.


NATIONAL HOCKEY LEAGUE              INTERNATIONAL ICE HOCKEY FEDERATION


By: */s/ Gary B. Bettman*                  By: */s/ Rene Fasel*
        Gary B. Bettman                              Rene Fasel
        Its: Commissioner                            Its: President

By: */s/ William L. Daly*                  By: */s/ Jan-Åke Edvisson*
        William L. Daly                               Jan-Åke Edvinsson
        Its: Executive Vice President                 Its: General Secretary
        Chief Legal Officer


18