IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

                            Plaintiff,                    Case No: 1:05 CV 02094 (HHK)

      -against-

ALEXANDER SEMIN, et al.,

                            Defendants.

## PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN REPLY TO THE OPPOSITION OF ALEXANDER SEMIN TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO SEMIN'S MOTION TO DISMISS

Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Telephone: (212) 969-3000

-and-

Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC 20036-2396
Telephone: (202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey
Limited Liability Company, doing
business as the Washington Capitals*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ................................................................................................. 3

I.   SEMIN'S CLAIM OF *FORUM NON CONVENIENS* SHOULD BE REJECTED
     AND THIS ACTION SHOULD PROCEED IN THIS COURT ........................................ 3

     A.   Semin Has Wholly Failed to Meet His Threshold Burden
          To Demonstrate That an Adequate Alternative Forum Exists ................................ 3

     B.   Semin Has Failed To Demonstrate That The
          Balancing of Interests Favors Transfer ...................................................... 4

          1.   The Private Interests in this Case Do Not Favor Transfer ........................... 6

          2.   The Public Interests in this Case Do Not Favor Transfer .......................... 10

II.  THE ACT OF STATE DOCTRINE DOES NOT PREVENT
     THIS COURT'S CONSIDERATION OF THIS CASE ............................................... 13

III. THIS DISPUTE IS NOT SUBJECT TO MANDATORY
     ARBITRATION UNDER THE NHL/IIHF AGREEMENT THAT
     THE ICE HOCKEY FEDERATION OF RUSSIA HAS REJECTED ............................... 17

IV.  THE REQUESTED PRELIMINARY INJUNCTION SHOULD BE GRANTED ........... 19

     A.   Semin Does Not Meet the Burden Imposed On Him
          By His Assertion Of An Impossibility Defense ............................................. 20

          1.   Semin Has Not Demonstrated that the Purported
               Impossibility on Which He Now Relies Is Real ..................................... 20

          2.   Semin Created the Alleged Impossibility on Which He Now Relies ........ 22

          3.   Semin Failed to Make a Good Faith Effort To Return
               To the Washington Capitals for the 2005-06 NHL Season ...................... 24

CONCLUSION ............................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**PAGE(s)**

### CASES

*Abu Ali v. Ashcroft,*
   350 F. Supp. 2d 28 (D.D.C. 2004) ........................................................................15

*Averbach v. Vnescheconombank,*
   280 F. Supp. 2d 945 (N.D. Cal. 2003) ..................................................................12

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (1964) ...................................................................................13, 14

*Bergman v. Parker,*
   216 A.2d 581 (D.C. 1966) .............................................................................20, 24

*Century Int'l Arms, LTD. v. Fed. State Unitary Enter. State Corp. Rosvoorouzhenie,*
   172 F. Supp. 2d 79 (D.D.C. 2001) ........................................................................12

*Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n,*
   361 F.3d 676 (2d Cir. 2004) ..............................................................................12

*El-Fadl v. Cent. Bank of Jordan,*
   75 F.3d 668 (D.C. Cir. 1996) ...........................................................................3, 4

*Films by Jove, Inc. v. Berov,*
   154 F. Supp. 2d 432 (E.D.N.Y. 2001) ....................................................................12

*Gross v. Owen,*
   221 F.2d 94 (D.C. Cir. 1995) ..............................................................................6

*Grupo Protexa, S.A. v. All Am. Marine Slip,*
   20 F.3d 1224 (3d Cir. 1994) ..............................................................................14

*Gulf Oil Corp. v. Gilbert,*
   330 U.S. 501 (1947) ..............................................................................3, 5, 6, 11

*In re Bridgestone/Firestone, Inc.,*
   420 F.3d 702 (7th Cir. 2005) ..............................................................................5

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
   153 F.3d 82 (2d Cir. 1998) ..............................................................................12

*Lamb v. Phillip Morris, Inc.,*
   915 F.2d 1024 (6th Cir. 1990) ...........................................................................15

*Mason v. Smithkline Beecham Clinical Labs.*,
    146 F. Supp. 2d 1355 (S.D. Fla. 2001) ............................................................. 8

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) .................................................................... 19

*Nemariam v. Fed. Democratic Republic of Eth.*,
    315 F.3d 390 (D.C. Cir. 2003) ................................................................... 4, 5

*Pain v. United Techs. Corp.*,
    637 F.2d 775 (D.C. Cir. 1980), *cert. denied*, 454 U.S. 1128 (1981) ....................... 5, 6, 11

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) .................................................................................. 4

*SEC v. Savoy Indus., Inc.*,
    587 F.2d 1149 (D.C. Cir. 1978) .................................................................... 8

*Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr. Ltd. Pshp.*,
    24 F. Supp. 2d 66 (D.D.C. 1998) ................................................................. 5, 8

*Sheraton Operating Corp. v. Just Corporate Travel*,
    984 F. Supp. 22 (D.D.C. 1997) ................................................................... 11

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,
    382 F.3d 1097 (11th Cir. 2004) .................................................................... 5

*Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*,
    196 F. Supp. 2d 21 (D.D.C. 2002) ............................................................. 6, 8, 11

*Tramp Oil & Marine, Ltd. v. M/V Mermaid I*,
    743 F.2d 48 (1st Cir. 1984) ...................................................................... 12

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) ................................................................................ 13

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) .............................................................................. 20, 24

*Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*,
    133 F. Supp. 2d 1 (D.D.C. 1999) ................................................................ 14

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) ........................................................................... 13-14, 15

**STATUTES**

28 U.S.C. § 1404(a) ...........................................................................................................8

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 264 cmt. b...................................................20, 24

**PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals (the "Washington Capitals"), submits this Statement of Points and Authorities in further support of its motion for a preliminary injunction, in reply to the Statement Of Points And Authorities submitted by Defendant Alexander Semin ("Semin"), dated November 25, 2005 (the "Semin Opp."), and in opposition to Semin's Motion to Dismiss the Washington Capitals' Complaint.

