IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINCOLN HOCKEY LIMITED LIABILITY
COMPANY, doing business as the
WASHINGTON CAPITALS,

        Plaintiff,        Case No.: 1:05 CV 02094 (HHK)

v.

ALEXANDER SEMIN, INTERNATIONAL
SPORTS ADVISORS COMPANY, INC. and
MARK GANDLER,

        Defendants.

**DEFENDANTS' SURREPLY TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

    Defendants, Mark Gandler and International Sports Advisors Company, Inc. (collectively "Gandler") respectfully submit this surreply memorandum in further opposition to Plaintiff Lincoln Hockey Limited Liability Company's, doing business as the Washington Capitals, ("Capitals") Motion for Preliminary Injunction.

**SUMMARY OF ARGUMENT**

    New evidence generated from documents recently produced by Alexander Semin's original agent IMG, as well as the 30(b)(6) depositon of IMG's J.P. Barry, establish conclusively that IMG, Gandler's predecessor, (1) facilitated Semin's playing for Lada in the 2004-2005 season, in direct contravention of the Capitals assignment of Semin to their Portland, Maine farm team, and (2) was fully aware of and actively involved for more than a year in Semin's conscription into and arrangements with the Russian military. To the extent any party interfered with Semin's contract with the Capitals, and it is far from clear in light of Semin's conscription that he is free to leave the military, IMG was that party. This new evidence also serves to upend

two key contentions made by the Capitals in its Complaint and moving papers: (1) that Semin's military conscription constitutes a "sham" and (2) that Gandler's hiring coincided with Semin's refusal to play for the Capitals and thus amounted to tortious conduct on the part of Gandler. Moreover, the Capitals' reply filed on November 22, 2005 inappropriately interjects double hearsay testimony, in the form of patently biased newspaper clippings, which should be stricken from the record.

## UPDATED STATEMENT OF FACTS

IMG's relationship with Semin was consummated on April 22, 2002 just prior to the 2002 NHL draft. (Barry Deposition Transcript, 20-21 attached hereto as Ex. 1). IMG negotiated Semin's three-year contract with the Capitals that began with the 2003-04 hockey season. *Id.* As part of its compensation for representing Semin, IMG received a 4% commission on Semin's salary from the Capitals. *Id.* at 21:15. IMG expects to collect a 4% commission from any future salary and bonuses Semin receives from the Capitals under the terms of Semin's current three-year contract with the team. *Id.* at 21:21.

IMG, unlike Gandler, also negotiates contracts for players with teams in the Russian professional hockey leagues. *Id.* at 13:7-9. In fact, IMG stated that it "provide[d] some advice in some provisions" in connection with Semin's contract to play for Lada Togliatti ("Lada") of the Russian Super League in 2004-05. *Id.* at 20:1-7. Not only did IMG advise Semin regarding provisions in his contract with Lada, IMG also spoke directly to Lada about attempting to persuade the Capitals to assign Semin to Lada prior to the 2004-05 season. *Id.* at 37:2-8. According to IMG, the Capitals would not consent to an assignment. *Id.* at 38:2-12. On September 24, 2004, IMG informed the Capitals that Semin would accept an assignment to the Capitals minor league Portland Pirates team. (September 24, 2004 Letter from D. Goryachkin to

G. McPhee, attached hereto as Ex. 2.)  However, on or about September 25, 2004, Semin was conscripted into the Russian military.  Ex. 1, Barry Tr.  56:16-21.

On September 29, 2004, IMG's Goryachkin e-mailed lawyers for the NHLPA a "letter from Lada that they will fax me tomorrow."  (E-mail and attachments, attached hereto as Ex. 3.)  That letter purported to describe an update to Goryachkin about Semin's conscription.  At deposition IMG's Barry could not explain how Goryachkin "c[a]me to be in possession of a letter that Lada was going to send [Goryachkin] the next day."  (Ex. 1, Barry Tr.  65:21-66:4.)  On September 30, 2004, IMG informed the Capitals that due to Semin's conscription it "was legally impossible for [Semin] to report to the Portland Pirates."  (Ex. 3 at MG/ISA 102.)  Aside from suspending and fining Semin, the Capitals did not institute any lawsuits to compel Semin's return or to enjoin Semin or IMG from aiding Semin's continued play in Russia during the 2004-05 season.

Nearly one year later, on August 24, 2005, the Capitals contacted IMG and asked for an update concerning Semin's return for the 2005-06 season.  (E-mail attached hereto as Ex. 4 at 14/38-15/38.)  The following day IMG's Goryachkin sent the Capitals Donald Fishman an e-mail explaining that "it looks like I was able to work out a deal with the Russian Military."  *Id.* at 14/38.  Goryachkin requested that Fishman not publicly mention the deal because it was "important that this information does not appear in the press prior to the Russian team releasing it first with the concent [sic] of the military."  *Id.* at 13/38.  According to Goryachkin, although Semin still had one more year under his Russian military obligation, the military would allow Semin to return to the United States with the condition that Semin play for the "National Team first."  *Id.*  Goryachkin warned that if Semin did not play for the National Team, the military would "withdraw its con[s]ent" and Semin would be considered a "deserter under the [R]ussian

3

federal law" if he left for the United States. *Id.* Although the Capitals would agree to this condition, later that day Goryachkin informed Fishman that Semin no longer had to play for the National Team as a condition for his release to play for the Capitals. *Id.* Goryachkin, elated by this development, told Fishman that he was "very happy that this sh…t is over" and he also noted that he now "had t[w]o f[r]iends at the Military District of Samara Region!" (E-mail attached hereto as Ex. 5 at 22/38.)