On November 4, 2005, this Court entered an order that required Alexander Semin to appear for a deposition in the Russian Federation within ten days. Semin failed to appear, and his attorney has ignored the Washington Capitals' requests that he reschedule the deposition. *See* the Reply Declaration of Scott A. Eggers, dated November 29, 2005 (the "Eggers Reply Decl.") ¶3. The Court's November 4 order also required Semin to produce the documents requested by the Washington Capitals within one week. Semin did not comply with that aspect of the order either. Eggers Reply Decl. ¶3.

Most importantly, the Court's November 4 order provided that, pending the hearing and determination of this motion, Semin and his agent Gandler were enjoined and restrained from any and all efforts to make, or any actions to facilitate the making of, and contract, agreement, trade, loan or other arrangement whereby Semin will play hockey for any professional hockey team or organization other than the Washington Capitals. According to press reports from Russia, since the Court's order of November 4, Semin has been traded by the Russian team Lada Togliatti and is now playing for a team in the Russian Super League called Khimik. Eggers Reply Decl. ¶3.

Although Semin (at least) would appear to have facilitated a trade from Lada Togliatti to Khimik, which would be a violation of this Court's order, Semin now asks the Court to "stay"

discovery. Although Semin does not challenge the jurisdiction of this Court over him personally, Semin claims that the Court "has no compulsory process powers with respect to any discovery in the Russian Federation." Semin Opp. at 15-16. And he cryptically claims that he is unable to "provide any discovery regarding his military status without *jeopardizing his relationship* with the Russian military." Semin Opp. at 16 (emphasis added). Why the revelation of the facts concerning Semin's "military status" would "jeopardize" his relationship with the military is not explained, although the import of the statement becomes clear once it is confirmed that Semin is not actually performing military service by playing hockey for a professional hockey team. *See* the Reply Declaration of Anna Beliakova, dated November 29, 2005 (the "Beliakova Reply Decl."), submitted herewith. The arrangements with respect to Semin's "military service" are a sham.

Semin raises various issues that he claims make this an inappropriate forum for this dispute, such as the *forum non conveniens doctrine*, the act of state doctrine and the arbitration clause contained in the expired agreement between the National Hockey League and the International Ice Hockey Federation. Semin fails to carry his burden on any of these arguments. *See* Points I, II and III, *infra*, respectively.

Semin's only claim on the merits is that he may have a defense of "impossibility" to the Washington Capitals' breach of contract claim, because he is supposedly performing military service in Russia. Semin has failed to meet his burden to establish the elements of this defense. Among other things, Semin appears to have been involved in the "arrangements" whereby his "military service" obligation arose. A party to a contract cannot create a condition and then point to the condition that they have created and claim that it makes performance "impossible." And the fact that Semin fired his agents at IMG because they insisted on having Semin play in

the NHL, and had made a "deal" to get Semin out of his alleged "military obligation," establishes that Semin's performance was not "impossible," merely "inconvenient." Semin cannot establish the defense. *See* Point IV.

The Washington Capitals' motion for a preliminary injunction should be granted. Semin's motions to dismiss and to stay discovery should be denied. The Washington Capitals are entitled to discover, among other things, whether Semin and his agent Gandler have violated this Court's order of November 4.

## ARGUMENT

I.    **SEMIN'S CLAIM OF *FORUM NON CONVENIENS* SHOULD
BE REJECTED AND THIS ACTION SHOULD PROCEED IN THIS COURT**

Semin contends that this action should be dismissed on the ground of *forum non conveniens*, arguing that a Russian tribunal could more easily apply Russian law, that some potential witnesses are located in the Russian Federation and that the Russian Federation has a greater interest in this dispute than do the courts of this nation. *See* Semin Opp. at 6-8. Semin fails to carry his heavy burden to demonstrate that the balance strongly favors a different forum and that this is one of "those rather rare cases where the doctrine [of *forum non conveniens*] should be applied" to disturb a plaintiff's choice of forum. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947).

A.    **Semin Has Wholly Failed to Meet His Threshold Burden
To Demonstrate That an Adequate Alternative Forum Exists**

"At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676-77 (D.C. Cir. 1996) (holding district court abused its discretion in determining there was an adequate

alternative forum).  This is a "prerequisite" to any dismissal on *forum non conveniens* grounds. *Nemariam v. Fed. Democratic Republic of Eth.*, 315 F.3d 390, 392 (D.C. Cir. 2003); *see also El-Fadl*, 75 F.3d at 677 ("[o]nly if there is an adequate alternative forum must the court then weigh the relative conveniences to the parties against the presumption of the plaintiff's forum selection").  It is the defendant's burden to demonstrate that an adequate alternative forum exists. *See El-Fadl*, 75 F.3d at 677.

In order to meet this burden, the defendant must show, and the court must expressly determine, that another adequate forum exists where the plaintiff can litigate essentially the same claim.  *Id.*  "To show the existence of an adequate alternative forum, the defendant 'must provide enough information to enable the District Court' to evaluate the alternative forum."  *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981)).

Semin wholly fails to meet this threshold burden.  Indeed, Semin provides the Court with *no* information regarding the existence of an adequate alternative forum, except to state in conclusory terms that the existence of such a forum "clearly is the case here."  Semin Opp. at 6. Absent any evidence to support such an *ipse dixit* conclusion, Semin has failed to meet his burden.  Accordingly, on this ground *alone*, Semin's motion to dismiss this action on *forum non conveniens* grounds should be denied.