According to IMG's deposition testimony, in early September 2005 Semin missed an appointment to obtain a new visa for his return trip to the United States "and not long after that we were terminated." Ex. 1, Barry Tr. 89:17-19. IMG's Barry testified that IMG was never given an explanation for its termination. *Id.* at 92:2-4. Barry also testified that he assumed that following IMG's termination the "deal" did not come to "fruition." *Id.* at 88:6-7. Gandler testified that due to the publicity surrounding Semin's conscription, Russian military officials would not be able to discharge or release Semin without risking their jobs. (Ex. 6, Gandler Dep. 72:4-17.) This testimony underscores what IMG's Goryachkin told Fishman of the Capitals on August 25, 2005: "It is important that this info does not appear in the press prior to the Russian team releasing it first with concent [sic] of the military."

## ARGUMENT

I. **NEW EVIDENCE SHOWS THAT THE CAPITALS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS**

    A. **Newly Revealed Evidence Shows That Gandler Has Not Intentionally Procured The Breach Of Semin's Contract**

New evidence from IMG's 30(b)(6) designee and its two document productions demonstrates that Semin's conscription is not a "sham" that can be simply ignored or dismissed. The fact that securing a "deal" with the military was clearly considered by the Capitals as a *sine qua non* for Semin's return belies the Capitals argument that Semin's conscription is a sham.

IMG's significant commitment of time and resources in negotiating a "deal" with the military necessarily shows that Semin's conscription, whether legitimately obtained by military officials or not, posed and still poses a very serious and real impediment to Semin's ability to return to the United States. It is undisputed that IMG was intimately involved in Semin's dealings with both Lada and military officials in Russia during its exclusive representation of Semin from April 22, 2002 until September 14, 2005. During that time period, IMG involved itself in all of Semin's professional affairs. IMG negotiated the terms of Semin's three-year contract with the Capitals for which it received a 4% commission. (Barry Tr. 21:12-15.) During the term of that contract with the Capitals, IMG also advised Semin and his family about certain provisions in Semin's contract to play with Lada. *Id.* at 19:25-20:1-7. When Semin became conscripted into the Russian military, IMG communicated with the Capitals informing the team that it was legally impossible for Semin to return. (Ex. 3 at MG/ISA 102.) Moreover, IMG's Goryachkin's particularly close relationship with Lada is reflected by the fact that Goryachkin even drafted a communication *to himself from Lada* concerning Semin's conscription on Lada's behalf. (Barry Tr. 65:7-66:4.) Ultimately IMG's success in brokering a purported "deal" involved Goryachkin's ability to make "two friends" with officials in the Russian military. (Ex. 5)

Not only do IMG's extensive negotiations and prior relationship with Lada and the Russian military show that Semin's conscription was not merely a sham, but the Capitals have also implicitly conceded as much. When the Capitals received word from Goryachkin that the "deal" securing Semin's return to the Capitals was conditioned on the Capitals allowing Semin to play for the Russian national team prior to his return to the United States, the Capitals agreed to this condition. (Ex. 4 at 13/38.) The Capitals' acquiescence to this demand demonstrates that

5

the Capitals knew that Semin's freedom was directly connected to Semin's obligations to the State.

### B. IMG's "Deal" With The Military Was Not Transferable to Gandler

With its extensive year long involvement in Semin's professional career in Russia, including its intimate contacts with both Lada and the military, IMG's purported deal to release Semin from further military obligation could not survive IMG's termination. The Capitals' argument that the alleged deal lost "momentum" upon Gandler's hiring and that he was obligated to coordinate a similar effort to secure Semin's release is absurd.

First, Gandler requested and received Semin's conscription papers from Semin's father shortly after being hired by Semin. Gandler Decl. at ¶ 7. Gandler reviewed those papers and determined that he could not advise Semin that the papers were without force. *Id.* Gandler forwarded those documents to the Capitals' Fishman. *Id.* at ¶ 8. Gandler communicated with Fishman almost daily, keeping him abreast of Semin's situation. In one of those communications, Gandler explained that with all the publicity the Semin controversy was generating it was becoming increasingly difficult for military officials to discharge Semin one year ahead of his release date. (Ex. 6 at 72:4-17.) Indeed, Fishman was aware of this fact because Goryachkin reported it to him in an e-mail on August 25, 2005. (Ex. 4 at 14/38.) Gandler also encouraged the Capitals to become actively involved in discussions with Russian officials.