**B.** **Semin Has Failed To Demonstrate That The
     Balancing of Interests Favors Transfer**

If Semin had made any effort to demonstrate that there is an adequate alternative forum, and if the Court were to determine that Semin had met his burden – all entirely hypothetical because Semin has done no such thing – then the Court would proceed to the balancing test

articulated by the Court of Appeals for the District of Columbia Circuit, which requires that the Court:

> consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiff's initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Nemariam*, 315 F.3d at 392-93 (quoting *Pain v. United Techs. Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980), *cert. denied*, 454 U.S. 1128 (1981)) (emphasis in original).

The defendant "bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate and that the action should therefore be dismissed." *Pain*, 637 F.2d at 784. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Pain*, 637 F.2d at 783 (quoting *Gulf Oil Corp.*, 330 U.S. at 508); *see also In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005) ("[b]efore a court should grant a defendant's motion, the plaintiff's chosen forum must be oppressive and vexatious to the defendant, out of all proportion to the plaintiff's convenience") (internal quotations omitted)). The presumption in favor of the plaintiff's choice of forum "is at its strongest when the plaintiffs are citizens, residents, or corporations of this country." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004). The deference afforded the plaintiff's choice of forum is even greater still where "plaintiff is a resident of the chosen forum and the activities forming the basis of the suit have a significant connection with the forum." *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr. Ltd. Pshp.*, 24 F. Supp. 2d 66, 70 (D.D.C. 1998).

5

To overcome this presumption, the defendant must demonstrate, first, that the private interests at stake are in or near "equipoise" and, if so, that the public interests at stake favor the foreign forum. *See Pain*, 637 F.2d at 784-785. In analyzing the private interests, again, "the burden is on the party seeking transfer to demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in [its] favor." *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (internal quotations omitted); *see also Gross v. Owen*, 221 F.2d 94, 95 (D.C. Cir. 1995) ("[i]t is almost a truism that a plaintiff's choice of a forum will rarely be disturbed . . . unless the balance of convenience is strongly in favor of the defendant").

### 1.    The Private Interests in this Case Do Not Favor Transfer

The private interests to be considered in a *forum non conveniens* analysis are:

> [The] relative ease of access to sources of proof; availability of
> compulsory process for attendance of unwilling, and the cost of
> obtaining attendance of willing, witnesses; possibility of view of
> premises, if view would be appropriate to the action; and all other
> practical problems that make trial of a case easy, expeditious and
> inexpensive. There may also be questions to the enforcibility [sic]
> of a judgment if one is obtained. The court will weigh relative
> advantages and obstacles to fair trial.

*Pain*, 637 F.2d at 782 (quoting *Gulf Oil Corp.*, 330 U.S. at 508). In this case, the private interests at stake clearly favor this forum.

Semin is not the only party to this action. The three other parties to this action, the Washington Capitals, Mark Gandler ("Gandler") and International Sports Advisors Company, Inc. ("ISA"), are all citizens of the United States. Semin has offered no valid reason why the Washington Capitals should be required to litigate their claims against Gandler, a New Jersey resident, and ISA, a New Jersey corporation, in Russia.

6

Each of these parties has retained counsel in this action, each has had access to sources of proof pertinent to the Washington Capitals' claim, each has appeared before the Court in this action, and each may be compelled by the Court to testify. Indeed, three of the four parties from whom the Washington Capitals have sought discovery with respect to its claims (Gandler, ISA, and Semin's former agents at IMG, which is headquartered in Ohio), are citizens of the United States. Intervenor the National Hockey League Players' Association is based in Toronto, Ontario and has members located in the United States, including in this district. Each of these parties and non-party witnesses would be inconvenienced if this action were to be transferred to a Russian court.

That leaves Semin himself and the unidentified witnesses whom Semin's counsel believes are relevant to the issue of Semin's military service. *See* Semin Opp. at 7-8. As for Semin himself, he signed a contract to play hockey in Washington, D.C. in exchange for millions of dollars in compensation. Semin does not suggest that he is not subject to jurisdiction in this Court. Nor does Semin suggest that he is unwilling to testify in this case. Although Semin has so far disregarded an order of this Court directing him to appear for a deposition and his counsel has failed to respond to a request that he produce his client for a deposition, Semin can be compelled to appear for a deposition. The fact that Semin's testimony may need to be recorded on videotape in Moscow rather than presented live in this Court does not tip the balance in favor of a trial in Russia.[1]

---

[1]    It should be noted that the Washington Capitals did not file a jury demand with its complaint. The Court is unlikely to have any difficulty evaluating Semin's demeanor in a videotaped deposition, should Semin prove unwilling to travel.

That leaves only the unidentified "Russian military officials" whom Semin identifies as "most critical" to his case. *See* Semin Opp. at 7. Citing the existence of some unnamed "critical witnesses" does not suffice to meet the movant's burden on a *forum non conveniens* motion. Rather, the moving party must demonstrate through affidavits or otherwise who the witnesses are, what they will testify to, and whether the witness is in fact unwilling to travel to the forum or to be deposed abroad. *See Thayer/Patricof*, 196 F. Supp. 2d at 33 (collecting cases); *see also Mason v. Smithkline Beecham Clinical Labs.*, 146 F. Supp. 2d 1355, 1361-62 (S.D. Fla. 2001) (transfer motion based on unavailability of witness may be denied where defendant does not identify any witness or show that the witness would be unwilling to testify).[2]

Semin has made no effort to demonstrate these facts. To the contrary, he claims that if this Court does not dismiss the action on *forum non conveniens* grounds, the case should be dismissed in favor of arbitration under the NHL/NHLPA Collective Bargaining Agreement. *See* Semin Opp. at 11-12. Whatever the limitations on a federal court's ability to compel the testimony of witnesses abroad, it can be fairly assumed that the Court has a broader ability to effectuate such a result (for example, under the Hague Convention) than does an arbitrator. Semin would jeopardize his ability to obtain any testimony from his unidentified "critical witnesses" by requesting arbitration instead. Obviously, Semin cannot credibly claim that these witnesses somehow become "critical" depending on the forum in which they would or would not be testifying.