Second, there exists no evidence that Gandler could marshal the same or similar resources that IMG did. It is evident that relationships were cultivated in various places by Semin's Russian-based agent Goryachkin. Unlike Goryachkin, Gandler has not been living in Russia and representing Semin for the past three years. Unlike IMG, Gandler was not involved with Semin's contract with Lada nor was he involved when Semin was originally conscripted.

6

Moreover, Gandler does not have the luxury of meeting with military officials to secure "deals." By the Capitals' reckoning, Gandler is interfering with a contract if he is unable to secure a "deal" from Goryachkin's friends in the Russian military. Gandler, of course, is not the guarantor of Semin's release from military duty—which duty, it is noted, is by admission of the Capitals own purported expert two years in duration.

### C. No Evidence From IMG Indicates That Semin Hired Gandler To Facilitate A Continuous Breach of Semin's Contract

IMG's testimony squares with Gandler's statement in his declaration that he was hired by Semin because Semin was unhappy with IMG's representation -- not because Gandler would help him remain with Lada. No evidence from IMG indicates or even suggests that Semin's termination of IMG was motivated by a desire to hire Gandler in order to remain in Russia. In fact, it was Barry's testimony that Semin never explained why he terminated IMG. (Ex. 1 at 92:2-4.) Barry could not even state with any degree of certainty that Semin did not like IMG's advice. (Q: And Mr. Semin didn't like that advice? A: No, I don't think so. I assume he did not. I don't know. (Barry Tr. 91:13-15.)) Even assuming Semin fired IMG because he did not like IMG's advice, no evidence exists from any source that Semin hired Gandler to facilitate remaining in Russia or to negotiate a contract in Russia on Semin's behalf. Indeed, there would be no reason to hire Gandler for either of those reasons. Semin was already under contract—a contract negotiated in part by IMG—to play the current season in Lada, and as a citizen of the Russian Federation, Semin does not need IMG or Gandler's assistance to remain there.

### II. THE CAPITALS' REPLY INTERJECTS NEW ALLEGATIONS, ALL BASED ON DOUBLE HEARSAY OR IRRELEVANT, THAT SHOULD BE STRICKEN

First, the Capitals make unsupported hearsay allegations that Gandler's relationship with Petr Vorobiev has some [unstated] connection to Semin's remaining in Russia. To the contrary, Gandler's relationship with Petr Vorobiev has no bearing on Semin remaining in Russia. The

Capitals fail to explain what exactly Gandler would receive from Vorobiev in exchange for keeping Semin in Russia. Although the Capitals describe Vorobiev "as a principal source of Gandler's clients," during Vorobiev's four year tenure at Lada, Gandler has not signed any Lada players to NHL contracts. Reply at 16. And, to this day, five years after Vorobiev departed from Yaroslavl, that team remains a primary source of clients for Gandler.

Second, Gandler's assertions that he does not represent Russian hockey players playing in Russia, but only in connection with their play in the NHL, remains true and uncontradicted. The Capitals' introduction of a hearsay document relating to an agreement between Ak-Bar in the Russian Super League and Gandler does nothing to dispute that fact. Gandler never represented the player in question, Dany Heatley, nor does he now. The facts of that transaction are irrelevant to the Semin situation, and do nothing to contradict Gandler's declaration.

Third, press clippings from Russia purporting to quote Semin are double hearsay, in all probability overlaid with translation inadequacies, and should be stricken from the record.[1]

## CONCLUSION

The Capitals' motion for a preliminary injunction rests on three propositions: double hearsay media reports quoting competitors with an obvious bias against Gandler; the coincidence of Semin's firing IMG and hiring Gandler on the eve of his purported return to Washington; and the fact alone that Semin has not returned. The first proposition is comprised of double hearsay that should be stricken from the record. The second proposition is rebutted conclusively by the IMG testimony and documents demonstrating their involvement and complicity in Semin's

---

[1] Similarly unavailing is the hearsay evidence from Barry's deposition relied upon by the Capitals for the proposition that "it is well-known in the community of agents who represent players that Russian hockey clubs have arranged to have their players conscripted into the Russian military in order to avoid playing in the NHL." Reply at 2. The basis for this conclusion is the alleged sham conscription of two Russian hockey players. This hearsay statement should be excluded from the record evidence in this case along with Barry's unsubstantiated statements concerning Semin's salary in Russia.

conscription and playing in Russia.  The remaining proposition misconstrues a tortious interference claim.  Gandler has no obligation affirmatively to ensure that Semin plays for the Capitals; he simply must not facilitate the contrary.  There is no evidence that he has done so.

For the foregoing reasons, the Capitals' motion for a preliminary injunction should be denied.

Respectfully submitted,


_____/S/_____
William L. Gardner
(D.C. Bar No. 04747)
David M. Hibey
(D.C. Bar No. 466856
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave NW
Washington, D.C. 20004
202.739.5000

Attorneys for Defendants
Mark Gandler and International Sports
Advisors Company, Inc.