---

[2] Although the *Thayer/Patricoff* and *Mason* decisions involved motions to transfer venue under 28 U.S.C. § 1404(a), rather to dismiss on *forum non conveniens* grounds, the D.C. Circuit has indicated that the same factors apply. *See Shapiro Lifschitz & Schram*, 24 F. Supp. 2d at 71 n.4 (citing *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1153 (D.C. Cir. 1978)).

8

Even if Semin had made some effort to identify some witness whose testimony was "critical" to explain his "military" status, the Court is not being asked to decide whether Semin's alleged conscription was valid under Russian law, or even to declare whether Semin is presently serving in the Russian military. Rather, the Court is being asked to enjoin Semin from playing professional hockey, in order to enforce his contract with the Washington Capitals. That is a question of U.S. law and it requires a relatively simple inquiry: whether Semin is playing professional hockey for a team other than the Washington Capitals.

Semin has asserted an "impossibility" defense based on his alleged conscription, and has proffered some documents to justify a claim that he is performing military service by playing hockey for the Russian hockey team Lada Togliatti (which documents are in fact not from any military organization and do not address the fact that Semin is apparently no longer playing hockey for that team). This defense does not turn some unidentified Russian military officials into "critical witnesses," for several reasons. First, the defense is likely unavailable to Semin. *See* Point IV, *infra*. Second, even if this defense were available to Semin, the defense raises an issue not of Russian military procedure, but rather of Russian law. As stated in the Beliakova Reply Declaration, Russian law makes no provision for a citizen to perform military service by playing hockey for a professional hockey team, or for a societal organization. *See* Beliakova Reply Decl. ¶20. Furthermore, Russian law makes no provision for a societal organization to "transfer" Russian "soldiers" to professional hockey teams. These are not questions of Russian military "procedure" that only "Russian military officials" can address. To the contrary, these are questions of Russian law.

The only other factor that Semin addresses in considering the private interests of the parties is that the "all relevant documents" are in Russian. *See* Semin Opp. at 7. That is a vast

overstatement.  The Semin Contract with the Washington Capitals is in English, as are his

contracts with his agents IMG and later Gandler.  Thus, the contracts at issue, as well as most of

the correspondence between the parties, are in English, and would have to be translated into

Russian for a Russian court.  The governing law is United States law, which would likely have to

be summarized and translated as well.  To be sure, there are some documents that must be

translated in this case no matter what forum it proceeds in, but there is probably more translation

to be done if it proceeds in Russia.  Thus, far from overcoming the heavy presumption in favor of

this forum, this argument actually tips the balance in favor of this Court's exercise of

jurisdiction.

Semin has not demonstrated that the private interests in this case favor transfer, nor has

he demonstrated even that the private interests are "in equipoise."  Therefore, once again, the

next step in the analysis need not even be reached and the heavy presumption in favor of a U.S.

residents' choice of a domestic forum for the resolution of a claim having a direct connection to

the forum should be upheld.  Nevertheless, even if the Court were to reach the next step in the

analysis and consider the public interests at stake, the analysis would still require the denial of

Semin's motion.

### 2.    <u>The Public Interests in this Case Do Not Favor Transfer</u>

The public interests to be considered have been stated by the Court of Appeals for the

District of Columbia Circuit as follows:

> Administrative difficulties follow for courts when litigation is piled
> up in congested centers instead of being handled at its origin.  Jury
> duty is a burden that ought not to be imposed upon the people of a
> community which has no relation to the litigation.  In cases which
> touch the affairs of many persons, there is reason for holding the
> trial in their view and reach rather than in remote parts of the
> country where they can learn of it by report only.  There is a local

> interest in having localized controversies decided at home. There
> is an appropriateness, too, in having the trial of a diversity case in a
> forum that is at home with the state law that must govern the case,
> rather than having a court in some other forum untangle problems
> in conflict of laws, and in law foreign to itself.

*Pain*, 637 F.2d at 782 (quoting *Gulf Oil Corp.*, 330 U.S. at 508-09). These "public interests"

also favor the present forum.

The claim in this case concerns the breach of a contract to perform services in the District

of Columbia. Semin chose to contract to perform services in the District of Columbia and, for

one year at least, he performed the services required under the contract. Under such

circumstances, the statement of the Court in *Sheraton Operating Corp. v. Just Corporate Travel*,

984 F. Supp. 22, 26-27 (D.D.C. 1997) is apt here as well: "[t]he Court is not unsympathetic to

the defendant's argument that it will be a burden to defend the litigation in Washington, D.C.;

however, the defendant should have considered that possibility before it chose to do business in

Washington, D.C." The Court's conclusion in *Sheraton* rests on the basic notion that the forum

where a contract was signed and to be performed retains an interest in its enforcement. *See*

*Thayer/Patricof*, 196 F. Supp. 2d at 37 (citing cases).

The law governing the Semin Contract is the law of the United States. Thus, the public

interest "in having the trial in a forum that is familiar with the law governing the action," *see*

Semin Opp. at 6, actually favors this forum, not Russia. A Russian court may be expected to be

wholly unfamiliar with that governing law. Thus, the other factor that Semin identifies as

strongly favoring a Russian forum – the "avoidance of unnecessary problems in conflict of laws

or in the application of foreign law," *see* Semin Opp. at 6 – actually favors this forum as well.

11

Semin claims that "to resolve the parties' dispute, this Court would have to interpret and apply the Russian military law, rules, regulations, practices and orders." Semin Opp. at 7. As explained above and in Point II, *infra*, the Court may need to decide certain issues of Russian law in this case in determining whether Semin was "assigned" to perform military service by playing professional hockey for a million dollars or more. But the fact that Russian law makes such an "arrangement" impossible as a legitimate matter is easily shown. *See* the Beliakova Declaration and the Beliakova Reply Declaration.

As the Court of Appeals for the First Circuit has explained:

> Even should it be determined that the resolution of certain questions of foreign [] law is necessary in order to determine plaintiff's right[s] . . . this in no way alters the fact that plaintiff's cause of action, and the ultimate issue in the case, arise under and involve United States law. Of course, to the extent foreign law also becomes material, the district court is not without means to investigate and determine what that law is.

*Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 743 F.2d 48, 52 (1st Cir. 1984). Indeed, federal courts in the United States have frequently applied Russian law and interpreted questions thereunder. *See, e.g., Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n*, 361 F.3d 676, 685-86 (2d Cir. 2004); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92-94 (2d Cir. 1998); *Averbach v. Vnescheconombank*, 280 F. Supp. 2d 945, 952-56 (N.D. Cal. 2003); *Films by Jove, Inc. v. Berov*, 154 F. Supp. 2d 432, 448-77 (E.D.N.Y. 2001); *Century Int'l Arms, LTD. v. Fed. State Unitary Enter. State Corp. Rosvoorouzhenie*, 172 F. Supp. 2d 79, 90-91, 94-95 (D.D.C. 2001).

Accordingly, Semin has failed to meet his burden at every step of the analysis. The heavy presumption in favor of this forum has not been overcome, and Semin's motion to dismiss this action on *forum non conveniens* grounds should be denied.

## II.    THE ACT OF STATE DOCTRINE DOES NOT PREVENT THIS COURT'S CONSIDERATION OF THIS CASE

Semin claims that the act of state doctrine precludes this Court "from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *See* Semin Opp. at 9-10 (citing, *inter alia, Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)). Semin also claims that if a foreign sovereign's official acts are even tangentially related to this case, then the Court must abstain from deciding the case and the Washington Capitals must seek redress through "diplomatic channels." *See* Semin Opp. at 9. Based on this misconception of the breadth of the act of state doctrine, Semin claims that this Court must dismiss this case because it would require a ruling on the validity of Semin's alleged conscription into the Russian military. *See* Semin Opp. at 10. Semin's reliance on the act of state doctrine is misplaced.

The doctrinal underpinnings of the act of state doctrine have evolved over time. The doctrine was originally conceived to ensure that United States courts gave the proper respect and deference to the acts of foreign sovereigns and arose out of concerns of international comity. *See W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990). The Supreme Court has "more recently described it, however, as a consequence of domestic separation of powers." *Id.*

In its current formulation, this prudential rather than jurisdictional rule is based on the concept that the engagement of the federal judiciary in ruling on the validity of acts of a foreign sovereign may hinder the conduct of foreign affairs. *Id.* at 404, 406. As such, the Court must engage in a balancing approach in deciding whether to apply the act of state doctrine, because in certain instances "even though the validity of the act of a foreign sovereign within its own

13

territory is called into question, the policies underlying the act of state doctrine may not justify its application." *Id.* at 409.  This balancing approach is necessary to avoid a court's unquestioning acceptance of the acts of a foreign sovereign where the underlying rationale for the doctrine shifts the balance against its application in a particular matter.  *Id.*

The party invoking the act of state doctrine has the burden to prove that it applies.  *See Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999).  To meet this burden, a party must offer evidence that the foreign government acted in its sovereign capacity and some indication of the depth and nature of the foreign government's interest. *Grupo Protexa, S.A. v. All Am. Marine Slip*, 20 F.3d 1224, 1237 (3d Cir. 1994).  Furthermore, a court must analyze on a case-by-case basis whether there is evidence of a potential institutional conflict between the judicial and political branches of the United States government "such that a judicial inquiry into the validity of a foreign state's actions could embarrass the political branches in their conduct of foreign affairs."  *Id.*  "'The less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.'"  *Id.* (quoting *Sabbatino*, 376 U.S. at 428).

The moving party cannot meet this burden without demonstrating that the controversy implicates the type of separation of powers concerns that require invocation of this doctrine.  *See Grupo Protexa S.A.*, 20 F.3d at 1237-38 (refusing to apply the act of state doctrine where the party seeking to invoke the doctrine failed to demonstrate foreign policy concerns of the U.S. government, even though the Court was required to decide the validity of an official act of a sovereign state and assumed that the foreign government had a substantial interest in the case). *See also Moldova*, 133 F. Supp. 2d at 8 (holding that the act of state doctrine was not applicable

14

where Moldova failed to offer sufficient evidence that the political branches of the U.S.

government had considerable involvement or interest in the case at hand).

The application of these principles in this case is well-illustrated by the Supreme Court's

decision in *W.S. Kirkpatrick & Co.* That case involved RICO and Robinson-Patman claims

between two commercial enterprises in which the plaintiff contended that the defendant obtained

a government contract with the Republic of Nigeria by paying bribes to Nigerian officials. *W.S.*

*Kirkpatrick & Co.*, 493 U.S. at 402. The defendants claimed that the act of state doctrine barred

the suit because in order to succeed the plaintiff would need to establish that the Nigerian

officials were bribed, which would call into question the legality of the contract under Nigerian

law. *Id.* at 406. The Supreme Court held that the act of state doctrine did not apply. *Id.* The

Court stated that "[a]ct of state issues only arise when a court *must decide* – that is when the

outcome of the case turns upon – the effect of official action by a foreign sovereign. When that

question is not in the case, neither is the act of state doctrine." *Id.*

The Court concluded that:

> The short of the matter is this: Courts in the United States have the
> power, and ordinarily the obligation, to decide cases and
> controversies properly presented to them. The act of state doctrine
> does not establish an exception for cases and controversies that
> may embarrass foreign governments, but merely requires that, in
> the process of deciding, the acts of foreign sovereigns taken within
> their own jurisdictions shall be deemed valid. That doctrine has no
> application to the present case because the validity of no foreign
> sovereign act is at issue.

*W.S. Kirkpatrick & Co.*, 493 U.S. at 409-10. *See also Lamb v. Phillip Morris, Inc.*, 915 F.2d

1024, 1027 (6th Cir. 1990) (the act of state doctrine does not bar a U.S. court from hearing a case

that would require imputing to foreign officials unlawful motives such as bribery); *Abu Ali v.*

*Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (refusing to apply the act of state doctrine where

15

an American citizen detained in Saudi Arabia sued the United States government; the actions of United States government officials in obtaining the detention were at issue, even if those actions cast doubt on the integrity of the acts of Saudi officials).

Semin has utterly failed to meet his burden in this case.  As stated in the Beliakova Reply Declaration, no official action of the Russian Federation is at issue here.  The documents that Semin has attached to the Berkovich Declaration as proof that he is performing his "military service" by playing professional hockey are – even if they are assumed to be admissible – not evidence of an official action by a foreign sovereign.  Those documents relate to Semin's contract to play hockey for a professional hockey team.  The documents are signed by officials of the hockey team Lada Togliatti and a societal organization, the Air Force Central Sports Club, that bears the same name as an organization of the Russian Air Force but is, in fact, *unrelated* to the Russian military.  *See* Beliakova Reply Decl. ¶¶ 11-19.  Based on this fact alone, the act of state doctrine is inapplicable in this case.

Nor does this case turn on the validity of Semin's alleged "conscription" under Russian law, the only allegedly "official" act involved in this case.  The Washington Capitals do not seek to enjoin Semin from serving in the Russian military and, to decide this case, this Court need not declare whether or not Semin was validly conscripted into the Russian military under Russian law.  Rather, the Washington Capitals seek to enjoin Semin from playing professional hockey, which is something entirely different.  If Semin has a legitimate military obligation, the relief that the Washington Capitals seek would in no way prevent or interfere with him fulfilling that obligation.

16

Even if the Court may be called upon to determine whether or not Semin or his agents were involved in procuring Semin's alleged conscription, for example in deciding whether Semin may raise the defense of "impossibility" based on a condition that he helped to create, the act of state doctrine would still not apply. As in *W.S. Kirkpatrick & Co.*, the Court may assume that Semin's conscription was a valid act of a foreign sovereign and still inquire whether that act was corruptly procured.

Nor has Semin offered any evidence that this Court's inquiry into this matter would embarrass the political branches in their conduct of foreign affairs. Having been presented with no evidence of any involvement or interest in the issues presented by this case by the executive or legislative branches of the U.S. government, nor with any evidence that this breach of contract case treads upon the sovereignty of the Russian Federation, the Court should find that Semin has failed to sustain his burden and decline to apply the act of state doctrine in this case.

## III.    THIS DISPUTE IS NOT SUBJECT TO MANDATORY ARBITRATION UNDER THE NHL/IIHF AGREEMENT THAT THE ICE HOCKEY FEDERATION OF RUSSIA HAS REJECTED

Semin submits a copy of an agreement, dated June 9, 2001, between the NHL and the International Ice Hockey Federation (the "IIHF"). *See* Berkovich Decl. Exh. E (the "IIHF Agreement").[3] Semin argues that (i) this dispute is subject to the terms of the IIHF Agreement and (ii) that this dispute must be arbitrated under the provisions of that agreement. (Semin Opp. at 10-11.) Semin is wrong, for several reasons.

---

[3]    The Washington Capitals agree that the document attached as Exhibit E to the Berkovich Declaration is a true copy of the IIHF Agreement and that the Court may consider that agreement on this motion.

First, the IIHF Agreement expired at the end of the 2003-2004 hockey season. *See* IIHF Agreement ¶ 9.5. The Ice Hockey Federation of Russia (the "IHFR") declined to join the new agreement that was executed in August 2005 by the hockey federations of six other European nations. *See* Eggers Reply Declaration, Exh. A (IIHF press releases announcing that the IHFR declined to ratify the new agreement). In light of its unwillingness to ratify the current NHL/IIHF Agreement, the willingness of the IHFR to agree that the IIHF Agreement would govern this dispute is uncertain. In any event, the Washington Capitals do not have the right under the IIHF Agreement to seek relief against Semin, who is not a party to the IIHF Agreement. *See* IIHF Agreement ¶9.1 (stating that the IIHF Agreement binds the national associations of the IIHF). And in no event does the IIHF Agreement govern any claims between the Washington Capitals and Semin's agents, Gandler and ISA.

Second, even assuming that the IIHF Agreement provided an efficacious remedy here, the agreement would still permit this action. The IIHF Agreement states that "[a]ny dispute as to whether a player is presently subject to a player contract with any NHL team . . . shall be resolved as provided for in any Collective Bargaining Agreement then in effect." IIHF Agreement ¶5.4.1. That is exactly the type of dispute that Semin engages in when he erroneously cites the IIHF Agreement provision on military service, or when he argues that his performance of his NHL contract may be excused on the grounds of "impossibility." As provided in the current NHL/NHLPA Collective Bargaining Agreement, this action may properly be brought in this Court. *See* Washington Capitals' Reply To The Motion To Dismiss Of The NHLPA, dated November 23, 2005.

Third, Lada Togliatti may indeed have violated ¶5.1 of the IIHF Agreement if it did not release Semin from any and all contractual obligations under his former contract with that team,

and by asserting a requirement to the player's services during the term of his NHL contract. Thus, the NHL, which must initiate any arbitration under the IIHF Agreement, may have a remedy under that agreement. *See* IIHF Agreement ¶6.3(a). But the agreement does not provide the Washington Capitals with a remedy against Semin. Therefore, by its terms, this action is not subject to the arbitration provisions of the IIHF Agreement.

## IV.    THE REQUESTED PRELIMINARY INJUNCTION SHOULD BE GRANTED

The Washington Capitals have thoroughly demonstrated an entitlement to injunctive relief under the four-pronged standard set forth by the Court of Appeals for the District of Columbia Circuit. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); Plaintiff's Statement of Points and Authorities in Support of Its Motion for a Preliminary Injunction, dated November 1, 2005 ("Capitals Mem."); Plaintiff's Statement of Points and Authorities in Reply to the Opposition of Defendants Mark Gandler and International Sports Advisors Company, Inc. to Plaintiff's Motion for a Preliminary Injunction, dated November 22, 2005 ("Capitals Reply Mem.").

Semin's only significant counter to the Washington Capitals' showing is that Semin's alleged "military obligation" makes his performance of the Semin Contract "impossible."[4] *See* Semin Opp. at 12-15. Semin's argument fails on several levels.

---

[4]    Notably, Semin makes no claim that the Washington Capitals will not be irreparably harmed if preliminary injunctive relief is not granted, nor does he claim that the issuance of a preliminary injunction runs counter to the public interest. It is patently clear that no defendant in this action can prevail on either of those two prongs of the test to be applied by the Court in deciding the Washington Capitals' motion. *See* Capitals Mem. at 10-11, 12; Capitals Reply Mem at 18-19, n.5.

## A. Semin Does Not Meet the Burden Imposed On Him By His Assertion Of An Impossibility Defense

It is Semin's burden to prove his impossibility defense. *See Bergman v. Parker*, 216 A.2d 581, 583 (D.C. 1966) ("the burden rests upon the party asserting [the impossibility] defense to prove it"). Three factors are significant in determining whether Semin has met this burden. First, the facts must establish "a real impossibility and not a mere inconvenience[.]" *Id.* Second, the "[impossibility] defense is . . . unavailable where the barrier to performance arises from the act of the party seeking discharge[.]" *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996). And, third, "a party who seeks to justify his non-performance [due to intervening government action] must have observed the duty of good faith and fair dealing . . . in attempting . . . to avoid its application." Restatement (Second) of Contracts § 264 cmt. b.

Because Semin has not demonstrated that the purported impossibility is real, because Semin created the alleged impossibility on which he now relies, and because Semin failed to make a good faith effort to avoid its application, Semin cannot prevail on his impossibility defense.

## 1. Semin Has Not Demonstrated that the Purported Impossibility on Which He Now Relies Is Real

It is Semin's burden to demonstrate that his "military obligation" renders his performance of the Semin Contract "impossible." *See Bergman v. Parker*, 216 A.2d at 583. Semin must prove the existence of a "*real* impossibility[.]" *Id.* (emphasis added). Semin's only effort to meet this burden is to submit documents to the Court without attempting to establish their legitimacy. *See* Berkovich Declaration Exhs. A, B, C, D. In fact, the documents are not legitimate, are not signed by any representative of any military organization (with the exception of Semin's "military passport"), and are in fact compelling evidence that Semin's alleged "military service" is a scam. *See* the Beliakova Reply Declaration.

20

Nor did Semin counter any of the evidence presented by the Washington Capitals establishing that "arrangements" for hockey players to perform "military service" by playing professional hockey are not possible under Russian law. *See* the Beliakova Declaration. Semin merely calls these "generic statutes," whatever that means. *See* Semin Opp. at 14. Semin also utterly fails to address the evidence clearly indicating that a "deal" had been made to "release" Semin from his "military obligation" less than one year after Semin was served with a "conscription summons" allegedly binding Semin to two years of military service. *See* Capitals Mem. at 4-5; Capitals Reply Mem. at 2-4.

What the evidence up to this point *does* demonstrate is that it was inconvenient for Semin to return to the Washington Capitals in September 2005 because he did not want to. *See* Barry Dep. at 89-90. In early September 2005, Semin traveled from Togliatti to his home town of Krasnojarsk in Siberia "to get all his stuff to go to Washington," missing Lada Togliatti's first four scheduled games of the 2005-06 regular season "[b]ecause he was making plans to go . . . getting ready to pack up and go to North America." Barry Dep. at 88, 93. Soon thereafter, Semin informed IMG he was "not so sure he wants to come." *Id*. at 90. No more than two days later, Semin fired IMG because he was unhappy with their advice that he return to the Washington Capitals. *See* Barry Dep. at 93-94.

After traveling home to pack his bags to return to Washington, deciding he did not really feel like returning to Washington, and firing IMG because they advised him to return to Washington whether he felt like it or not, Semin *now* asks the Court to find that what he doesn't feel like doing is impossible. This evidence cannot establish an impossibility defense. Accordingly, the Court should reject Semin's impossibility defense for this reason *alone*.

21

**2.    Semin Created the Alleged Impossibility on Which He Now Relies**

Whether or not a real impossibility exists here, the facts thus far adduced also unequivocally suggest that Semin, by and through his agents, *created* the "impossibility" allegedly presented by his "military obligation."

Semin was purportedly "conscripted" into the Russian military by personal delivery of a "conscription summons" on Saturday, September 25, 2004, *one day* before Semin was scheduled to depart for the United States to report to the Washington Capitals' minor league affiliate in Portland, Maine (the "Portland Pirates"). *See* Barry Dep. at 55-57. His former agents, IMG, acknowledge the "timing seems odd." Barry Dep. at 57. After receiving the "conscription summons," Semin continued play with Lada Togliatti in the Russian Super League. *See* Barry Dep. at 69. Not coincidentally, Semin was to receive approximately $1 million to play for Lada Togliatti, but only $92,500 if he reported to the Portland Pirates. *See* Barry Dep. 64.[5] Clearly, it was in Semin's immediate economic interests to stay in Russia. It is unsurprising, then, that IMG felt the same. *See* Barry Dep. at 50-51. And it is similarly unsurprising that in the weeks just prior to Semin receiving his "conscription summons" IMG engaged in a failed attempt on Semin's behalf to have him formally assigned by the Washington Capitals to Lada Togliatti rather than to the Portland Pirates. *See* Barry Dep. at 47-49.

In yet another case of odd timing, in a letter to the Washington Capitals dated September 30, 2004 – the same letter in which IMG informed the Washington Capitals that Semin had been "conscripted" into the Russian military – IMG also addressed a quite sudden turnabout in

---

[5]     Due to the NHL lockout during the 2004-05 season, Semin would have been unable to fulfill his contract by playing for the Washington Capitals. But under the terms of the Semin Contract the Washington Capitals had the right to assign Semin to play for the Portland Pirates for a minor league salary. *See* McPhee Decl., Exh. A; Barry Dep. at 49.

Semin's two-year military obligation, noting: "Fortunately, the management and ownership of the LADA Togliyatti [sic] Hockey Team of the Russian Elite League was able to persuade the military authorities, citing Alexander's status as a world-class athlete, to allow Alexander to serve his military term while playing for their team." Barry Dep. at 62; McPhee Declaration in Support of the Washington Capitals' Motion for Preliminary Injunction, Exh. C. IMG continued in the same letter, "[w]e may also require [Lada Togliatti's] *further assistance* in our attempts in trying to reduce the term of Alexander's military service." Barry Dep. at 62-63 (emphasis added).

These rather odd circumstances lead to a readily apparent conclusion. Semin and his agents believed that it was in their best interests for Semin to stay in Russia and play for Lada Togliatti during the 2004-05 season. IMG attempted and failed to persuade the Washington Capitals to assign Semin to Lada Togliatti. Someone then arranged on Semin's behalf another means to "assign" Semin to Lada Togliatti – procuring Semin's "conscription" into the Russian military. Indeed, regarding one matter where Semin's current agent, Gandler, has no incentive not to tell the truth, Gandler concludes the same: "IMG was involved with Semin's conscription into the Russian military . . . IMG negotiated the terms of his service obligation with then-General Manager of Lada Leonid Vaysfeld, so that Semin could play hockey for Lada." Gandler Decl. ¶ 6. How does Gandler conclude this? He claims never to have discussed Semin's "military obligation" with IMG. *See* Gandler Dep. at 79-81, 114. He *had*, however, talked with *Semin* on approximately 15 occasions between being hired as his agent on September 14, 2005 and his deposition on November 10, 2005. *See* Gandler Dep. at 29.

On the face of these facts, Semin would have the Court believe that this wholly arranged "military obligation" makes the performance of his contract with the Washington Capitals

23

"impossible." The facts readily permit the inference that Semin *created* this "military obligation," either by and through his former agents IMG or with their active assistance. There is no impossibility defense under such circumstances. *See Winstar*, 518 U.S. at 895.

**3.    Semin Failed to Make a Good Faith Effort To Return
To the Washington Capitals for the 2005-06 NHL Season**

The Ice Hockey Federation of Russia stated in 2004 that Semin could play in the NHL after the NHL lockout ended, notwithstanding his alleged "military obligation." *See* Gandler Dep. at 189-191; McPhee Decl. Exh. J. Predictably, then, in the summer of 2005, less than one year into Semin's "military obligation," IMG was moving forward on a "deal" to get Semin out of the Russian military. *See* Barry Dep. at 80. By August 25, 2005, IMG was of the view that it had been "able to work out a deal with the Russian Military." *See id.* at 85. As described above, the evidence indicates that after these arrangements had been made to facilitate Semin's return to the Washington Capitals for the 2005-06 season, Semin decided that he preferred not to return. On the cusp of departing for Washington in September 2005, Semin *unpacked* his bags, fired IMG, hired an agent who has stymied the Washington Capitals' efforts to enforce its contractual rights, and resumed play for Lada Togliatti. Why? Because Semin decided that he did not want to go to Washington after all. Barry Dep. at 89-90.

Where by every indication there was nothing stopping Semin from returning to the Washington Capitals but Semin's own inconvenience, the Court cannot now accept Semin's argument that his return was "impossible." *See Bergman*, 216 A.2d at 583; Restatement (Second) of Contracts § 264 cmt. b.

24

## CONCLUSION

For the reasons stated above and those set forth in its previous submissions, the Washington Capitals' motion for a preliminary injunction should be granted, and Semin's motions to dismiss the complaint and for a stay of discovery should be denied.

Dated: November 29, 2005

Respectfully submitted,

PROSKAUER ROSE LLP

By: s/ Scott A. Eggers
Bradley I. Ruskin (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
Telephone: (212) 969-3000

-and-

By: s/
Robert M. Bernstein
(D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 20th Street, N.W., Suite 800
Washington, DC 20036-2396
(202) 416-6800

*Attorneys for Plaintiff Lincoln Hockey Limited Liability Company, doing business as the Washington Capitals*

25